EMIL PETROSSIAN - State Bar No. 264222
epetrossian@glaserweil.com
ALEXANDER R. MILLER - State Bar No. 294474
amiller@glaserweil.com
GLASER WEIL FINK HOWARD
   JORDAN & SHAPIRO LLP
600 West Broadway, Suite 2850
San Diego, California 92101
Tel.: (619) 765-4380
Fax: (619) 483-0646

Attorneys for Plaintiff
NEOLOGY, INC.

*Additional Counsel Listed on Signature Page*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEOLOGY, INC., a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> JOSEPH N. MULLIS, an individual; QORE4 LLC, a Nevada limited liability company; and DOES 1 to 20, inclusive, <br><br> Defendants. | CASE NO.: **'25CV1744 BEN DEB** <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Neology, Inc. ("Neology" or the "Company") complains and alleges the following against Defendants Joseph Mullis ("Mullis"), QORE4 LLC ("QORE4," together with Mullis, the "Named Defendants"), and Does 1 through 20, inclusive (collectively, the "Doe Defendants," and together with the Named Defendants, "Defendants"):

<u>**NATURE OF THE ACTION**</u>

1.     This action stems from a concerted scheme by Defendant Mullis and his start-up business, Defendant QORE4, to steal and misuse Neology's trade secret and confidential information for the benefit of QORE4's entry into the market as a

competitive business. This action also relates to the Doe Defendants' false and misleading statements to Neology's customers, which were designed to improperly interfere with Neology's business and harm its reputation in the industry. Neology has reason to believe that the conduct of the Doe Defendants is related to that of the Named Defendants.

2.      The industry in which Neology operates is highly technical and complex. Neology is focused on the design, manufacturing, and integration of sophisticated electronic toll collection systems, radio-frequency identification ("RFID"), automated vehicle identification and classification, enforcement technologies and digital payment platforms. Neology's business is built on hundreds of patented technologies and non-patented trade secrets related to the design, operation, manufacturing, marketing, pricing of its products, complex partnerships, and specialized supply chain relationships.

3.      Defendant Mullis, a former executive of Neology, misappropriated Neology's confidential information and trade secrets while he was employed by the Company. After Mullis had a critical performance failure in his role as General Manager of Neology that appeared to jeopardize his future at the Company, he began creating a personal library of Neology's confidential and trade secret information for his own benefit and for the benefit of his future, competitive business endeavor, QORE4.

4.      In 2023, Neology discovered dozens of confidential and proprietary documents that Mullis sent to his personal email account and had refused to return to Neology after his departure from the Company in 2022. Despite requests from Neology shortly after his departure, Mullis repeatedly refused to identify and return Neology's information in his possession, which was a violation of his employment agreement. Neology only later discovered that Mullis had taken and refused to return numerous documents containing Neology's confidential information and trade secrets. There was no business reason for Mullis to send Neology's confidential information and trade

secrets to his personal email account because he had access to the Company's email system and a Company-issued laptop.

5.    Shortly after departing Neology with a trove of the Company's confidential and trade secret information, Mullis founded QORE4, a business that directly competes with Neology. Mullis started QORE4 less than a year after his departure from Neology and immediately began competing for business in this highly technical and complex industry. Building a competitive business like QORE4 from scratch would require significant investment of time, capital, and resources into technology, operational know-how, and relationship building across the supply chain. On information and belief, QORE4 is misappropriating Neology's confidential and trade secret information to jump start its business and to unfairly compete with Neology.

6.    Mullis is both the founder and Chief Executive Officer of QORE4 and has enticed other former Neology executives to join his business, at least one of whom, Manuel Moreno, also carried off with Neology's confidential information and trade secrets.

7.    Since QORE4 entered the market, Named Defendants have also misleadingly held out Neology's prior work and experience as their own and taken aim at Neology's business. For example, in a proposal to a customer, QORE4 falsely claimed that under new leadership, Neology is shifting its focus away from advanced RFID product solutions. This is not true and Neology's RFID products are integral to its business.

8.    Around the same time that Defendant QORE4 began competing against Neology, the Doe Defendants deceptively sent dozens of emails to Neology's customers, posing as a consumer protection agency and disparaging Neology's business with false and misleading statements. On information and belief, the Doe Defendants are concealing their identities by communicating through an email account with the name of an apparently fictitious agency. Neology sent an inquiry to the email

address to learn the identity of the individual(s) behind the account, but the Doe Defendants have refused to identify themselves. Defendant Mullis, through his counsel, has also not responded to Neology's questions regarding whether or not Mullis is involved in the Doe Defendants' conduct.

9.    Plaintiff Neology comes to this Court to hold Defendants accountable for their unlawful, willful, and malicious conduct, including trade secret misappropriation, breach of contractual obligations to Neology, trade libel, and tortious interference; to permanently enjoin Defendants unlawful conduct; and to recover the economic damages it has suffered and the attorneys' fees it has incurred because of Defendants' willful, knowing, and unlawful actions.

## PARTIES

10.    Plaintiff Neology is a Delaware corporation, with its principal place of business in Carlsbad, California.

11.    Defendant Mullis is, and at all times relevant to this Complaint was, a resident of the State of California, County of San Diego, City of Oceanside. Mullis is the founder and Chief Executive Officer of QORE4.

12.    Defendant QORE4 is a limited liability company registered in Nevada. On information and belief, QORE4 conducts business from the State of California through its Chief Executive Officer, Mullis, and Chief Technology Officer, Sheshi Nyalamadugu, both of whom reside in California, and both of whom Neology previously employed.

13.    The Doe Defendants are the person(s) who sent or caused to be sent to Neology's customers emails purporting to be from "Consumer Protection Advocates." On information and belief, Consumer Protection Advocates is a fictious agency. Plaintiff has been unable to identify any entity by the name of Consumer Protection Advocates and the email address used by this purported group, consumerprotectionadvocates7@gmail.com, does not appear to be associated with any active agency. Plaintiff is ignorant of the true names and capacities of the Doe

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Defendants who committed the acts alleged herein, whether individual, corporate, or otherwise. Therefore, Neology is suing them under fictitious names. When Neology ascertains the true names and capacities of the Doe Defendants, Neology will amend this Complaint. Neology is informed and believes, and on that basis alleges, that each of the fictitiously named Doe Defendants is responsible in some manner for the acts, omissions, and circumstances alleged herein, and Neology's resulting damages.

## JURISDICTION AND VENUE

14.    This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., and 28 U.S.C. § 1331.

15.    This Court has supplemental jurisdiction over the other claims pleaded herein pursuant to 28 U.S.C. § 1367 because the state law claims are so related to claims in this action within the Court's subject matter jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

16.    This Court has general personal jurisdiction over Mullis because he is a resident of California.

17.    This Court has general personal jurisdiction over QORE4 because, on information and belief, QORE4 operates its business out of California, where both its Chief Executive Officer, Mullis, and Chief Technology Officer, Sheshi Nyalamadugu, are located.

18.    This Court also has specific personal jurisdiction over Mullis and QORE4 because they purposefully directed unlawful activities towards California. Mullis and QORE4 unlawfully stole Neology's confidential information and trade secrets in California. The Named Defendants engaged in intentional acts expressly aimed at California, the effects of which continue to be felt in California because the stolen confidential information and trade secrets were located in California and Neology's headquarters and principal place of business is in California. Mullis and QORE4, through its executives, agents, and/or employees, including Mullis, Moreno, and

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Nyalamadugu, were aware of these facts. Thus, the Named Defendants caused harm that they knew would be suffered in California.

19.    Moreover, on information and belief, Mullis, QORE4's founder and Chief Executive Officer, was physically located in California during the period in which he formed QORE4 and engaged in the acts on behalf of QORE4 giving rise to the claims in this lawsuit. On information and belief, QORE4's Chief Technology Officer, Sheshi Nyalamadugu, was also physically located in California when he participated in the acts on behalf of QORE4 giving rise to the claims herein.

20.    This Court has personal jurisdiction over the Doe Defendants because they purposefully directed unlawful activities towards California. On information and belief, the Doe Defendants engaged in intentional acts expressly aimed at California and knew the effects of such acts and the harm caused would be felt in California because Neology's headquarters and principal place of business is in California.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Named Defendants reside or are deemed to reside in this District and a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

**I.    Neology's Business**

22.    Neology is a global technology company focused on state-of-the-art tolling, automated vehicle identification and classification, data processing, and digital payment systems. As an early pioneer and industry leader in radio-frequency identification ("RFID") original equipment manufacturing and software development, Neology designs and develops products used within most toll systems across the world. Neology has more than 15,000 toll solution devices worldwide.

23.    Neology is a unique provider in the industry, offering a broad range of toll solutions, including RFID toll transponders, all electronic and open road tolling solutions, automatic license plate recognition cameras, automatic vehicle detection and

classification systems, and vehicle importation control systems. Neology is also a leading service provider through its Transportation and Operation solutions.

24.    Neology holds hundreds of granted and pending patents and is now at the forefront of integrating emerging technologies and artificial intelligence into its transportation and tolling solutions.

25.    Neology participates in strategic research-and-development partnerships to develop and test mobility solutions and continually innovate within the industry.

26.    Neology bids for and wins business through a lengthy and resource-intensive process that involves, among other things, coordinating multiple internal teams at Neology to study the specifications of the request for proposal; define the technical needs of the matter; develop a structured solution that fits the customer's needs; build a strategy for utilization of and engagement with subcontractors, as needed; determine pricing for all components of the work and for the project overall to present a proposal that is both competitive and profitable; and complete robust compliance review to ensure all aspects of the proposal satisfy the customer's requirements. Neology's proposals involve a significant investment of time and resources and incorporate Neology's confidential information and trade secrets. Neology has a practice of reviewing each proposal for confidential and trade secret information and marking its proposals with confidentiality designations, consistent with the local rules and regulations that apply to each customer's proposal process.

## II.    Mullis's Employment at Neology

27.    Defendant Mullis joined Neology in August 2003 as an Operations Manager. He was promoted to Director of Operations in May 2004 and ultimately promoted to General Manager for the United States, a title he held from February 2011 through his departure from Neology on or about September 30, 2022.

28.    As General Manager, Mullis was intimately involved in developing and implementing the strategic direction of Neology's business. Among other things, Mullis was responsible for directing and coordinating all aspects of Engineering,

Operations, and Sales to develop and implement long range goals to meet business and profitability objectives. He was also responsible for developing and updating Neology's strategic plan, including sales, financial performance, and new product development. Mullis oversaw design concepts with fundamental or new technology for both new and existing products to, among other things, grow Neology's position in the market.

29.    Mullis reported directly to the Chief Executive Officer. He also worked closely with Manuel Moreno, Neology's then-Vice President of Sales and Strategy, and Sheshi Nyalamadugu, Neology's then-Vice President of Research and Development.

30.    Mullis was also a Member of Neology's Board of Directors ("Board") for over eight years, from October 2013 to approximately March 2022. He regularly attended Board meetings and frequently was given access to confidential, proprietary, and highly sensitive strategic and financial information pertaining to Neology.

31.    In his roles as Neology's General Manager and a member of its Board, Mullis had access to Neology's confidential and trade secret information, including but not limited to Neology's business plan and competitive strategy, financial results and forecasts, customer relationship and sales pipeline, strategic partnerships and initiatives, development of IP, pricing and profitability strategy, and supply chain strategy. Mullis also had access to information provided to Neology pursuant to confidentiality and non-disclosure agreements by which Mullis, as an executive of Neology, was bound.

32.    When Mullis was appointed as General Manager, he entered into an Employment Agreement with Neology, a copy of which is attached hereto as **Exhibit A** (the "Employment Agreement"). The Employment Agreement governed Mullis's confidentiality obligations to Neology. Specifically, it provides:

Section 9.2: Restrictions on Use or Disclosure of Confidential Information. Employee shall keep the Confidential Information in absolute confidence both during the Employment Period and after the Termination Date,

regardless of the reason for such termination. Employee agrees that Employee will not, at any time, disclose to others, use for Employee's benefit, or the benefit of any other entity or person other than Company, or otherwise take or copy any such Confidential Information, whether or not developed by Employee except as required in Employee's duties to Employer.

Section 9.4: Return of Confidential Information and Property. When the Employment Period terminates, regardless of the reasons for such termination, Employee will promptly turn over to Employer in good condition all Company property in Employee's possession, or control, including but not limited to all originals, copies or, or electronically stored documents or other materials containing Confidential Information, regardless of who prepared them. In the case of electronically stored information retained by Employee outside of Company's electronic systems, Employee will promptly make a hard copy of such information in paper, audio recording, disc format, or other format requested by Employer, provide that copy to Employer, and then destroy all electronically stored information. Further, Employee agrees to provide Employer with written confirmation that all Confidential Information in the Employee's possession, or to which the Employee has access, has been turned over to Employer.

Section 9.5: Confidential Information and Trade Secrets of Others. Employee agrees that he will not disclose or otherwise use the confidential information or trade secrets of any third party which Employee learns of prior to or otherwise outside the scope if his employment with Employer.

33.    Section 9.1 of the Employment Agreement further defines Confidential Information to mean "any information which Employee learns of or develops during the Employment Period that derives independent economic value from being not

generally known or readily ascertainable by other persons who could obtain economic value from its disclosure or use, and includes, but is not limited to, trade secrets, Inventions as defined in Section 10 below, financial information, personnel information, and information relating to such matters as existing or contemplated products, services, profit margins, fee schedules, pricing, design, processes, formulae, business plans, sales techniques, marketing techniques, training manuals and materials, policies or practices related to Company's business, personnel or other matters, computer databases, computer programs, software and other technology, customer lists and requirements, vendor lists, or supply information. Confidential Information includes such information of Company, its customers, vendors, and other third parties or entities with whom Company does business."

34.    Pursuant to Section 15.11 of the Employment Agreement, all obligations under Section 9 of the Employment Agreement survive termination of the Agreement and termination of Mullis's employment with Neology, regardless of the reason for termination.

35.    In or around May 2020, Mullis failed to timely submit a significant customer proposal, which raised a concern regarding Mullis's performance and questions about his future with the Company. However, Mullis remained employed at Neology.

36.    Mullis was ultimately terminated from Neology in September 2022 due to a Company restructuring.

**III.    Neology's Measures to Protect Its Confidential Information and Trade Secrets**

37.    Neology protects its confidential information and trade secrets by, among other things, requiring all new hires to sign confidentiality agreements and all executives to sign employment agreements containing confidentiality provisions. For example, in addition to Mullis, both Manuel Moreno and Sheshi Nyalamadugu, former

executives at Neology and later executives at QORE4, entered into binding confidentiality agreements with Neology.

38.    Neology took additional measures to protect its confidential information. Neology's Employee Handbook mandates that all information stored on, or received or transmitted with the aid of, the Company's computer systems remains the sole and exclusive property of the Company. All devices issued by Neology or otherwise used to access the Company's email accounts or information or to conduct Company business, must be password protected. Neology's system only allows access to Company user accounts and Neology uses strong passwords, group policy, Single Sign On ("SSO"), and secure multi-factor authentication wherever possible to determine a user's identity and ensure it is correct. User login IDs and passwords are required to be unique and not shared within the Company. Further, employees may not use personal IT equipment, including laptops and computers, on Neology's network without prior approval from the IT department.

39.    Neology also has a practice of requiring its business partners, subcontractors, and suppliers to enter into non-disclosure agreements to protect its confidential and trade secret information.

40.    Neology further protects its confidential and trade secret information through the various state procedures for public records requests. Neology's practice is to review public records requests of which it receives notice, including requests for Neology's proposals or other documentation that may contain its confidential or trade secret information, and take action to redact, or otherwise prevent disclosure of, such information. *See, e.g.*, *Neology, Inc v. State of Washington, et al*, Case No. 25-2-02229-34 (Wash. Super. Ct. 2025).

## IV.    Mullis's Theft of Neology's Confidential Information and Trade Secrets

41.    After terminating Mullis in September 2022, Neology discovered that in or around May 2020, when Mullis's future at Neology was in question because of a critical performance failure, he began repeatedly sending documents containing

Neology's confidential and trade secret information from his secure Neology email to his personal email account, joenmullis@gmail.com (the "Gmail Account"), resulting in the unauthorized disclosure of Neology's confidential information and theft of Neology's trade secrets. The confidential and trade secret information that Mullis misappropriated spans multiple aspects of Neology's business.

A.    Information Relating to Neology's Financials and Its Business Strategies

42.    Mullis sent to his personal Gmail Account documents detailing Neology's business and financial strategy, goals for the Company, Neology's sales pipeline, and financial performance and forecasts. This quintessential trade secret information that Neology holds in strict confidence, would allow a competitor to know the ins and outs of Neology's business, and at a minimum, would enable a competitor to copy Neology's business plans and strategy, position itself to compete against Neology, and use Neology's sales pipeline for its own benefit.

43.    More specifically, on May 16, 2020, Mullis forwarded an email chain with the subject "Fwd: Neology update for the week ending May 15th" from his Neology email account to his personal Gmail Account. This email concerned, among other things, Neology's business negotiations with software suppliers, memoranda of understanding with various industry players, and a response to a request for proposal that Neology was working on. It contained information about key points of the negotiations, future projections, commercial partnerships, and agreements. It also attached a slide from a Neology Board presentation concerning a potential customer contract.

44.    This email and its attachments are confidential and proprietary and contain Neology's trade secrets, including:

a.    Details regarding a strategic investment by Neology into a software license, including the rationale and financial impact of the investment. This provides information on how Neology is

**COMPLAINT AND DEMAND FOR JURY TRIAL**

deploying capital to improve its business and competitive advantage.

b.    Details regarding a proposed key strategic partnership that Neology was in the advanced stages of exploring, including the strategic rationale for the proposed partnership, specifics concerning the anticipated projects that the partnership would seek and the expected revenue of such projects. This provides competitively sensitive information that reveals a key strategy on how Neology would compete for business and improve its value proposition to prospective customers.

c.    Neology's assessment of a prospective opportunity for a service contact, including Neology's "initial estimated proposal value" for the project, which incorporates Neology's margin, and its "actions and next steps" for the opportunity with details on Neology's use of a strategic partnership for the opportunity.

45.    On March 2, 2022, Mullis forwarded to his personal Gmail Account an internal Neology email concerning Neology initiatives and processes, including information related to Neology's process for sales forecasting for particular client projects, accounting procedures, and efficiency initiatives. This information would be valuable to a competitor because it discusses the systems and operations behind all of Neology's products, platform, and proposals, thus giving a competitor a detailed framework to replicate in its business.

46.    On September 23, 2022, Mullis forwarded to his personal Gmail Account an email sent to Neology's Board in early August. That email had two attachments. The first attachment was a Board presentation from June 27, 2022 containing Neology's strategy and financial information, which was marked "Company Proprietary." The deck includes action items from the June 2022 Board meeting, details about Neology's strategy and sales pipeline, detailed financial goals and action items related to the same,

a description of a confidential partnership, and discussion of changes to Neology's business model. The second attachment was a monthly financial report from June 2022, which was marked "Confidential." This included management discussion and analysis of Neology's financials and information concerning the Company's margin and profitability. The information in these attachments would be valuable to a competitor because, among other things, it would allow a competitor to copy Neology's strategy, pitch its pipeline, interfere with its planned business relationships, and undercut it in the market.

B.    Information Relating to Neology's Patented Technology and Supply Chain

47.    Mullis sent Neology documents to his personal Gmail Account that specify the components of Neology's valuable patented products, the supplier from whom Neology acquires such components, the pricing that Neology negotiated with its suppliers, and the details of Neology's orders. Neology considers this information to be its trade secrets and maintains its confidence. In the hands of a competitor, this information could be used to reverse engineer Neology's products, replicate its supply chain, and obtain favorable supplier relationships and terms.

48.    More specifically, on May 17, 2020, Mullis sent an email from his Neology email account to his personal Gmail Account with an attachment titled "PO 5875 Components for 3 Position Switch Bata Rev. 2." This is a purchase order for the components of one of Neology's complex patented products, which Neology acquires through a key supplier.[1] It details each component that goes into Neology's patented product, the unit price Neology negotiated for these components, the quantities in which it orders the components, and the total amount spent. The document includes information beyond that disclosed in patents and which Neology holds as trade secrets.

---

[1] Neology does not specifically identify its key vendors and partners in this publicly filed complaint to protect its trade secrets, confidential information, and business interests.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Glaser Weil

49.    The specifications of the components that go into Neology's patented products could be used by a competitor to reverse engineer Neology's products. Further, the detailed unit-pricing information contained in the PO is the result of Neology's negotiations and long-standing relationship with its supplier. The information concerning Neology's relationship with a key supplier and the details of its purchase history and unit rates it pays go to the core of Neology's supply chain and profitability and would be valuable to a competitor in mimicking Neology's supply chain and negotiating favorable supplier relationships and pricing.

50.    On June 8, 2022, Mullis forwarded to his personal Gmail Account an internal Neology email attaching a purchase order, purchase requisition, and quote with a key supplier for component parts for one of Neology's products. These documents show the items Neology considered, what was ordered, in what quantity, the unit per price, and the total amount spent.

51.    The information concerning Neology's relationship with this key supplier and the details of its purchase history and unit rates it pays impact Neology's expenses and profitability and would be valuable to a competitor in mimicking Neology's supply chain and negotiating favorable supplier relationships.

C.    Information Detailing Neology's Partnerships and Work for End Consumers

52.    Mullis sent to his personal Gmail Account information concerning Neology's proposed work for complex projects it was seeking to win from customers, which detailed Neology's tailored approach and technical plans for the project. Neology holds this information in confidence and considers it trade secrets.

53.    More specifically, on January 13, 2021, Mullis sent from his Neology email account to his personal Gmail Account a 97-page joint proposal made to a customer that details Neology's proposed work as subcontractor for its strategic partner on the proposal. Neology partnered with this vendor to provide complex services to the client and entered into a non-disclosure agreement with the partner in connection with this work.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

54.     The proposal Mullis emailed to his personal Gmail Account is confidential and proprietary and contains significant trade secrets. For example, it includes Neology's tailored approach to the project plan and related implementation plans; the Company's plan for the highly technical aspects of the project, including drawings and floor plans and procedures for maintaining security of inventory; and, among other things, the Company's approach to operations and maintenance throughout the project.

55.     This information details Neology's approach for winning and delivering business to its end customers and how Neology partners with other contractors do so. It goes to the heart of how Neology competes for business. It would be valuable to a competitor because it provides extensive details on how Neology pitches for work, who it partners with to do so, and how it packages its products and services for its customers. Access to these trade secrets would allow a competitor to undercut Neology in the market going forward. The proposal, the discussions between Neology and its strategic partner, and all of the work done related to the proposal and project are covered by a non-disclosure agreement executed by both parties.

56.     On February 28, 2021, Mullis forwarded to his personal Gmail Account an email chain with the subject "Pre meeting for Monday's Rapid Pass Pilot meeting" between Mullis, Manuel Moreno (Neology's then Vice President of Sales & Strategy), and representatives from Neology's partner discussed in Paragraphs 53 through 55, regarding planning for a new business opportunity involving optimization of toll transactions across vehicle types and payment cards. Neology and the strategic partner were working to build specialized technology, and Neology had collected data to further this project.

57.     The email Mullis forwarded to himself contains Neology's confidential and trade secret information, including a draft "use case" detailing how Neology's technology could be used for the particular business opportunity. The document includes "operational notes" detailing Neology's strategy for winning the business and describes the products and methodology that Neology would use to address the business

**COMPLAINT AND DEMAND FOR JURY TRIAL**

opportunity. This information was subject to the non-disclosure agreement between Neology and the strategic partner. This information is useful to a competitor because it provides insight into how Neology is positioning itself to win this opportunity and other similar opportunities.

58.     On June 16, 2021, Mullis sent a copy of a non-disclosure agreement between Neology and a key partner with which Neology does extensive business from his Neology email account to his personal Gmail Account. The agreement discloses the business relationship between Neology and the firm in relation to RFID products, technologies, and related intellectual property and innovations, which ultimately came to fruition. Neology considers the identity and nature of its relationship with this firm to be its confidential and trade secret information, disclosure of which would provide a competitor with insight into how Neology plans and structures its strategic partnerships, who in the industry it focuses on, and how Neology furthers its business goals, which may allow a competitor to disrupt Neology's business relationship with its partner. In addition, information concerning this partnership would be valuable to a competitor because it is one of Neology's larger customers with which Neology anticipates additional, potential business and a competitor could use the information regarding Neology's relationship to present itself as an alternative for future business opportunities from this partner.

59.     On June 21, 2021, Mullis forwarded an email chain and attachment concerning Neology's relationship with a strategic partner to his personal Gmail Account. This email lays out a phased approach, with details of the steps that must be taken in each phase, to collaborate with the partner. The email also describes customers to be serviced and the products to be used in such services. Neology considers these details of its strategic partnership to be its confidential and trade secret information. A competitor would be able to use this information to short circuit any preparation work for a similar collaboration or even attempt to present itself to this partner as an

**COMPLAINT AND DEMAND FOR JURY TRIAL**

alternative to Neology in the partner's strategy using the intelligence it learned from Neology's trade secret information.

D.    Information Relating to Neology's Opportunities

60.    Mullis forwarded to his personal Gmail Account Neology's information detailing numerous opportunities for customer or partner relationships. Neology expends significant resources in canvassing for and identifying business opportunities through its robust and global business development operation. The opportunities Neology identifies and the contacts it has for such opportunities belong to the Company and would be highly valuable to a competitor, who could use that information to pursue such opportunities for its own benefit. Neology holds this information in confidence and considers it trade secrets.

61.    More specifically, on November 11, 2020, Mullis forwarded from his Neology email account to his personal Gmail Account an email chain from years earlier regarding a potential business opportunity presented to Neology through its operations in Mexico. In the email, one Neology employee referred to the opportunity as a "gold mine" and provided his assessment of the business opportunity and its monetary value. Mullis also forwarded additional attachments regarding the business opportunity.

62.    The information concerning this business opportunity would be valuable to a competitor because it would learn of a business opportunity that Neology generated and Neology's assessment of its value and could then utilize that information to capture the opportunity for its own gain.

63.    On December 18, 2021, Mullis forwarded an email chain with a construction engineering company to his personal Gmail Account. The email concerned an opportunity brought to Neology to provide services to the construction company for tracking certain materials.

64.    Similarly, and related to Neology's opportunity with the construction engineering company referenced in Paragraph 63, on February 9, 2022, Mullis forwarded another email chain with the construction engineering company to his

**COMPLAINT AND DEMAND FOR JURY TRIAL**

personal Gmail Account. Attached to the email, and also forwarded to Mullis's Gmail Account, were several photos that were provided to Neology for the purpose of scoping the work that the construction company was seeking from Neology. This business opportunity belongs to Neology and came to Neology based on its work in the industry. It is valuable to a competitor because it provides detailed information regarding a business opportunity that a competitor could pursue for its own benefit.

65.     On March 27, 2021, Mullis forwarded from his Neology email to his personal Gmail Account correspondence with representatives from a strategic partner regarding commercialization of a joint product. Several days later, on March 31, 2021, Mullis forwarded from his Neology email account to his personal Gmail Account another email regarding commercialization of the same joint product. On April 9, 2021, Mullis again forwarded to his personal Gmail Account correspondence with the same partner that outlined action items for launching the product at issue.

66.     These emails contain discussion of the product, its intended purpose, discussion of how the product was to be built, and information on how Neology's products would be integrated. This information would be valuable to a competitor as it would provide insight into Neology's relationship with the partner, the opportunity at hand, and a roadmap for how to build this commercially valuable product, which a competitor could seek to leverage for its own benefit.

67.     On November 30, 2021, Mullis emailed his personal Gmail Account from his Neology account regarding an opportunity for Neology to provide tolling technology and services to a customer in Dubai. This email includes details and intelligence that Neology collected and compiled about this opportunity, as well as how Neology planned to service the account. A competitor could use this information not only to pursue the opportunity using the non-public information Neology compiled, but also to leverage Neology's planned approach to structure its own proposal for the work.

68.     On February 9, 2022, Mullis forwarded to his personal Gmail Account an internal Neology email chain regarding another opportunity to provide Neology's

**COMPLAINT AND DEMAND FOR JURY TRIAL**

products to a company in Dubai. The email includes the initial inquiry to Neology, Neology's questions related to scope and specifics, further detailed description of the project, and Neology's internal discussion of its quote and proposal. This information would be valuable to a competitor because it would show how Neology considers scoping and pitches, and a competitor could try to use this information to pursue the opportunity for itself and/or undercut Neology in the industry.

## V.    Moreno's Misappropriation of Neology's Trade Secrets

69.    Manuel Moreno, Neology's former Vice President of Sales and Strategy, and subsequently QORE4's Chief Sales Officer, also improperly sent Neology's confidential and trade secret information to his personal email account and, on information and belief, retained that information in violation of his employment agreement with Neology. For example, on April 6, 2020, Moreno emailed his personal Gmail Account attaching a confidential and proprietary excel spreadsheet that detailed Neology's pricing information. The spreadsheet contains item descriptions, unit and quantities, competitive market analysis, and cost and profit margins.

70.    Moreno sent this spreadsheet to his personal email on at least two other occasions.

71.    The detailed pricing information contained in the spreadsheet is Neology's trade secret. The spreadsheet provides the pricing and margins that drive Neology's business model and would provide Neology's competitors a valuable roadmap on how to structure its own business and how to compete with Neology on pricing.

72.    On information and belief, Moreno, together with Mullis and QORE4, misappropriated the information for the benefit of QORE4.

## VI.    Mullis's Refusal to Return the Trade Secret Information He Misappropriated

73.    The use of personal email for Neology business was not authorized by the Company and there was no business need for Mullis to send Neology information to his personal email. Neology provided a Company-issued device to Mullis and its

expectation was that Mullis would use his Company-issued laptop and his Neology email account for Company business. Mullis had access to his Company laptop until his departure in September 2022. But Mullis sent confidential, proprietary, and trade secret information to his personal Gmail Account anyway.

74.    On information and belief, Mullis sent Neology's documents to his personal email account in order to save documents and Neology's confidential and trade secret information therein for later competitive use. In other words, he created a library of Neology's confidential and trade secret information, stored off Neology's servers, for use upon his departure from Neology. Mullis began sending documents to his personal email account in or about May 2020, which was around the time that Mullis had a critical performance failure at Neology that raised doubts about his future with the Company. Mullis continued to send Neology's information to his personal account until his departure in September 2022. Less than a year after Mullis departed Neology, he created a competing company, QORE4, and immediately began competing in a highly technical and complex industry.

75.    On information and belief, Mullis is still in possession of the documents he sent to his personal Gmail Account. On August 8, 2023, Neology wrote to Mullis demanding that he identify and return any Neology information in his possession as required by his Employment Agreement. Mullis responded several days later stating that he had only retained materials concerning a purported dispute with Neology regarding an equity plan and that his legal team would dispose of them following the conclusion of those matters.

76.    Neology then asked for Mullis to (1) confirm he had searched his email to ensure that all Neology related documents had been deleted except those he explicitly acknowledged were in his possession, (2) confirm a specified list of documents had been permanently deleted from Mullis's possession, (3) send copies of the Neology documents he retained, and (4) preserve all documents and metadata related to the transmission of any Neology documents to any party.

77.    Mullis refused to provide the information and assurances that Neology specifically requested and that his Agreement explicitly required. Instead, he simply stated he did not "have" any documents.

78.    Only later did Neology discover the volume of Company documents Mullis had diverted to his personal email and the nature of those documents, which were starkly inconsistent with Mullis's representations.

79.    Mullis did not acknowledge the litany of emails containing Neology's confidential and trade secret information that he sent from his Neology account to his personal Gmail Account, nor did he confirm that he searched for and deleted such information despite Neology's explicit demands and Mullis's contractual obligations to do so.

## VII.    Mullis's Departure from Neology and Founding of a Competitive Business

80.    Mullis was informed in September 2022 that he would be terminated from Neology as part of a restructuring. His last day at Neology was on or about September 30, 2022.

81.    Shortly thereafter, on information and belief, Mullis began work on founding a competing company, QORE4. QORE4 was formally launched less than a year later on July 18, 2023. In a press release announcing its official launch, QORE4 described itself as a provider of product and service solutions for both public and private entities with a focus on RFID technology. Mullis was and remains the CEO of QORE4.

82.    Several days after its launch, Manuel Moreno joined QORE4 as its Chief Sales Officer. Moreno was tasked with developing and implementing QORE4's sales strategy and driving sales growth and business expansion.

83.    Then, in February 2024, QORE4 recruited Sheshi Nyalamadugu from Neology to join as its Chief Technology Officer.

## VIII.    QORE4's Misappropriation of Neology's Trade Secrets

84.    On information and belief, QORE4 used Neology's trade secrets, which it acquired from Mullis and Moreno to give itself a head start in entering the market.

QORE4 was able to enter this complicated business quickly. This industry is highly technical; entities typically need patented and developed products, specialized supply chains, and robust implementation procedures. As a new company, QORE4 did not have an existing product line, established supplier relationships, or deep technical know-how on its own.

85.    On information and belief, Mullis is disclosing and using Neology's confidential and trade secret information for the benefit of QORE4 and to unfairly compete with and harm Neology's business. After his departure from Neology and in violation of his Employment Agreement, Mullis refused to identify and return Neology's trade secret and confidential information sent to his personal email or otherwise in his possession. Mullis subsequently started QORE4 while he continued to unlawfully retain Neology's information.

86.    Further, Mullis, through QORE4, has submitted proposals deceptively presenting Neology's work and track record as that of QORE4's in an attempt to compete against Neology. For example, in QORE4's bid to the Washington State Department of Transportation ("WSDOT"), QORE4 claimed that QORE4's team had "successfully facilitated [transitions to a new transponder contract] in the past" and that its "management team transitioned WSDOT to the 2-way switch transponder currently in circulation." QORE4 further asserted that its "proven track record and expertise ensure a smooth transition should you choose to award QORE4 as your future transponder vendor." QORE4 later writes, "*Our proven track record with WSDOT* highlights our reliability and ability to meet the evolving needs of transportation systems." But the past work and track record referenced in QORE4's bid to obtain business from WSDOT does not belong to QORE4. It belongs to Neology. It is Neology that performed the work QORE4 seeks to leverage in this letter and Neology that has a proven track record with WSDOT.

87.    Named Defendants' scheme became apparent to Neology in July 2024 when QORE4 submitted the competing proposal to WSDOT described above.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

88.    Named Defendants' scheme expanded on or about September 2024 when QORE4, through Mullis, began making numerous public records requests across the nation to obtain more of Neology's trade secrets and confidential information than what Mullis had already stolen from the Company while an employee. Between late 2024 and early 2025, QORE4 made public records requests to at least nine of Neology's customers, including WSDOT, Humber Bridge Tolling Board, Los Angeles Country Metropolitan Transportation Authority, North Texas Tollway Authority, San Diego Association of Governments, State Road and Tolling Authority, TCA, and Riverside County Transportation Commission.

89.    On information and belief, QORE4 is attempting to use the public records request process to obtain information on Neology's bids and then use that information alongside the trade secrets and confidential information Mullis stole from Neology to unfairly compete with Neology in the bidding process and to undercut Neology in the market.

90.    Neology has been forced to expend significant resources to prevent Mullis and QORE4 from obtaining the confidential and trade secret information contained in Neology's proposals.

**IX.    Use of Fictitious Agency to Disparage Neology**

91.    As QORE4 was interfering with Neology's business by using and further seeking its confidential and trade secret information, in or about March 2025, an apparently fictious entity calling itself "Consumer Protection Advocates," began disrupting Neology's business by sending emails to Neology's customers disparaging Neology's products. The customers in receipt of the disparaging emails include the Los Angeles Department of Transportation, the Colorado Department of Transportation, the Oklahoma Turnpike Authority, the Bay Area Rapid Transit, the Utah Department of Transportation, the Riverside County Transportation commission, the Northwest Parkway, E-470 Public Highway Authority, the Orange County Transportation Authority, the North Texas Tollway Authority, and the Kansas Turnpike Authority.

92.    The purported consumer protection agency that sent these emails did so through the email address consumerprotectionadvocates7@gmail.com, signed the emails "Consumer Protection Advocates," and included no letterhead or other contact information. As far as Neology can tell, no entity by the name of Consumer Protection Advocates exists nor does the email addressconsumerprotectionadvocates7@gmail.com appear to be associated with any active agency.

93.    The emails purported to bring "critical technical flaws affecting tolling and consumer billing across [the customer's] toll road systems" and took aim at Neology's technology with false and misleading statements.

94.    The false and misleading statements disparaged the transponders supplied by Neology. The emails asserted that Neology's technology is based on "an outdated RFID integrated circuit" and that "Neology remains the only vendor still supplying this outdated technology." This is blatantly false. To the contrary, only one manufacturer in the industry coalition known as 6C, referred to in the emails, is using different technology. All others in the 6C Coalition use the same base technology as Neology, although Neology has patents relating to unique features in its products.

95.    The emails also asserts that other "modern RFID ICs" would "eliminate" the issue of mischarges identified in the emails. This is also false. The technology referenced in the emails as an alternative to Neology's technology would only reduce the already marginal risk of mischarges, not eliminate such risk as the author asserts.

96.    On information and belief, Defendant Mullis, acting on behalf of QORE4, is acting as or in concert with the Doe Defendants under the guise of "Consumer Protection Advocates." The claims made in the emails regarding Neology's technology are similar to assertions that QORE4 has made about Neology's technology in its proposal to WSDOT. In an effort to uncover the true identity behind the emails, Neology's counsel wrote to the consumerprotectionadvocates7@gmail.com address seeking additional information. Neology also wrote to Mullis's counsel asking that

Mullis confirm or deny his involvement. "Consumer Protection Advocates" refused to provide any additional information concerning the individual(s) behind the emails and Mullis's counsel did not respond.

97.    On information and belief, the Doe Defendants knew Neology had contracts with the parties targeted by the emails either through his knowledge of Neology's internal workings and/or through public record requests. Information concerning Neology's contracts with its customers is available internally at Neology and was available to Mullis when he was employed at the Company.

98.    The statements made to Neology's customers injured Neology's reputation. While Neology cannot yet know the impact of the Doe Defendants' false and misleading statements on its future business, Neology was forced to expend significant resources on a public relations firm to communicate with its customers and correct the Doe Defendants' false and misleading statements. This was a significant distraction to Neology's business and Neology was forced to use its time and resources responding to these false statements.

## COUNT I: BREACH OF CONTRACT

*(Against Mullis)*

99.    Neology re-alleges and incorporates by reference paragraphs 1 through 98 of this Complaint.

100.    Neology and Defendant Mullis are parties to a valid contract in the form of the Employment Agreement.

101.    The Employment Agreement by its terms is supported by valid consideration, including, without limitation, Defendant Mullis's continued employment.

102.    At all times prior to Defendant Mullis's breach of contract, Neology continued to perform its obligations under the contract.

103.    Defendant Mullis breached the Employment Agreement by diverting Neology's confidential information to his personal email.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

104.   Defendant Mullis also breached the Employment Agreement by failing to return Neology's documents containing confidential information, failing to make and subsequently provide a hard copy of any Neology electronically stored information retained by Defendant Mullis on his personal Gmail Account, failing to destroy Neology's electronically stored information, and failing to provide Neology with written confirmation that all Neology confidential information in Defendant Mullis's possession or within his access had been turned over to Neology.

105.   On information and belief, Defendant Mullis further breached the Employment Agreement by disclosing Neology's confidential information to QORE4 and/or using it for QORE4's benefit.

106.   As a proximate result of Defendants' acts, Neology has suffered general and special damages in amounts to be determined according to proof at trial.

## COUNT II: INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

### *(Against QORE4)*

107.   Neology re-alleges and incorporates by reference Paragraphs 1 through 106 of this Complaint.

108.   Neology had a valid and enforceable Employment Agreement with Mullis. The Employment Agreement contained confidentiality provisions that survived termination of the Mullis's employment with Neology.

109.   At all times, QORE4, through Mullis, was aware that Neology had a valid and enforceable contract with Mullis.

110.   On information and belief, QORE4 intentionally induced Mulls to breach the confidentiality provisions of his Employment Agreement, including but not limited to his obligations to refrain from using or disclosing Neology's confidential information and trade secrets to any third party or for the benefit of himself or any other entity, or otherwise take or copy such information, refrain from, by, among other things, inducing

**COMPLAINT AND DEMAND FOR JURY TRIAL**

him to divert confidential information and trade secrets to QORE4 and to use that information for QORE4's benefit.

111.    QORE4's wrongful interference with Mullis's Employment Agreement caused breaches of the Agreement.

112.    QORE4's intentional and wrongful conduct has caused immediate, substantial, and ongoing injury to Neology, including actual damages. Neology has suffered direct financial harm because it was required to expend thousands of dollars on public relations consultants, significant Company resources, and attorneys' fees to respond to and mitigate the harm of QORE4's intentional interference with the Employment Agreement. Neology does not yet know the full extent of harm caused by Defendant QORE4's conduct.

113.    QORE4 committed the wrongful acts alleged herein maliciously, oppressively, and with intent to defraud and permanently deprive Neology of its property and economic benefits. Neology is entitled to punitive and exemplary damages in an amount to be ascertained.

## COUNT III: MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF CALIFORNIA CIVIL CODE § 3426

*(Against Mullis and QORE4)*

114.    Neology re-alleges and incorporates by reference paragraphs 1 through 113 of this Complaint.

115.    Through his employment and Board membership, Defendant Mullis had access to Neology's confidential and proprietary information.

116.    Neology takes great efforts to protect its confidential and proprietary information.

117.    Neology has expended significant time, resource, and expense in developing and maintaining its confidential and proprietary information. Such information is highly valuable to Neology and integral to its competitive advantage in the market. The information would also be valuable to a competitor or prospective

competitor, including but not limited to by providing a head start and roadmap for a competitor seeking to enter the market and build its business and by providing a competitor with information concerning business opportunities and relationships that such competitor could leverage for its own benefit.

118.   Neology's confidential and proprietary information thus constitute trade secrets within the meaning of the California Civil Code.

119.   Defendant Mullis knowingly and willfully misappropriated Neology's trade secrets by sending them to his personal Gmail Account and, on information and belief, retaining them after his departure from the Company. Defendant Mullis sent Neology's trade secrets to his personal email despite the fact that doing so was unauthorized by the Company and there was no business need to do so. He then refused to return the information to Neology despite his contractual obligations and Neology's explicit demand.

120.   On information and belief, Defendant Mullis further misappropriated Neology's trade secrets by knowingly and willfully sharing them with Defendant QORE4 and/or using them QORE4's benefit.

121.   On information and belief, Defendant QORE4 misappropriated Neology's trade secrets by knowingly and willfully acquiring the information from Mullis and by using it to compete with Neology in the market.

122.   Neology did not discover Named Defendants' misappropriation until after Defendant Mullis left Neology.

123.   As a result of Defendants Mullis's and QORE4's conduct, Neology had been harmed. Neology is entitled to actual damages as well as permanent injunctive relief.

124.   Named Defendants' conduct was willful, knowing, and malicious.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

## COUNT IV: MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF 18 U.S.C. §§ 1831-39

*(Against Mullis and QORE4)*

125.  Neology re-alleges and incorporates by reference paragraphs 1 through 124 of this Complaint.

126.  Through his employment and Board membership, Defendant Mullis had access to Neology's confidential and proprietary information.

127.  Neology takes great efforts to protect its confidential and proprietary information.

128.  Neology has expended significant time, resource, and expense in developing and maintaining its confidential and proprietary information. Such information is highly valuable to Neology and integral to its competitive advantage in the market. The information would also be valuable to a competitor or prospective competitor, including but not limited to by providing a head start and roadmap for a competitor seeking to enter the market and build its business and by providing a competitor with information concerning business opportunities and relationships that such competitor could leverage for its own benefit.

129.  Neology's confidential information, as described above, is related to interstate commerce as Neology and its clients conduct business across state lines and thus constitute trade secrets within the meaning of the Defend Trade Secrets Act.

130.  Defendant Mullis knowingly and willfully misappropriated Neology's trade secrets by sending them to his personal Gmail Account and, on information and belief, retaining them after his departure from the Company. Defendant Mullis sent Neology's trade secrets to his personal email despite the fact that doing so was unauthorized by the Company and there was no business need to do so. He then refused to return the information to Neology despite his contractual obligations and Neology's explicit demand.

131.   On information and belief, Defendant Mullis further misappropriated Neology's trade secrets by knowingly and willfully sharing them with Defendant QORE4 and/or using them QORE4's benefit.

132.   On information and belief, Defendant QORE4 misappropriated Neology's trade secrets by knowingly and willfully acquiring the information from Mullis and by using it to compete with Neology in the market.

133.   Neology did not discover Named Defendants' misappropriation until after Defendant Mullis left Neology.

134.   As a result of Defendants Mullis's and QORE4's conduct, Neology had been harmed. Neology is entitled to actual damages as well as permanent injunctive relief.

135.   As a result of Defendants Mullis's and QORE4's conduct, Neology had been harmed. Neology is entitled to actual damages as well as permanent injunctive relief.

136.   Named Defendants' conduct was willful, knowing, and malicious.

## COUNT V: INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

*(Against Does 1 Through 20, Inclusive)*

137.   Neology re-alleges and incorporates by reference Paragraphs 1 through 136 of this Complaint.

138.   Neology and its customers, Los Angeles Department of Transportation, the Colorado Department of Transportation, the Oklahoma Turnpike Authority, the Bay Area Rapid Transit, the Utah Department of Transportation, the Riverside County Transportation commission, the Northwest Parkway, E-470 Public Highway Authority, the Orange County Transportation Authority, the North Texas Tollway Authority, and the Kansas Turnpike Authority, entered into contracts for Neology to provide services and products.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

139.    On information and belief, Defendant the Doe Defendants had knowledge of Neology's existing contracts with these customers.

140.    The Doe Defendants committed intentional acts designed to induce Neology's customers to terminate the contracts or otherwise disrupt the contracts, including but not limited to providing false and misleading information about Neology and its products to disparage Neology.

141.    The Doe Defendants' intentional interference with Neology's contracts were designed to disrupt Neology's contracts. The Doe Defendants' false and misleading statements seek to improperly influence consumers to avoid Neology's products and, on information and belief, to instead purchase competitor QORE4's products.

142.    As a direct and proximate result of the Doe Defendants' interference, Neology suffered direct financial harm because it was required to engage and expend thousands of dollars on public relations consultants and attorneys' fees to mitigate the harm caused by the Doe Defendants' interference with Neology's contracts and customer relationships. Neology does not yet know the full extent of harm caused by the Doe Defendants' conduct.

143.    The Doe Defendants committed the wrongful acts alleged herein maliciously, oppressively, and with intent to defraud and permanently deprive Neology of its property, contractual relationships, and economic benefits. Neology is entitled to punitive and exemplary damages in an amount to be ascertained.

## COUNT VI: TRADE LIBEL

*(Against Does 1 Through 20, Inclusive)*

144.    Neology re-alleges and incorporates by reference paragraphs 1 through 143 of this Complaint.

145.    The Doe Defendants made statements that would be clearly or necessarily understood to have disparaged the quality of Neology's products and/or services.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

146.   The Doe Defendants made those statements to at least the following Neology customers: Los Angeles Department of Transportation, the Colorado Department of Transportation, the Oklahoma Turnpike Authority, the Bay Area Rapid Transit, the Utah Department of Transportation, the Riverside County Transportation commission, the Northwest Parkway, E-470 Public Highway Authority, the Orange County Transportation Authority, the North Texas Tollway Authority, and the Kansas Turnpike Authority.

147.   The Doe Defendants' statements to these customers were false and they knew that the statements were false and/or acted with reckless disregard for the truth or falsity of the statements.

148.   The Doe Defendants knew or should have recognized that someone else, including the customers, might act in reliance on those statements, causing Neology to suffer financial loss as a result.

149.   On information and belief, the Doe Defendants are primarily engaged in the business of selling goods or services. Neology suspects that Mullis, acting on behalf of QORE4, is acting as or in concert with the Doe Defendants. The statements at issue were representations about Neology's products and, on information and belief, the Doe Defendants made these statements for the purpose of obtaining business for QORE4.

150.   Neology suffered direct financial harm because it was required to engage and expend thousands of dollars on public relations consultants and attorneys' fees to mitigate the negative harm caused by the Doe Defendants' false and disparaging statements.

151.   The Doe Defendants' refusal to retract or withdraw the false statements was and continues to be a substantial factor in causing harm to Neology's business.

152.   The Doe Defendants committed the wrongful acts alleged herein maliciously, oppressively, and with intent to defraud and permanently deprive Neology of its property, contractual relationships, and economic benefits. Neology is entitled to punitive and exemplary damages in an amount to be ascertained.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff Neology, Inc. respectfully requests that this Court grant the following relief:

a.  Enter judgment for Neology against Defendants on all counts of this Complaint.

b.  Award Neology damages in an amount to be determined at trial.

c.  Award Neology attorneys' fees, costs, and expenses in this action.

d.  Enter an order requiring Defendant Mullis to promptly identify and return all of Neology's confidential information and trade secrets as required by the Employment Agreement.

e.  Enter a permanent injunction against Named Defendants' use or disclosure of Neology's confidential information and trade secrets.

f.  Enter a permanent injunction against the Doe Defendants from further disseminating false and disparaging statements regarding Neology and interfering with Neology's contracts; and

g.  Grant any such other relief that the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on any counts so triable.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1    DATED:  July 8, 2025                    Respectfully submitted,

2                                            GLASER WEIL FINK HOWARD
                                               JORDAN & SHAPIRO LLP
3

4
                                            By: */s/ Emil Petrossian*
5                                               Emil Petrossian
                                                Alexander R. Miller
6                                               GLASER WEIL FINK HOWARD
                                                JORDAN & SHAPIRO LLP
7                                               600 West Broadway, Suite 2850
                                                San Diego, CA 92101
8                                               Tel: (619) 765-4380
                                                epetrossian@glaserweil.com
9                                               amiller@glaserweil.com

10                                              Robert Haney, Jr. (*Pro Hac Vice*
                                                Forthcoming)
11                                              FOLEY HOAG LLP
                                                1301 Avenue of the Americas
12                                              New York, NY 10019
                                                Tel: (212) 812-0399
13                                              rhaney@foleyhoag.com

14                                              Leah Rizkallah (*Pro Hac Vice*
                                                Forthcoming)
15                                              FOLEY HOAG LLP
                                                155 Seaport Boulevard
16                                              Boston, MA 02210
                                                Tel: (617) 832-1000
17                                              lrizkallah@foleyhoag.com

18                                              *Attorneys for Plaintiff*
                                                NEOLOGY, INC.
19

20

21

22

23

24

25

26

27

28

**COMPLAINT AND DEMAND FOR JURY TRIAL**