EMIL PETROSSIAN (State Bar No. 264222)
epetrossian@glaserweil.com
ALEXANDER R. MILLER (State Bar No. 294474)
amiller@glaserweil.com
GLASER WEIL FINK HOWARD
  JORDAN & SHAPIRO LLP
600 West Broadway, Suite 2850
San Diego, California 92101
Tel.: (619) 765-4380
Fax: (619) 483-0646

*Attorneys for Plaintiff*
NEOLOGY, INC.

*Additional Counsel Listed on Signature Page*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEOLOGY, INC., a Delaware corporation,<br><br>    Plaintiff,<br><br>v.<br><br>JOSEPH N. MULLIS, an individual; and QORE4 LLC, a Nevada limited liability company,<br><br>    Defendants. | CASE NO.: 3:25-cv-01744-JES-BJW<br><br>**FIRST AMENDED COMPLAINT JURY TRIAL DEMANDED** |

Plaintiff Neology, Inc. ("Neology" or the "Company") complains and alleges the following against Defendants Joseph Mullis ("Mullis") and QORE4 LLC ("QORE4," together with Mullis, the "Defendants").

## <u>NATURE OF THE ACTION</u>

1.      This action stems from a concerted scheme by Defendant Mullis and his start-up business, Defendant QORE4, to unfairly compete with Neology by stealing and misusing Neology's trade secrets and confidential information for the benefit of QORE4's entry into the market as a competitive business and by making false and misleading statements to Neology's customers, which were designed to improperly interfere with Neology's business and harm its reputation in the industry.

2.      The industry in which Neology operates is highly technical and complex. Neology is focused on the design, manufacturing, and integration of sophisticated electronic toll collection systems, radio-frequency identification ("RFID"), automated vehicle identification and classification, enforcement technologies and digital payment platforms. Neology's business is built on hundreds of patented technologies and non-patented trade secrets related to the design, operation, manufacturing, marketing, pricing of its products, complex partnerships, and specialized supply chain relationships.

3.      Defendant Mullis, a former executive of Neology, misappropriated Neology's confidential information and trade secrets while he was employed by the Company. In or around May 2020, Mullis began creating a personal library of Neology's confidential and trade secret information. On information and belief, Mullis did so to leverage the information for his own benefit and for the benefit of his future, competitive business endeavor, QORE4.

4.      In 2023, Neology discovered dozens of confidential and proprietary documents that Mullis sent to his personal email account and had refused to identify and return to Neology after his departure from the Company in 2022. Despite requests from Neology shortly after his departure, Mullis repeatedly refused to identify and

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

return Neology's information in his possession, which was a violation of his employment agreement. Neology only later discovered that Mullis had taken and refused to identify and return numerous documents containing Neology's confidential information and trade secrets. There was no business reason for Mullis to send Neology's confidential information and trade secrets to his personal email account because he had access to the Company's email system and a Company-issued laptop.

5. Shortly after departing Neology with a trove of the Company's confidential and trade secret information, Mullis founded QORE4, a business that directly competes with Neology. Mullis started QORE4 less than a year after his departure from Neology and immediately began competing for business in this highly technical and complex industry. Building a competitive business like QORE4 from scratch would require significant investment of time, capital, and resources into technology, operational know-how, and relationship building across the supply chain. On information and belief, QORE4 is misappropriating Neology's confidential and trade secret information to jump start its business and to unfairly compete with Neology.

6. Mullis is the founder, sole Managing Member, and Chief Executive Officer of QORE4 and has enticed two former Neology executives to join his business, at least one of whom, Manuel Moreno, also departed Neology with Neology's confidential information and trade secrets.

7. Since QORE4 entered the market, Defendants have also misleadingly held out Neology's prior work and experience as their own and taken aim at Neology's business. For example, in a proposal to a customer, Mullis, on behalf of QORE4, falsely claimed that under new leadership, Neology is shifting its focus away from advanced RFID product solutions. This is not true and Neology's RFID products are integral to its business.

8. Mullis, while the founder, sole Managing Member, and Chief Executive Officer of QORE4, deceptively sent dozens of emails to Neology's customers, posing

as a consumer protection agency and disparaging Neology's business with false and misleading statements. Mullis did so under the cover of the fabricated "Consumer Protection Advocates" identity using the email consumerprotectionadvocates7@ gmail.com, all the while concealing his identity.

9.      On information and belief, Mullis posed as a bogus consumer protection agency to disparage Neology to improperly benefit himself and his competing business, QORE4.

10.      Neology repeatedly attempted to confirm its belief that Mullis was responsible for the disparaging emails from a fake consumer protection agency. Neology sent an inquiry to the email address to learn the identity of the individual(s) behind the account, but the entity refused to identify itself. Defendant Mullis, through his counsel, also did not respond to Neology's questions regarding whether or not Mullis was involved in the entity's conduct. After Neology filed its original complaint in this matter, it repeatedly requested that Mullis either confirm or deny his responsibility for the disparaging emails. Neology only confirmed Defendants' involvement through court-ordered discovery in this case.

11.      Plaintiff Neology comes to this Court to hold Defendants accountable for their unlawful, willful, and malicious conduct, including trade secret misappropriation, breach of contractual obligations to Neology, trade libel, tortious interference, and unfair competition; to permanently enjoin Defendants' unlawful conduct; and to recover the economic damages it has suffered and the attorneys' fees it has incurred because of Defendants' willful, knowing, and unlawful actions.

## **PARTIES**

12.      Plaintiff Neology is a Delaware corporation, with its principal place of business in Carlsbad, California.

13.      Defendant Mullis is, and at all times relevant to this Complaint was, a resident of the State of California, County of San Diego, City of Oceanside. Mullis is the founder, sole Managing Member, and Chief Executive Officer of QORE4.

14.     Defendant QORE4 LLC is a limited liability company registered in Nevada. The Nevada Secretary of State lists Mullis as the sole Managing Member of QORE4. On information and belief, QORE4 conducts business from the State of California through its Chief Executive Officer, Mullis, and Chief Technology Officer, Sheshi Nyalamadugu, both of whom reside in California, and both of whom Neology previously employed.

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., and 28 U.S.C. § 1331.

16.     This Court has supplemental jurisdiction over the other claims pleaded herein pursuant to 28 U.S.C. § 1367 because the state law claims are so related to claims in this action within the Court's subject matter jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

17.     This Court has general personal jurisdiction over Mullis because he is a resident of California.

18.     This Court has general personal jurisdiction over QORE4 because, on information and belief, QORE4 operates its business out of California, where both its Chief Executive Officer, Mullis, and Chief Technology Officer, Sheshi Nyalamadugu, are located.

19.     This Court also has specific personal jurisdiction over Mullis and QORE4 because they purposefully directed unlawful activities towards California. Mullis and QORE4 unlawfully stole Neology's confidential information and trade secrets in California. Defendants, and each of them, engaged in intentional acts expressly aimed at California, the effects of which continue to be felt in California because the stolen confidential information and trade secrets were located in California and Neology's headquarters and principal place of business is in California. Mullis and QORE4, through its executives, agents, and/or employees, including Mullis, Moreno, and Nyalamadugu, were aware of these facts. Thus, Defendants, and each of them, caused

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

harm that they knew would be suffered in California. Further, Defendants directed their conduct into California by circulating libelous emails to at least three California state entities, thereby injuring Neology's reputation in the state.

20.    Moreover, on information and belief, Mullis, QORE4's founder and Chief Executive Officer, was physically located in California during the period in which he formed QORE4 and engaged in the acts on behalf of QORE4 giving rise to the claims in this lawsuit. On information and belief, QORE4's Chief Technology Officer, Sheshi Nyalamadugu, was also physically located in California when he participated in the acts on behalf of QORE4 giving rise to the claims herein.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants reside or are deemed to reside in this District and a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

### I.    Neology's Business

22.    Neology is a global technology company focused on state-of-the-art tolling, automated vehicle identification and classification, data processing, and digital payment systems. As an early pioneer and industry leader in radio-frequency identification ("RFID") original equipment manufacturing and software development, Neology designs and develops products used within most toll systems across the world. Neology has more than 15,000 toll solution devices worldwide.

23.    Neology is a unique provider in the industry, offering a broad range of toll solutions, including RFID toll transponders, all electronic and open road tolling solutions, automatic license plate recognition cameras, automatic vehicle detection and classification systems, and vehicle importation control systems. Neology is also a leading service provider through its Transportation and Operations solutions.

24.    Neology holds hundreds of granted and pending patents and is now at the forefront of integrating emerging technologies and artificial intelligence into its transportation and tolling solutions.

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

25.     Neology participates in strategic research-and-development partnerships to develop and test mobility solutions and continually innovate within the industry.

26.     Neology bids for and wins business through a lengthy and resource-intensive process that involves, among other things, coordinating multiple internal teams at Neology to study the specifications of the request for proposal; defining the technical needs of the matter; developing a structured solution that fits the customer's needs; building a strategy for utilization of and engagement with subcontractors, as needed; determining pricing for all components of the work and for the project overall to present a proposal that is both competitive and profitable; and completing robust compliance reviews to ensure all aspects of the proposal satisfy the customer's requirements. Neology's proposals involve a significant investment of time and resources and incorporate Neology's confidential information and trade secrets. Neology has a practice of reviewing each proposal for confidential and trade secret information and marking its proposals with confidentiality designations, consistent with the local rules and regulations that apply to each customer's proposal process.

## II.    **Mullis's Employment at Neology**

27.     Defendant Mullis joined Neology in August 2003 as an Operations Manager. He was promoted to Director of Operations in May 2004 and ultimately promoted to General Manager for the United States, a title he held from February 2011 through his departure from Neology on or about September 30, 2022.

28.     As General Manager, Mullis was intimately involved in developing and implementing the strategic direction of Neology's business. Among other things, Mullis was responsible for directing and coordinating all aspects of Engineering, Operations, and Sales to develop and implement long range goals to meet business and profitability objectives. He was also responsible for developing and updating Neology's strategic plan, including sales, financial performance, and new product development. Mullis oversaw design concepts with fundamental or new technology for

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

both new and existing products to, among other things, grow Neology's position in the market.

29.    Mullis reported directly to the Chief Executive Officer. He also worked closely with Manuel Moreno, Neology's then-Vice President of Sales and Strategy, and Sheshi Nyalamadugu, Neology's then-Vice President of Research and Development.

30.    Mullis was also a Member of Neology's Board of Directors ("Board") for over eight years, from October 2013 to approximately March 2022. He regularly attended Board meetings and frequently was given access to confidential, proprietary, and highly sensitive strategic and financial information pertaining to Neology.

31.    In his roles as Neology's General Manager and a member of its Board, Mullis had access to Neology's confidential and trade secret information, including but not limited to Neology's business plan and competitive strategy, financial results and forecasts, customer relationship and sales pipeline, strategic partnerships and initiatives, development of IP, pricing and profitability strategy, and supply chain strategy. Mullis also had access to information provided to Neology pursuant to confidentiality and non-disclosure agreements by which Mullis, as an executive of Neology, was bound.

32.    When Mullis was appointed as General Manager, he entered into an Employment Agreement with Neology, a copy of which is attached hereto as **Exhibit A** (the "Employment Agreement"). The Employment Agreement governed Mullis's confidentiality obligations to Neology. Specifically, it provides:

Section 9.2: Restrictions on Use or Disclosure of Confidential Information.

Employee shall keep the Confidential Information in absolute confidence both during the Employment Period and after the Termination Date, regardless of the reason for such termination. Employee agrees that Employee will not, at any time, disclose to others, use for Employee's benefit, or the benefit of any other entity or person other than Company, or otherwise take or copy any such Confidential Information, whether or

not developed by Employee except as required in Employee's duties to Employer.

Section 9.4: Return of Confidential Information and Property. When the Employment Period terminates, regardless of the reasons for such termination, Employee will promptly turn over to Employer in good condition all Company property in Employee's possession, or control, including but not limited to all originals, copies of, or electronically stored documents or other materials containing Confidential Information, regardless of who prepared them. In the case of electronically stored information retained by Employee outside of Company's electronic systems, Employee will promptly make a hard copy of such information in paper, audio recording, disc format, or other format requested by Employer, provide that copy to Employer, and then destroy all electronically stored information. Further, Employee agrees to provide Employer with written confirmation that all Confidential Information in the Employee's possession, or to which the Employee has access, has been turned over to Employer.

Section 9.5: Confidential Information and Trade Secrets of Others. Employee agrees that he will not disclose or otherwise use the confidential information or trade secrets of any third party which Employee learns of prior to or otherwise outside the scope of his employment with Employer.

33. Section 9.1 of the Employment Agreement further defines Confidential Information to mean "any information which Employee learns of or develops during the Employment Period that derives independent economic value from being not generally known or readily ascertainable by other persons who could obtain economic value from its disclosure or use, and includes, but is not limited to, trade secrets, Inventions as defined in Section 10 below, financial information, personnel information, and information relating to such matters as existing or contemplated

products, services, profit margins, fee schedules, pricing, design, processes, formulae, business plans, sales techniques, marketing techniques, training manuals and materials, policies or practices related to Company's business, personnel or other matters, computer databases, computer programs, software and other technology, customer lists and requirements, vendor lists, or supply information. Confidential Information includes such information of Company, its customers, vendors, and other third parties or entities with whom Company does business."

34.    Pursuant to Section 15.11 of the Employment Agreement, all obligations under Section 9 of the Employment Agreement survive termination of the Agreement and termination of Mullis's employment with Neology, regardless of the reason for termination.

35.    Mullis was ultimately terminated from Neology in September 2022 due to a Company restructuring.

### III.    Neology's Measures to Protect Its Confidential Information and Trade Secrets

36.    Neology protects its confidential information and trade secrets by, among other things, requiring all new hires to sign confidentiality agreements and all executives to sign employment agreements containing confidentiality provisions. For example, in addition to Mullis, both Manuel Moreno and Sheshi Nyalamadugu, former executives at Neology and later executives at QORE4, entered into binding confidentiality agreements with Neology.

37.    Neology took additional measures to protect its confidential information. Neology's Employee Handbook mandates that all information stored on, or received or transmitted with the aid of, the Company's computer systems remains the sole and exclusive property of the Company. All devices issued by Neology or otherwise used to access the Company's email accounts or information or to conduct Company business, must be password protected. Neology's system only allows access to Company user accounts and Neology uses strong passwords, group policy, Single Sign

On ("SSO"), and secure multi-factor authentication wherever possible to determine a user's identity and ensure it is correct. User login IDs and passwords are required to be unique and not shared within the Company. Further, employees may not use personal IT equipment, including laptops and computers, on Neology's network without prior approval from the IT department.

38.   Neology also has a practice of requiring its business partners, subcontractors, and suppliers to enter into non-disclosure agreements to protect its confidential and trade secret information.

39.   Neology further protects its confidential and trade secret information through the various state procedures for public records requests. Neology's practice is to review public records requests of which it receives notice, including requests for Neology's proposals or other documentation that may contain its confidential or trade secret information, and take action to redact, or otherwise prevent disclosure of, such information. *See, e.g.*, *Neology, Inc. v. State of Washington, et al.*, Case No. 25-2-02229-34 (Wash. Super. Ct. 2025).

### IV.   Mullis's Theft of Neology's Confidential Information and Trade Secrets

40.   After terminating Mullis in September 2022, Neology discovered that in or around May 2020, he began repeatedly sending documents containing Neology's confidential and trade secret information from his secure Neology email to his personal email account, joenmullis@gmail.com (the "Gmail Account"), resulting in the unauthorized disclosure of Neology's confidential information and theft of Neology's trade secrets. The confidential and trade secret information that Mullis misappropriated spans multiple aspects of Neology's business.

A.   Information Relating to Neology's Financials and Its Business Strategies

41.   Mullis sent to his personal Gmail Account documents detailing Neology's business and financial strategy, goals for the Company, Neology's sales pipeline, and financial performance and forecasts. This quintessential trade secret information, which Neology holds in strict confidence, would allow a competitor to know the ins and outs

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

of Neology's business, and at a minimum, would enable a competitor to copy Neology's business plans and strategy, position itself to compete against Neology, and use Neology's sales pipeline for its own benefit.

42.    More specifically, on May 16, 2020, Mullis forwarded an email chain with the subject "Fwd: Neology update for the week ending May 15th" from his Neology email account to his personal Gmail Account. This email concerned, among other things, Neology's business negotiations with software suppliers, memoranda of understanding with various industry players, and a response to a request for proposal that Neology was working on. It contained information about key points of the negotiations, future projections, commercial partnerships, and agreements. It also attached a slide from a Neology Board presentation concerning a potential customer contract.

43.    This email and its attachments are confidential and proprietary and contain Neology's trade secrets, including:

      a.    Details regarding a strategic investment by Neology into a software license, including the rationale and financial impact of the investment. This provides information on how Neology is deploying capital to improve its business and competitive advantage.

      b.    Details regarding a proposed key strategic partnership that Neology was in the advanced stages of exploring, including the strategic rationale for the proposed partnership, specifics concerning the anticipated projects that the partnership would seek and the expected revenue of such projects. This provides competitively sensitive information that reveals a key strategy on how Neology would compete for business and improve its value proposition to prospective customers.

   c.  Neology's assessment of a prospective opportunity for a service contract, including Neology's "initial estimated proposal value" for the project, which incorporates Neology's margin, and its "actions and next steps" for the opportunity with details on Neology's use of a strategic partnership for the opportunity.

44.  On March 2, 2022, Mullis forwarded to his personal Gmail Account an internal Neology email concerning Neology initiatives and processes, including information related to Neology's process for sales forecasting for particular client projects, accounting procedures, and efficiency initiatives. This information would be valuable to a competitor because it discusses the systems and operations behind all of Neology's products, platform, and proposals, thus giving a competitor a detailed framework to replicate in its business.

45.  On September 23, 2022, Mullis forwarded to his personal Gmail Account an email sent to Neology's Board in early August. That email had two attachments. The first attachment was a Board presentation from June 27, 2022 containing Neology's strategy and financial information, which was marked "Company Proprietary." The deck includes action items from the June 2022 Board meeting, details about Neology's strategy and sales pipeline, detailed financial goals and action items related to the same, a description of a confidential partnership, and discussion of changes to Neology's business model. The second attachment was a monthly financial report from June 2022, which was marked "Confidential." This included management discussion and analysis of Neology's financials and information concerning the Company's margin and profitability. The information in these attachments would be valuable to a competitor because, among other things, it would allow a competitor to copy Neology's strategy, pitch its pipeline, interfere with its planned business relationships, and undercut it in the market.

B.    Information Relating to Neology's Patented Technology and Supply Chain

46.    Mullis sent Neology documents to his personal Gmail Account that specify the components of Neology's valuable patented products, the supplier from whom Neology acquires such components, the pricing that Neology negotiated with its suppliers, and the details of Neology's orders. Neology considers this information to be its trade secrets and maintains its confidence. In the hands of a competitor, this information could be used to reverse engineer Neology's products, replicate its supply chain, and obtain favorable supplier relationships and terms.

47.    More specifically, on May 17, 2020, Mullis sent an email from his Neology email account to his personal Gmail Account with an attachment titled "PO 5875 Components for 3 Position Switch Bata Rev. 2." This is a purchase order for the components of one of Neology's complex patented products, which Neology acquires through a key supplier.[1] It details each component that goes into Neology's patented product, the unit price Neology negotiated for these components, the quantities in which it orders the components, and the total amount spent. The document includes information beyond that disclosed in patents and which Neology holds as trade secret.

48.    The specifications of the components that go into Neology's patented products could be used by a competitor to reverse engineer Neology's products. Further, the detailed unit-pricing information contained in the PO is the result of Neology's negotiations and long-standing relationship with its supplier. The information concerning Neology's relationship with a key supplier and the details of its purchase history and unit rates it pays go to the core of Neology's supply chain and profitability and would be valuable to a competitor in mimicking Neology's supply chain and negotiating favorable supplier relationships and pricing.

---

[1] Neology does not specifically identify its key vendors and partners in this publicly filed complaint to protect its trade secrets, confidential information, and business interests.

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

49.   On June 8, 2022, Mullis forwarded to his personal Gmail Account an internal Neology email attaching a purchase order, purchase requisition, and quote with a key supplier for component parts for one of Neology's products. These documents show the items Neology considered, what was ordered, in what quantity, the unit price, and the total amount spent.

50.   The information concerning Neology's relationship with this key supplier and the details of its purchase history and unit rates it pays impacts Neology's expenses and profitability and would be valuable to a competitor in mimicking Neology's supply chain and negotiating favorable supplier relationships.

C.   Information Detailing Neology's Partnerships and Work for End Consumers

51.   Mullis sent to his personal Gmail Account information concerning Neology's proposed work for complex projects it was seeking to win from customers, which detailed Neology's tailored approach and technical plans for the project. Neology holds this information in confidence and considers it trade secret information.

52.   More specifically, on January 13, 2021, Mullis sent from his Neology email account to his personal Gmail Account a 97-page joint proposal made to a customer that details Neology's proposed work as subcontractor for its strategic partner on the proposal. Neology partnered with this vendor to provide complex services to the client and entered into a non-disclosure agreement with the partner in connection with this work.

53.   The proposal Mullis emailed to his personal Gmail Account is confidential and proprietary and contains significant trade secrets. For example, it includes Neology's tailored approach to the project plan and related implementation plans; the Company's plan for the highly technical aspects of the project, including drawings and floor plans and procedures for maintaining security of inventory; and, among other things, the Company's approach to operations and maintenance throughout the project.

54.   This information details Neology's approach for winning and delivering business to its end customers and how Neology partners with other contractors to do

so. It goes to the heart of how Neology competes for business. It would be valuable to a competitor because it provides extensive details on how Neology pitches for work, who it partners with to do so, and how it packages its products and services for its customers. Access to these trade secrets would allow a competitor to undercut Neology in the market going forward. The proposal, the discussions between Neology and its strategic partner, and all of the work done related to the proposal and project are covered by a non-disclosure agreement executed by both parties.

55.    On February 28, 2021, Mullis forwarded to his personal Gmail Account an email chain with the subject "Pre meeting for Monday's Rapid Pass Pilot meeting" between Mullis, Manuel Moreno (Neology's then Vice President of Sales and Strategy), and representatives from Neology's partner discussed in paragraphs 52 through 54, regarding planning for a new business opportunity involving optimization of toll transactions across vehicle types and payment cards. Neology and the strategic partner were working to build specialized technology, and Neology had collected data to further this project.

56.    The email Mullis forwarded to himself contains Neology's confidential and trade secret information, including a draft "use case" detailing how Neology's technology could be used for the particular business opportunity. The document includes "operational notes" detailing Neology's strategy for winning the business and describes the products and methodology that Neology would use to address the business opportunity. This information was subject to the non-disclosure agreement between Neology and the strategic partner. This information is useful to a competitor because it provides insight into how Neology is positioning itself to win this opportunity and other similar opportunities.

57.    On June 16, 2021, Mullis sent a copy of a non-disclosure agreement between Neology and a key partner with which Neology does extensive business from his Neology email account to his personal Gmail Account. The agreement discloses the business relationship between Neology and the firm in relation to RFID products,

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

technologies, and related intellectual property and innovations, which ultimately came to fruition. Neology considers the identity and nature of its relationship with this firm to be its confidential and trade secret information, disclosure of which would provide a competitor with insight into how Neology plans and structures its strategic partnerships, who in the industry it focuses on, and how Neology furthers its business goals, which may allow a competitor to disrupt Neology's business relationship with its partner. In addition, information concerning this partnership would be valuable to a competitor because it is one of Neology's larger customers with which Neology anticipates additional, potential business and a competitor could use the information regarding Neology's relationship to present itself as an alternative for future business opportunities from this partner.

58.    On June 21, 2021, Mullis forwarded an email chain and attachment concerning Neology's relationship with a strategic partner to his personal Gmail Account. This email lays out a phased approach, with details of the steps that must be taken in each phase, to collaborate with the partner. The email also describes customers to be serviced and the products to be used in such services. Neology considers these details of its strategic partnership to be its confidential and trade secret information. A competitor would be able to use this information to short circuit any preparation work for a similar collaboration or even attempt to present itself to this partner as an alternative to Neology in the partner's strategy using the intelligence it learned from Neology's trade secret information.

D.    Information Relating to Neology's Opportunities

59.    Mullis forwarded to his personal Gmail Account Neology's information detailing numerous opportunities for customer or partner relationships. Neology expends significant resources in canvassing for and identifying business opportunities through its robust and global business development operation. The opportunities Neology identifies and the contacts it has for such opportunities belong to the Company and would be highly valuable to a competitor, who could use that information to pursue

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

such opportunities for its own benefit. Neology holds this information in confidence and considers it trade secret information.

60.    More specifically, on November 11, 2020, Mullis forwarded from his Neology email account to his personal Gmail Account an email chain from years earlier regarding a potential business opportunity presented to Neology through its operations in Mexico. In the email, one Neology employee referred to the opportunity as a "gold mine" and provided his assessment of the business opportunity and its monetary value. Mullis also forwarded additional attachments regarding the business opportunity.

61.    The information concerning this business opportunity would be valuable to a competitor because it would learn of a business opportunity that Neology generated and Neology's assessment of its value and could then utilize that information to capture the opportunity for its own gain.

62.    On December 18, 2021, Mullis forwarded an email chain with a construction engineering company to his personal Gmail Account. The email concerned an opportunity brought to Neology to provide services to the construction company for tracking certain materials.

63.    Similarly, and related to Neology's opportunity with the construction engineering company referenced in paragraph 62, on February 9, 2022, Mullis forwarded another email chain with the construction engineering company to his personal Gmail Account. Attached to the email, and also forwarded to Mullis's Gmail Account, were several photos that were provided to Neology for the purpose of scoping the work that the construction company was seeking from Neology. This business opportunity belongs to Neology and came to Neology based on its work in the industry. It is valuable to a competitor because it provides detailed information regarding a business opportunity that a competitor could pursue for its own benefit.

64.    On March 27, 2021, Mullis forwarded from his Neology email to his personal Gmail Account correspondence with representatives from a strategic partner regarding commercialization of a joint product. Several days later, on March 31, 2021,

Mullis forwarded from his Neology email account to his personal Gmail Account another email regarding commercialization of the same joint product. On April 9, 2021, Mullis again forwarded to his personal Gmail Account correspondence with the same partner that outlined action items for launching the product at issue.

65.     These emails contain discussion of the product, its intended purpose, discussion of how the product was to be built, and information on how Neology's products would be integrated. This information would be valuable to a competitor as it would provide insight into Neology's relationship with the partner, the opportunity at hand, and a roadmap for how to build this commercially valuable product, which a competitor could seek to leverage for its own benefit.

66.     On November 30, 2021, Mullis emailed his personal Gmail Account from his Neology account regarding an opportunity for Neology to provide tolling technology and services to a customer in Dubai. This email includes details and intelligence that Neology collected and compiled about this opportunity, as well as how Neology planned to service the account. A competitor could use this information not only to pursue the opportunity using the non-public information Neology compiled, but also to leverage Neology's planned approach to structure its own proposal for the work.

67.     On February 9, 2022, Mullis forwarded to his personal Gmail Account an internal Neology email chain regarding another opportunity to provide Neology's products to a company in Dubai. The email includes the initial inquiry to Neology, Neology's questions related to scope and specifics, further detailed description of the project, and Neology's internal discussion of its quote and proposal. This information would be valuable to a competitor because it would show how Neology considers scoping and pitches, and a competitor could try to use this information to pursue the opportunity for itself and/or undercut Neology in the industry.

**V.     Moreno's Misappropriation of Neology's Trade Secrets**

68.     Manuel Moreno, Neology's former Vice President of Sales and Strategy, and subsequently QORE4's Chief Sales Officer, also improperly sent Neology's

confidential and trade secret information to his personal email account and, on information and belief, retained that information in violation of his employment agreement with Neology. For example, on April 6, 2020, Moreno emailed his personal Gmail account attaching a confidential and proprietary Excel spreadsheet that detailed Neology's pricing information. The spreadsheet contains item descriptions, unit costs and quantities, competitive market analysis, and profit margins.

69. Moreno sent this spreadsheet to his personal email on at least two other occasions.

70. The detailed pricing information contained in the spreadsheet is Neology's trade secret. The spreadsheet provides the pricing and margins that drive Neology's business model and would provide Neology's competitors a valuable roadmap on how to structure its own business and how to compete with Neology on pricing.

71. On information and belief, Moreno, together with Mullis and QORE4, misappropriated the information for the benefit of QORE4.

## VI.    Mullis's Refusal to Return the Trade Secret Information He Misappropriated

72. The use of personal email for Neology business was not authorized by the Company and there was no business need for Mullis to send Neology information to his personal email. Neology provided a Company-issued device to Mullis and its expectation was that Mullis would use his Company-issued laptop and his Neology email account for Company business. Mullis had access to his Company laptop until his departure in September 2022. But Mullis sent confidential, proprietary, and trade secret information to his personal Gmail Account anyway.

73. On information and belief, Mullis sent Neology's documents to his personal email account in order to save documents and Neology's confidential and trade secret information therein for later competitive use. In other words, he created a library of Neology's confidential and trade secret information, stored off Neology's servers, for use upon his departure from Neology. Mullis began sending documents to

his personal email account in or about May 2020. Mullis continued to send Neology's information to his personal account until his departure in September 2022. Less than a year after Mullis departed Neology, he created a competing company, QORE4, and immediately began competing in a highly technical and complex industry, on information and belief, with the benefit of the Neology information he stole.

74.    On information and belief, Mullis is still in possession of the documents he sent to his personal Gmail Account.

75.    On August 8, 2023, Neology sent Mullis a detailed letter demanding that he identify and return any Neology information in his possession as required by his Employment Agreement (the "August 8 Letter"). A true and correct copy of the August 8 Letter is attached hereto as **Exhibit B**.

76.    The August 8 Letter provided, in part: "The company is concerned that many of the documents that you sent to your personal email account are confidential Neology documents. The use of such documents by a competitor of Neology could cause severe damage."

77.    The August 8 Letter specifically requested:  "To protect the trade secrets and confidential information of Neology, we request that you *immediately search your email account to identify any documents relating to the business of Neology*. We ask that you <u>*send us electronic copies of all documents located*</u> and promptly delete all documents relating to Neology's business from your personal email accounts. Similarly, if you have saved any Neology documents on any other media, we ask that you *send copies of all such documents back to Neology* and destroy any such documents that may be in your possession (including deleting them from trash or any other locations where copies might be stored on electronic media).  *Please also confirm whether you have used such documents in connection with any business activities outside Neology, Inc.*" Ex. B (emphases added).

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

78.    Between August 8 and August 21, 2023, Mullis and Neology corresponded by email regarding Neology's demand that Mullis return its information. A true and correct copy of the email correspondence is attached hereto as **Exhibit C**.

79.    Mullis did not respond to or comply with the specific demands made in the August 8 Letter.

80.    Mullis initially responded stating that he had only retained materials concerning a purported dispute with Neology regarding an equity plan and that his legal team would dispose of them following the conclusion of those matters. In particular, on August 11, 2023, Mullis sent an email representing that "[a]ny materials I've retained are exclusively to support my legal issues with Neology, Inc., members of Neology Board of Directors, OEP, and JPMorgan."

81.    On August 15, 2023, Neology sent Mullis an email with five demands: (1) confirm he had searched his email to ensure that all Neology related documents had been deleted except those he explicitly acknowledged were in his possession; (2) confirm whether any Neology documents he was retaining were solely in the possession of his attorneys and whether or not they had been removed from the email accounts or other media available for Mullis's use or the use of any individuals or entities other than Mullis's legal team; (3) confirm a specified list of documents, which were unrelated to Mullis purported dispute with Neology, had been permanently deleted from all of Mullis's devices and accounts and provide the date of deletion; (4) send Neology copies of all the Neology documents he retained that allegedly related to any dispute between Mullis and Neology, and (5) preserve all documents and metadata related to the transmission of any Neology documents to any party.

82.    Mullis refused to provide the information and assurances that Neology specifically requested and that his Agreement explicitly required. In particular, on August 15, 2023, Mullis provided an incomplete response to Neology's third demand, stating that he did not have the specified documents in his possession. Mullis went on to make various statements regarding the nature of the documents Neology specified in

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

its August 15 email and asserting that they are "subject to public domain and not trade secret related," disregarding the fact that Neology's demands were based on the confidentiality provisions in Mullis's Employment Agreement. Mullis's August 15 email did not respond to or address Neology's four remaining demands.

83.    On August 18, 2023, Neology wrote again to Mullis reminding him of the definition of Confidential Information provided in his Employment Agreement and providing him the relevant language from the Agreement. Neology stated that the documents it had listed in its prior correspondence were protected by the Employment Agreement.

84.    In the same email, Neology again asked Mullis to provide an explanation of the status of the documents: "If you no longer have these documents, please indicate what happened to them since [Neology has] evidence that they were sent to your personal email. If they were deleted, please indicate the date of deletion. Please also indicate whether you ever gave copies of any of these documents to another party or know of any copies that may be in existence anywhere outside Neology."

85.    On August 21, 2023, Mullis again refused to comply with Neology's demands as required by his Employment Agreement. Instead, Mullis communicated his unilateral conclusion that he had both satisfied his contractual obligations and that the documents were not trade secrets. In particular, Mullis stated: "I've met the obligations noted in your email and from your response it is clear that the documents you identified were in fact subject to public domain and not trade secrets."

86.    Mullis never responded to the remaining demands in Neology's August 15 email.

87.    Only much later did Neology discover the volume of Company documents Mullis had diverted to his personal email and the nature of those documents, which were starkly inconsistent with Mullis's representations in the August 2023 correspondence.

88.    At no point during the 2023 correspondence did Mullis disclose or acknowledge the litany of emails containing Neology's confidential and trade secret information that he sent from his Neology account to his personal Gmail Account, nor did he confirm that he searched for and deleted such information despite Neology's explicit demands and Mullis's contractual obligations to do so.

**VII.   Mullis's Departure from Neology and Founding of a Competitive Business**

89.    Mullis was informed in September 2022 that he would be terminated from Neology as part of a restructuring. His last day at Neology was on or about September 30, 2022.

90.    Shortly thereafter, on information and belief, Mullis began work on founding a competing company, QORE4. QORE4 was formally launched less than a year later on July 18, 2023. In a press release announcing its official launch, QORE4 described itself as a provider of product and service solutions for both public and private entities with a focus on RFID technology. Mullis was and remains the sole Managing Member and CEO of QORE4.

91.    Several days after its launch, Manuel Moreno joined QORE4 as its Chief Sales Officer. Moreno was tasked with developing and implementing QORE4's sales strategy and driving sales growth and business expansion.

92.    Then, in February 2024, QORE4 recruited Sheshi Nyalamadugu from Neology to join as its Chief Technology Officer.

**VIII.   QORE4's Misappropriation of Neology's Trade Secrets**

93.    On information and belief, QORE4 used Neology's confidential information and trade secrets, which it acquired from Mullis and Moreno, to give itself a head start in entering the market. QORE4 was able to enter this complicated business quickly. This industry is highly technical; entities typically require patented and developed products, specialized supply chains, and robust implementation procedures. As a new company, QORE4 did not have an existing product line, established supplier relationships, or deep technical know-how on its own.

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

94.    On information and belief, Mullis is disclosing and using Neology's confidential and trade secret information for the benefit of QORE4 and to unfairly compete with and harm Neology's business. After his departure from Neology and in violation of his Employment Agreement, Mullis refused to identify and return Neology's trade secrets and confidential information sent to his personal email or otherwise in his possession. Mullis subsequently started QORE4 while he continued to unlawfully retain Neology's information.

95.    Further, Mullis, on behalf of QORE4, has submitted proposals deceptively presenting Neology's work and track record as that of QORE4's in an attempt to compete against Neology. For example, in QORE4's bid to the Washington State Department of Transportation ("WSDOT"), QORE4 claimed that QORE4's team had "successfully facilitated [transitions to a new transponder contract] in the past" and that its "management team transitioned WSDOT to the 2-way switch transponder currently in circulation." QORE4 further asserted that its "proven track record and expertise ensure a smooth transition should you choose to award QORE4 as your future transponder vendor." QORE4 later wrote, "*Our proven track record with WSDOT* highlights our reliability and ability to meet the evolving needs of transportation systems." But the past work and track record referenced in QORE4's bid to obtain business from WSDOT does not belong to QORE4. It belongs to Neology. It is Neology that performed the work QORE4 seeks to leverage in this letter and Neology that has a proven track record with WSDOT.

96.    Defendants' scheme became apparent to Neology in July 2024 when Mullis, on behalf of QORE4, submitted the competing proposal to WSDOT described above.

97.    Defendants' scheme expanded on or about September 2024 when Mullis, on behalf of QORE4, began making numerous public records requests across the nation to obtain more of Neology's trade secrets and confidential information than what Mullis had already stolen from the Company while an employee. Between late 2024 and early

2025, QORE4 made public records requests to at least nine of Neology's customers, including WSDOT, Humber Bridge Tolling Board, Los Angeles County Metropolitan Transportation Authority, North Texas Tollway Authority, San Diego Association of Governments, State Road and Tolling Authority, TCA, and Riverside County Transportation Commission.

98.    For example, on April 1, 2025, Neology received a letter from the WSDOT stating, "[t]he department has received a public disclosure records request from Joe Mullis of QORE4 . . ." The notice from WSDOT outlined several documents sought by the request and acknowledged that Neology had "marked certain pages as being confidential and or proprietary" and that WSDOT had released redacted copies to Joe Mullis of QORE4. The letter further provided that "Joe Mullis of QORE4 has let [WSDOT] know that his organization is not in agreement with the proposed redactions outlined by Neology" and that Neology would need to seek a court order to protect the information it redacted. As a result, Neology was required to seek a court order through legal action.

99.    The public records request to WSDOT was submitted using an account created on the WSDOT portal under the title Joe Mullis as CEO of QORE4 and included Mullis's QORE4 email address.

100.    On information and belief, QORE4 is attempting to use the public records request process to obtain information on Neology's bids and then use that information alongside the trade secrets and confidential information Mullis stole from Neology to unfairly compete with Neology in the bidding process and in an attempt to undercut Neology in the market.

101.    Neology has been forced to expend significant resources to prevent Mullis and QORE4 from obtaining the confidential and trade secret information contained in Neology's proposals.

## IX.    Use of Fictitious Agency to Disparage Neology

102.   As QORE4 was interfering with Neology's business by using and further seeking its confidential and trade secret information, in or about March 2025, an apparently fictitious entity calling itself "Consumer Protection Advocates" began disrupting Neology's business by sending emails to Neology's customers disparaging Neology's products. The customers in receipt of the disparaging emails include the Los Angeles Department of Transportation, the Colorado Department of Transportation, the Oklahoma Turnpike Authority, the Bay Area Rapid Transit, the Utah Department of Transportation, the Riverside County Transportation Commission, the Northwest Parkway, E-470 Public Highway Authority, the Orange County Transportation Authority, the North Texas Tollway Authority, and the Kansas Turnpike Authority. Defendants are behind this fictitious entity.

103.   The purported consumer protection agency that sent these emails did so through the email address consumerprotectionadvocates7@gmail.com, signed the emails "Consumer Protection Advocates," and included no letterhead or other contact information. As far as Neology can tell, no entity by the name of Consumer Protection Advocates exists, nor does the email address consumerprotectionadvocates7@gmail.com appear to be associated with any active agency.

104.   The emails purported to bring "critical technical flaws affecting tolling and consumer billing across [the customer's] toll road systems" and took aim at Neology's technology with false and misleading statements.

105.   The false and misleading statements disparaged the transponders supplied by Neology. The emails asserted that Neology's technology is based on "an outdated RFID integrated circuit" and that "Neology remains the only vendor still supplying this outdated technology." This is blatantly false. To the contrary, only one manufacturer in the industry coalition known as 6C, referred to in the emails, is using different

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

technology. All others in the 6C Coalition use the same base technology as Neology, although Neology has patents relating to unique features in its products.

106.   The emails also assert that other "modern RFID ICs" would "eliminate" the issue of mischarges identified in the emails. This is also false. The technology referenced in the emails as an alternative to Neology's technology would only reduce the already marginal risk of mischarges, not eliminate such risk as the author asserts. A true and accurate copy of one such email sent to Neology's customers is attached hereto as **Exhibit D.**

107.   In an effort to uncover the true identity behind the emails, Neology's counsel wrote to the consumerprotectionadvocates7@gmail.com address seeking additional information. Neology also wrote to Mullis's counsel asking that Mullis confirm or deny his involvement. "Consumer Protection Advocates" refused to provide any additional information concerning the individual(s) behind the emails and Mullis's counsel did not respond.

108.   Only through discovery in this case did Neology learn that Defendant Mullis sent these emails under the guise of "Consumer Protection Advocates," pretending to be a neutral, third party consumer protection agency. Defendant Mullis sent these emails while CEO and sole Managing Member of QORE4 and, on information and belief, did so to benefit himself and his competing venture, QORE4. Indeed, the claims made in the emails regarding Neology's technology are similar to assertions that QORE4 has made about Neology's technology in its proposal to WSDOT.

109.   Defendants knew Neology had contracts with the parties targeted by the emails through Mullis's knowledge of Neology's internal workings and/or through public record requests. Further, information concerning Neology's contracts with its customers is available internally at Neology and was available to Mullis when he was employed at the Company.

110.   The statements made to Neology's customers injured Neology's reputation. While Neology cannot yet know the impact of Defendants' false and misleading statements on its future business, Neology was forced to expend significant resources on a public relations firm to communicate with its customers and correct Defendants' false and misleading statements. This was a significant distraction to Neology's business and Neology was forced to use its time and resources responding to these false statements.

## COUNT I: BREACH OF CONTRACT

*(Against Mullis)*

111.   Neology re-alleges and incorporates by reference paragraphs 1 through 110 of this Complaint.

112.   Neology and Defendant Mullis are parties to a valid contract in the form of the Employment Agreement.

113.   The Employment Agreement by its terms is supported by valid consideration, including, without limitation, Defendant Mullis's continued employment.

114.   At all times prior to Defendant Mullis's breach of contract, Neology continued to perform its obligations under the contract.

115.   Defendant Mullis breached the Employment Agreement by diverting Neology's confidential information to his personal email.

116.   Defendant Mullis also breached the Employment Agreement by failing to return Neology's documents containing confidential information, failing to make and subsequently provide a hard copy of any Neology electronically stored information retained by Defendant Mullis on his personal Gmail Account, failing to destroy Neology's electronically stored information, and failing to provide Neology with written confirmation that all Neology confidential information in Defendant Mullis's possession or within his access had been turned over to Neology.

117.   On information and belief, Defendant Mullis further breached the Employment Agreement by disclosing Neology's confidential information to QORE4 and/or using it for QORE4's benefit.

118.   As a proximate result of Mullis's acts, Neology has suffered general and special damages in amounts to be determined according to proof at trial.

## COUNT II: INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

### *(Against QORE4)*

119.   Neology re-alleges and incorporates by reference paragraphs 1 through 118 of this Complaint.

120.   Neology had a valid and enforceable Employment Agreement with Mullis. The Employment Agreement contained confidentiality provisions that survived termination of Mullis's employment with Neology.

121.   At all times, QORE4, through Mullis, was aware that Neology had a valid and enforceable contract with Mullis.

122.   On information and belief, QORE4 intentionally induced Mullis to breach the confidentiality provisions of his Employment Agreement, including but not limited to his obligations to refrain from using or disclosing Neology's confidential information and trade secrets to any third party or for the benefit of himself or any other entity, or otherwise taking or copying such information, by, among other things, inducing him to divert confidential information and trade secrets to QORE4 and to use that information for QORE4's benefit.

123.   QORE4's wrongful interference with Mullis's Employment Agreement caused breaches of the Agreement.

124.   QORE4's intentional and wrongful conduct has caused immediate, substantial, and ongoing injury to Neology, including actual damages. Neology has suffered direct financial harm because it was required to expend thousands of dollars on public relations consultants, significant Company resources, and attorneys' fees to

respond to and mitigate the harm of QORE4's intentional interference with the Employment Agreement. Neology does not yet know the full extent of harm caused by Defendant QORE4's conduct.

125.   QORE4 committed the wrongful acts alleged herein maliciously, oppressively, and with intent to defraud and permanently deprive Neology of its property and economic benefits. Neology is entitled to punitive and exemplary damages in an amount to be ascertained.

## COUNT III: MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF CALIFORNIA CIVIL CODE § 3426

### *(Against Mullis and QORE4)*

126.   Neology re-alleges and incorporates by reference paragraphs 1 through 125 of this Complaint.

127.   Through his employment and Board membership, Defendant Mullis had access to Neology's confidential and proprietary information.

128.   Neology takes great efforts to protect its confidential and proprietary information.

129.   Neology has expended significant time, resources, and expense in developing and maintaining its confidential and proprietary information. Such information is highly valuable to Neology and integral to its competitive advantage in the market. The information would also be valuable to a competitor or prospective competitor, including but not limited to by providing a head start and roadmap for a competitor seeking to enter the market and build its business and by providing a competitor with information concerning business opportunities and relationships that such competitor could leverage for its own benefit.

130.   Neology's confidential and proprietary information thus constitutes trade secrets within the meaning of the California Civil Code.

131.   Defendant Mullis knowingly and willfully misappropriated Neology's trade secrets by sending them to his personal Gmail Account and, on information and

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

belief, retaining them after his departure from the Company. Defendant Mullis sent Neology's trade secrets to his personal email despite the fact that doing so was unauthorized by the Company and there was no business need to do so. He then refused to return the information to Neology despite his contractual obligations and Neology's explicit demand.

132.   On information and belief, Defendant Mullis further misappropriated Neology's trade secrets by knowingly and willfully sharing them with Defendant QORE4 and/or using them for QORE4's benefit.

133.   On information and belief, Defendant QORE4 misappropriated Neology's trade secrets by knowingly and willfully acquiring the information from Mullis and by using it to compete with Neology in the market.

134.   Neology did not discover Defendants' misappropriation until after Defendant Mullis left Neology.

135.   As a result of Defendants' conduct, Neology has been harmed. Neology is entitled to actual damages as well as permanent injunctive relief.

136.   Defendants' conduct was willful, knowing, and malicious.

## COUNT IV: MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF 18 U.S.C. §§ 1831-39

### *(Against Mullis and QORE4)*

137.   Neology re-alleges and incorporates by reference paragraphs 1 through 136 of this Complaint.

138.   Through his employment and Board membership, Defendant Mullis had access to Neology's confidential and proprietary information.

139.   Neology takes great efforts to protect its confidential and proprietary information.

140.   Neology has expended significant time, resources, and expense in developing and maintaining its confidential and proprietary information. Such information is highly valuable to Neology and integral to its competitive advantage in

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

the market. The information would also be valuable to a competitor or prospective competitor, including but not limited to by providing a head start and roadmap for a competitor seeking to enter the market and build its business and by providing a competitor with information concerning business opportunities and relationships that such competitor could leverage for its own benefit.

141.   Neology's confidential information, as described above, is related to interstate commerce as Neology and its clients conduct business across state lines and thus constitutes trade secrets within the meaning of the Defend Trade Secrets Act.

142.   Defendant Mullis knowingly and willfully misappropriated Neology's trade secrets by sending them to his personal Gmail Account and, on information and belief, retaining them after his departure from the Company. Defendant Mullis sent Neology's trade secrets to his personal email despite the fact that doing so was unauthorized by the Company and there was no business need to do so. He then refused to return the information to Neology despite his contractual obligations and Neology's explicit demand.

143.   On information and belief, Defendant Mullis further misappropriated Neology's trade secrets by knowingly and willfully sharing them with Defendant QORE4 and/or using them for QORE4's benefit.

144.   On information and belief, Defendant QORE4 misappropriated Neology's trade secrets by knowingly and willfully acquiring the information from Mullis and by using it to compete with Neology in the market.

145.   Neology did not discover Defendants' misappropriation until after Defendant Mullis left Neology.

146.   As a result of Defendants' conduct, Neology has been harmed. Neology is entitled to actual damages as well as permanent injunctive relief.

147.   Defendants' conduct was willful, knowing, and malicious.

## COUNT V: INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

### *(Against Mullis and QORE4)*

148.   Neology re-alleges and incorporates by reference Paragraphs 1 through 147 of this Complaint.

149.   Neology and its customers, Los Angeles Department of Transportation, the Colorado Department of Transportation, the Oklahoma Turnpike Authority, the Bay Area Rapid Transit, the Utah Department of Transportation, the Riverside County Transportation Commission, the Northwest Parkway, E-470 Public Highway Authority, the Orange County Transportation Authority, the North Texas Tollway Authority, and the Kansas Turnpike Authority, entered into contracts for Neology to provide services and products.

150.   Defendants had knowledge of Neology's existing contracts with these customers through their knowledge of the industry, public records requests, and Mullis's knowledge of Neology's business.

151.   Defendants committed intentional acts designed to induce Neology's customers to terminate the contracts or otherwise disrupt the contracts, including but not limited to providing false and misleading information about Neology and its products to disparage Neology. Defendant Mullis took these actions on QORE4's behalf. His actions were taken while he was acting as QORE4's founder, sole Managing Member, and CEO and were intended to benefit QORE4.

152.   Defendants' intentional interference with Neology's contracts was designed to disrupt Neology's contracts. Defendants' false and misleading statements seek to improperly influence consumers to avoid Neology's products and, on information and belief, to instead purchase competitor QORE4's products.

153.   As a direct and proximate result of Defendants' interference, Neology suffered direct financial harm because it was required to engage and expend thousands of dollars on public relations consultants and attorneys' fees to mitigate the harm caused

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Glaser Weil

by Defendants' interference with Neology's contracts and customer relationships. Neology does not yet know the full extent of harm caused by Defendants' conduct.

154.    Defendants committed the wrongful acts alleged herein maliciously, oppressively, and with intent to defraud and permanently deprive Neology of its property, contractual relationships, and economic benefits. Neology is entitled to punitive and exemplary damages in an amount to be ascertained.

## COUNT VI: TRADE LIBEL

### *(Against Mullis and QORE4)*

155.    Neology re-alleges and incorporates by reference paragraphs 1 through 154 of this Complaint.

156.    Defendant Mullis, on QORE4's behalf, made statements that would be clearly or necessarily understood to have disparaged the quality of Neology's products and/or services. Defendant Mullis's actions were taken while he was acting as QORE4's founder, sole Managing Member, and CEO and were intended to benefit QORE4.

157.    Defendants made those statements to at least the following Neology customers: Los Angeles Department of Transportation, the Colorado Department of Transportation, the Oklahoma Turnpike Authority, the Bay Area Rapid Transit, the Utah Department of Transportation, the Riverside County Transportation Commission, the Northwest Parkway, E-470 Public Highway Authority, the Orange County Transportation Authority, the North Texas Tollway Authority, and the Kansas Turnpike Authority.

158.    Defendants' statements to these customers were false and they knew that the statements were false and/or acted with reckless disregard for the truth or falsity of the statements.

159.    Defendants knew or should have recognized that someone else, including the customers, might act in reliance on those statements, causing Neology to suffer financial loss as a result.

160.  Defendants are primarily engaged in the business of selling goods or services. The statements at issue were representations about Neology's products and, on information and belief, Defendants made these statements for the purpose of obtaining business for QORE4.

161.  Neology suffered direct financial harm because it was required to engage and expend thousands of dollars on public relations consultants and attorneys' fees to mitigate the harm caused by Defendants' false and disparaging statements.

162.  Defendants' refusal to retract or withdraw the false statements was and continues to be a substantial factor in causing harm to Neology's business.

163.  Defendants committed the wrongful acts alleged herein maliciously, oppressively, and with intent to defraud and permanently deprive Neology of its property, contractual relationships, and economic benefits. Neology is entitled to punitive and exemplary damages in an amount to be ascertained.

## COUNT VII: UNFAIR COMPETITION IN VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200, *et seq.*

### *(Against Mullis and QORE4)*

164.  Neology re-alleges and incorporates by reference paragraphs 1 through 163 of this Complaint.

165.  Defendants have committed business acts and practices that are unlawful, unfair, and fraudulent in violation of California Unfair Competition Law ("UCL," Bus. & Prof. Code §§ 17200 *et seq.*) by engaging in a comprehensive anti-competitive scheme to harm Neology by, *inter alia*, misusing Neology's confidential and trade secret information; tortiously interfering with Neology's contractual and prospective business relationships while pretending to be a consumer protection agency; disparaging and making false statements about Neology to various state agencies while pretending to be a neutral consumer protection agency; leveraging Neology's track record as their own in various proposals to Neology's customers and potential customers in misleading fashion; misusing the purpose of public records requests to try

Glaser
Weil

to obtain even more of Neology's trade secrets and confidential information; and restructuring QORE4's proposals to try to undercut Neology in the market.

166. Defendant Mullis took all actions on QORE4's behalf. His actions were intended to benefit QORE4.

167. Defendants' actions are business acts or practices and amount to unfair, unlawful, and fraudulent competition.

168. As a direct and proximate result of Defendants' actions, Neology has suffered great and irreparable harm and damages.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff Neology, Inc. respectfully requests that this Court grant the following relief:

    a.   Enter judgment for Neology against Defendants on all counts of this Complaint.

    b.   Award Neology damages in an amount to be determined at trial.

    c.   Award Neology attorneys' fees, costs, and expenses in this action.

    d.   Enter an order requiring Defendant Mullis to promptly identify and return all of Neology's confidential information and trade secrets as required by the Employment Agreement.

    e.   Enter a permanent injunction against Defendants' use or disclosure of Neology's confidential information and trade secrets.

    f.   Enter a permanent injunction against Defendants from further disseminating false and disparaging statements regarding Neology and interfering with Neology's contracts; and

    g.   Grant any such other relief that the Court deems just and proper.

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

## **JURY DEMAND**

Plaintiff demands a trial by jury on any counts so triable.

Respectfully submitted,

DATED: December 3, 2025

GLASER WEIL FINK HOWARD
   JORDAN & SHAPIRO LLP


By: */s/ Emil Petrossian*
   Emil Petrossian
   Alexander R. Miller
   GLASER WEIL FINK HOWARD
   JORDAN & SHAPIRO LLP
   600 West Broadway, Suite 2850
   San Diego, CA 92101
   Tel.: (619) 765-4380
   epetrossian@glaserweil.com
   amiller@glaserweil.com

   Robert Haney, Jr. (*Pro Hac Vice*
   Application Forthcoming)
   FOLEY HOAG LLP
   1301 Avenue of the Americas
   New York, NY 10019
   Tel.: (212) 812-0399
   rhaney@foleyhoag.com

   Leah Rizkallah (*Pro Hac Vice*
   Application Forthcoming)
   FOLEY HOAG LLP
   155 Seaport Boulevard
   Boston, MA 02210
   Tel.: (617) 832-1000
   lrizkallah@foleyhoag.com

   *Attorneys for Plaintiff*
   NEOLOGY, INC.

# EXHIBIT A

<u>**EMPLOYMENT AGREEMENT**</u>

between

**Neology, Inc.,** 12760 Danielson Court, Suite A, Poway CA 92064-8850, a Delaware corporation

- hereinafter referred to as the **"Employer"**-

and

**Mr. Joe Mullis,** 1152 Breakaway Drive, Oceanside, CA 92057

- hereinafter referred to as **"Employee"**-

## RECITALS

A.  Employer desires to employ Employee and Employee desires to accept such employment, in accordance with the terms of this Agreement.

B.  Employee recognizes that the Employer and its past, present and future parent, subsidiary and other affiliates (collectively, the "Company") operates in a highly competitive environment and the importance to Company of ensuring Employee's loyalty and protecting Company's customers, employees, business information and inventions, goodwill, trade secrets and confidential and proprietary information. Accordingly, Employee has entered into and agrees to be bound by this Agreement in consideration of Employee's employment with Employer and being given access to Company's confidential information.

C.  Employee acknowledges he is receiving good and valuable consideration for entering into this Employment Agreement (the "Agreement"), including the Non-Competition/Non-Solicitation provisions contained in Section 8 of this Agreement, and Employee acknowledges that this Agreement was negotiated between the parties hereto, that because Employee is being newly hired by the Employer, Employee was not previously entitled to the benefits conferred to Employee under this Agreement including without limitation the benefits of Section 11, and that Employee received bargained for consideration, in exchange for agreeing to the Non-Competition/Non-Solicitation provisions of this Agreement set forth in Section 8 of this Agreement, including Employer providing Employee access to Company's confidential and proprietary information.

## AGREEMENT

In consideration of the above recitals and the mutual promises set forth in this Agreement the parties agree as follows:

### 1. Nature and Capacity of Employment

1.1  <u>Employment Position.</u>  Employer hereby agrees to employ Employee, and Employee agrees to accept such employment and perform services for Employer, pursuant to the terms and conditions set forth in this Agreement. Employee shall be employed in the position of General Manager Neology, or in such other position as may be assigned to him. Employee shall report to the Chief Executive Officer of Neology or such other person as Chief Executive Officer may designate, and shall perform such duties



and responsibilities for Employer and its Affiliates as Employer shall assign to him from time to time consistent with his position.

1.2 <u>Responsibilities</u>. Employee shall serve Employer faithfully and to the best of his ability and shall devote his full working time, attention and efforts to the business of Employer during his employment. Employee will follow applicable policies and procedures adopted by Employer from time to time, including without limitation policies relating to business ethics, conflict of interest, non-discrimination, confidentiality and protection of trade secrets. Employee will not engage in other employment or other material business activity, except as approved in writing by Employer's Board of Directors (the "Board"). Employee hereby represents and confirms that he is under no contractual or legal commitments that would prevent him from fulfilling his duties and responsibilities as set forth in this Agreement.

1.3 <u>Conditions Precedent to Employment</u>. This Agreement and Employee's employment with Employer will not become effective unless and until Employee has satisfied all conditions of employment established by Employer, including satisfactory results of a background check and drug test, and verification of Employee's authorization for employment.

**2. Employment Period**

Employee's employment hereunder shall commence as of the July 15, 2014 and shall continue until such employment is terminated pursuant to Section 11 of this Agreement (the "Employment Period"). The last day of Employee's employment with Employer shall be the "Termination Date".

**3. Base Salary**

3.1 <u>Base Salary</u>. During the Employment Period, Employer will pay Employee an annual base salary for services rendered at the rate of $170,000 (the "Base Salary"), which shall be paid according to Employer's normal payroll practices.

3.2 <u>Review</u>. Employer will review and may adjust the Base Salary in accordance with Employer's annual performance review cycle, and may take into account Employee's performance, Employer's financial performance, market conditions and other factors as determined by Employer. Any adjustment to Employee's Base Salary will be in the sole discretion of Employer.

**4. Variable Remuneration**

During the Employment Period, in addition to Base Salary Employee is eligible to participate in Employer's annual bonus program as in effect from time to time (the "Incentive Compensation"). The Target Bonus is $70,000 – terms and conditions are laid down in the Employer's Incentive Policy. The Employer may, in its sole discretion, make changes to or terminate any such policy or program.

**5. Employee Benefits/Leave**

During the Employment Period, Employee shall be entitled to:

(i)    Participate in the retirement plans, health plans, and all other employee benefits made available by Employer, to the extent that Employee meets the eligibility requirements for each such individual plan or program. Employer may, in its sole discretion, make changes to any such plan or program.

(ii)   Paid vacation time off (prorated for any partial year) in accordance with the Employer's policies as in effect from time to time, with a minimum annual accrual of four 4 weeks. Vacation time must be taken by Employee in a manner so as to minimize disruption to Employer's operations.



## 6. Employment Benefit Plan

Employee acknowledges and agrees that Employer is under no obligation to Employee to establish or maintain any employee benefit plan in which Employee may participate, and that the terms and provisions of any employee benefit plan of Employer are matters within the exclusive province of the Board, subject to applicable law.

## 7. Outlays and Expenses

Fares, travel costs and expenses incurred by Employee in connection with his employment hereunder – to the extent that such costs are reasonable and necessary in the interests of Employer – shall be reimbursed subject to submission by Employee of appropriate documentation of such expenses and consistent with the Employer's travel policy and practices of Employer as may be in effect from time to time.

## 8. Non-Competition/Non-Solicitation

8.1    Acknowledgement by Employee. The parties acknowledge that (a) Employee will acquire special training and knowledge during the Employment Period; (b) Employee's services which are to be performed for Employer are of a special and unique nature; (c) Company operates in a highly competitive environment and would be substantially harmed if Employee were to compete with Company or divulge its confidential or proprietary information; (d) Employee has received valuable and sufficient consideration for entering into this Agreement, including but not limited to the benefits provided under Sections 3, 4 and 5 of this Agreement, the access to Company customers and employees, and the receipt of Confidential Information as defined in Section 9, and (e) the provisions of this Section 8, including all of its subparts, are reasonable and necessary to protect Company's business.

8.2    "Corporate Product" Defined. For purposes of this Agreement, "Corporate Product" means any product or service, including any component thereof and any research to develop information useful in connection with a product or service that has been or is being designed, developed, manufactured, marketed or sold by Company.

Employee understands and acknowledges that, at the present time, Corporate Products include without limitation RFID tags, transponders and inlays. The parties understand and acknowledge that the products and services comprising Corporate Products may change over time, and the provisions of this Section 8 and all of its subparts that relate to periods of time following the termination of Employee's employment shall apply with respect to the Corporate Products as determined as of the date of termination of the Employment Period.

8.3    "Competitive Product" Defined. For purposes hereof, "Competitive Product" means any product or service (including any components thereof and any research to develop information useful in connection with the product or service) that is being designed, developed, manufactured, marketed or sold by any person or entity other than Company that is of the same general type, performs similar functions, or is used for the same purpose as a Corporate Product on which Employee worked, with which Employee assisted Company during Employee's employment, or about which Employee has had access to Confidential Information.

8.4    Non-Compete Obligations. Employee agrees that, during the Employment Period and for a period of six (6) months following the Termination Date, regardless of the reason for termination, Employee will not, directly or indirectly, render services to any person or entity that designs, develops, manufactures, markets or sells a Competitive Product in any geographic area where Company designs, develops, manufactures, markets or sells a Corporate Product.



Employee understands and acknowledges that, at the present time, Company operates its business and has customers throughout the international market.  Employee understands and acknowledges that the Company's geographic market may change, and the provisions of this Section 8 and all of its subparts that relate to periods of time following the termination of Employee's employment shall apply with respect to the geographic markets of Company as determined as of the Termination Date.

8.5    <u>Non-Solicitation of Customers</u>.  During the Employment Period and for a period of six (6) months after the Termination Date, regardless of the reason for such termination, Employee will not, directly or indirectly, with respect to any Competitive Product solicit business from any customer or prospective customer of Company to which Employee has solicited, marketed, serviced, supported, or sold during the two year period immediately preceding the Termination Date.

8.6    <u>Non-Solicitation of Employees or Business Contacts</u>.  During the Employment Period and for a period of twelve (12) months after the Termination Date, regardless of the reason for such termination, Employee will not, directly or indirectly, take any action to encourage, solicit or recruit any employee, consultant, independent contractor, subcontractor, supplier, vendor, or other business relation of Company to terminate or otherwise negatively alter their relationship with Company.

8.7    <u>Disclosure of Obligations</u>.  Employee agrees that, during the Employment Period and for a period of twelve (12) months after the Termination Date, regardless of the reason for such termination, Employee shall, prior to accepting employment or any other business relationship with any other person or entity, inform that person or entity of Employee's obligations under Sections 8 and 9, including all of their subparts.

**9.  Confidential Information**

9.1    <u>Definition of Confidential Information</u>.  As used in this Agreement, the term "Confidential Information" shall mean any information which Employee learns of or develops during the Employment Period that derives independent economic value from being not generally known or readily ascertainable by other persons who could obtain economic value from its disclosure or use, and includes, but is not limited to, trade secrets, inventions as defined in Section 10 below, financial information, personnel information, and information relating to such matters as existing or contemplated products, services, profit margins, fee schedules, pricing, design, processes, formulae, business plans, sales techniques, marketing techniques, training manuals and materials, policies or practices related to Company's business, personnel or other matters, computer databases, computer programs, software and other technology, customer lists and requirements, vendor lists, or supply information.  Confidential Information includes such information of Company, its customers, vendors, and other third parties or entities with whom Company does business.

Any information disclosed to Employee or to which Employee has access during the time of Employee's employment that Employee reasonably considers to be Confidential Information, or which the Company treats as Confidential Information, will be presumed Confidential Information.

9.2    <u>Restrictions on Use or Disclosure of Confidential Information</u>.  Employee shall keep the Confidential Information in absolute confidence both during the Employment Period and after the Termination Date, regardless of the reason for such termination.  Employee agrees that Employee will not, at any time, disclose to others, use for Employee's benefit or the benefit of any other entity or person other than Company, or otherwise take or copy any such Confidential Information, whether or not developed by Employee, except as required in Employee's duties to Employer.

9.3    <u>Restrictions on Disclosure of Compensation</u>.  The Employee may not divulge any information regarding his remuneration to third parties.  This does not apply to cases where he is legally obligated to provide such information, for example, to federal, state, or local tax authorities.  In addition, the Employee may



disclose information regarding his remuneration to his spouse, financial, tax, and legal advisors, and financial institutions.

9.4 Return of Confidential Information and Property. When the Employment Period terminates, regardless of the reason for such termination, Employee will promptly turn over to Employer in good condition all Company property in Employee's possession or control, including but not limited to all originals, copies of, or electronically stored documents or other materials containing Confidential Information, regardless of who prepared them. In the case of electronically stored information retained by Employee outside of Company's electronic systems, Employee will promptly make a hard copy of such information in paper, audio recording, disc format, or other format as requested by Employer, provide that copy to Employer, and then destroy all electronically stored information. Further, Employee agrees to provide Employer with written confirmation that all Confidential Information in the Employee's possession, or to which the Employee has access, has been turned over to Employer.

9.5 Confidential Information and Trade Secrets of Others. Employee agrees that he will not disclose or otherwise use the confidential information or trade secrets of any third party which Employee learned of prior to or otherwise outside the scope of his employment with Employer.

## 10. Inventions

10.1 Definition of Inventions. As used in this Agreement, "Inventions" means any inventions, improvements, trade names or trademarks, trade secrets, discoveries, designs, formulae, ideas or original works of authorship (whether or not reduced to writing, other media or practice and whether or not patentable or copyrightable), or work product originated, conceived, developed, discovered or made in whole or in part solely by Employee or jointly with others that relate, directly or indirectly, (a) to Company's business; (b) to Company's actual or demonstrably anticipated research or development; (c) that are made through the use of any of Company's equipment, facilities, supplies, trade secrets or Confidential Information; (d) that result from any work Employee performs for Company; or (e) that are developed on Company time.

10.2 Ownership of Inventions. With respect to Inventions originated, conceived, developed, discovered or made in whole or in part solely or jointly by Employee at any time during the Employment Period or during the one year period after the Termination Date, Employee understands and agrees that Employer will own all right, title, and interest, including patent rights, copyrights, trade secret rights and all other intellectual property rights of any sort, throughout the world related to all Inventions without further payment beyond Employee's agreed-upon salary or wage. To the maximum extent permitted by law, all Inventions are deemed "works made for hire" under the United States Copyright Act and Employer is deemed the sole author of any Inventions. To the extent any Inventions are determined not to constitute "works made for hire," Employee hereby assigns and transfers to Employer all right, title and interest in the Inventions.

Employee further agrees to:

(a) Promptly and fully disclose all such Inventions to Employer;

(b) Keep accurate, complete, and timely records of all Inventions, which records shall be Employer's property and shall be maintained on Employer's premises;

(c) At Employer's expense, assist Employer to perfect, protect, and use its rights to Inventions, including without limitation, transferring Employee's entire right, title and interest in Inventions and enabling Employer to obtain patent, copyright or trademark protection for Inventions anywhere in the world; and

(d) Give affidavits and testimony as to facts within Employee's knowledge in connection with any Inventions in any administrative proceedings, arbitration, litigation or controversy relating thereto.



In addition, the Employee agrees to promptly disclose: (i) any patents, pending patents, inventions, trade secrets or copyrighted works ("Employee Intellectual Property") that Employee creates or acquires prior to the Employment Period that Employee believes should not be subject to this Agreement; and (ii) any Employee Intellectual Property that Employee creates or acquires during the Employment Period that Employee believes should not be subject to this Agreement. If Employee does not promptly disclose any Employee Intellectual Property that Employee believes should not be subject to this Agreement, Employee acknowledges that such non-disclosure will be considered a material representation under this Agreement that, prior to and during the course of the Employment Period, Employee has no claim of ownership or other rights to any Employee Intellectual Property.

10.3 Notice Regarding Exception to Inventions Assignment. Employee understands that the assignment of Inventions set forth herein does not apply to any invention for which no equipment, supplies, facilities, confidential, proprietary or secret knowledge or information, or other trade secret information of Employer was used and that was developed entirely on Employee's own time, and (a) that does not relate (i) directly to the business of Company, or (ii) to Company's actual or demonstrably anticipated research or development, or (b) that does not result from any work performed by Employee for Company.

### 11. Termination of Employment

Employee's employment may be terminated as follows:

11.1 For Cause Termination, Without Severance. Notwithstanding anything contained herein to the contrary, the Employer may discharge Employee for Cause immediately upon written notice to Employee. For purposes of this Agreement, "Cause" shall mean the occurrence of any of the following as determined in good faith by the Employer:

(i)    any act of dishonesty, gross misconduct or other conduct or omission that, in any case, injures the integrity, character or reputation of Company, or otherwise impairs Employee's ability to effectively perform services hereunder; or

(ii)   the commission by Employee of any act that constitutes a felony or other crime that may be punishable by imprisonment of more than one year; or

(iii)  material failure of Employee to perform his duties and responsibilities hereunder or to satisfy his obligations as an officer or employee of Employer, including without limitation the violation of established policies of Employer or lawful instructions from the Board, which failure (if curable) has not been cured by Employee within thirty (30) days after written notice thereof to Employee from Employer; or

(iv)   any material breach of any terms and conditions of this Agreement by Employee, which breach (if curable) has not been cured by Employee within thirty (30) days after written notice thereof to Employee from Employer.

If the Employer terminates Employee's employment for Cause pursuant to this Section 11.1, Employee shall not be entitled to severance pay or to any bonus or incentive compensation of any kind.

11.2 Without Cause, With Severance. The Employer may terminate Employee's employment at any time and for any reason without Cause by providing written notice to Employee at least thirty (30) days prior to the Termination Date (the "Employer's Notice Period"). Upon providing written notice, Employer may elect either (a) to have Employee continue performing work for Employer until the Termination Date; or (b) at any time during the Employer Notice Period, to terminate Employee's employment and pay Employee with his final paycheck a lump sum amount equal to Employee's then-current Base Salary that would have been earned for the remainder of the Employer Notice Period.



Provided that Employee meets all of the Severance Pay Conditions (as hereinafter set forth in this Section 11.2), the Employer shall pay Employee severance pay equal to six months of Employee's Base Salary, as in effect as of the Termination Date ("Severance Pay"), payable in accordance with the Employer's regular payroll cycle during the six-month period following the Termination Date, provided, however, that any Severance Pay that would be paid before the release of claims required by the Severance Pay Conditions becomes final shall be held and paid on the first payroll date after such release is final.

Employee shall only be entitled to receive the Severance Pay described herein if Employee signs and does not rescind a release of claims in a form prepared by Employer that includes adequate provisions for the following: (i) Employee's general release of any and all legal claims; (ii) Employee's return of all of Employer's property in Employee's possession; (iii) non-disparagement of Employer and its representatives; (iv) confidentiality of terms; and (v) acknowledgement of Employee's continuing contractual obligations to Employer, including Employee's continuing non-competition, non-solicitation, confidentiality, return of property, and invention obligations under Sections 8, 9, and 10 of this Agreement (collectively, all of the conditions set forth in this paragraph shall hereinafter be referred to as the "Severance Pay Conditions.")

11.3 <u>Resignation by Employee, Without Severance</u>. Employee may resign Employee's position by providing written notice to the Employer thirty (30) days prior to Employee's intended Termination Date. At any time during such notice period, the Employer may at relieve Employee from some or all of his duties and responsibilities for the Employer.

11.4 <u>Because of Death, Disability or Incapacity of Employee, Without Severance</u>. Employee's employment with Employer is terminated immediately upon the death of the Employee. If the **Employee is unable to perform Employee's duties and responsibilities for more than ninety (90) days in any consecutive 12-month period**, by reason of physical or mental disability or incapacity, the Employer may terminate Employee's employment upon thirty (30) days advance written notice to Employee. This paragraph does not relieve the Employer of any duty to reasonably accommodate a qualifying disability under the Americans with Disabilities Act, any legal duty under the Family Medical Leave Act, or any of its other duties pursuant to applicable law. If Employee's employment is terminated pursuant to this Section 11.4, Employee (or Employee's estate in the case of death) shall receive payment for Base Salary and benefits earned through the Termination Date as provided in Section 3.

11.5 <u>No Other Payments</u>. Unless otherwise provided in this Agreement, Employee shall only be entitled to the following in the event of Employee's termination of employment: (i) Base Salary and Incentive Compensation (for any full year of employment during the plan year) earned and unpaid through the date of termination; (ii) benefits under any employee benefit plan or program to the extent provided therein; and (iii) continued coverage under Employer's health and group term life insurance programs to the extent required under state or federal insurance continuation coverage laws.

### 12. Compliance and Remedies

Employee recognizes that if Employee violates this Agreement, including but not limited to Sections 8, 9 or 10 of this Agreement, irreparable damage will result to Employer that could not adequately be remedied by monetary damages. As a result, Employee hereby agrees that notwithstanding any other dispute resolution provisions of this Agreement, in the event of any breach by Employee of this Agreement, including but not limited to Sections Sections 8, 9 or 10 of this Agreement or in the event of apparent danger of such breach, Employer shall be entitled, in addition to any other legal or equitable remedies available to it, to an injunction to restrain Employee's violation of any portion of this Agreement, without a requirement to post bond, as well as Employer's attorney's fees and costs incurred in enforcing this Agreement.



### 13. Informal Dispute Resolution

Employee and Employer agree to make good faith efforts to resolve internally and without resort to formal dispute resolution any dispute that may arise out of or relate to Employee's recruitment, employment or the termination of Employee's employment with Employer, or any dispute regarding any of the provisions of this Agreement. This Section 13 does not affect any rights that either party may have in law or equity to immediately seek emergency or temporary injunctive and other equitable relief.

### 14. Legal Actions

14.1 Jurisdiction and Venue. Employee and Employer consent to the exclusive jurisdiction of the courts of the State of California for the purpose of resolving all issues of law, equity, or fact, arising out of or in connection with this Agreement. Any action involving claims for interpretation, breach, or enforcement of this Agreement shall be brought in such courts. Each party consents to personal jurisdiction over such party in the state and/or federal courts of California and hereby waives any defense of lack of personal jurisdiction. Venue, for the purpose of all such suits in the courts of the State of California, shall be in San Diego, California.

14.2 Waiver of Jury Trial. Employee and Employer expressly waive any and all rights to a jury trial with respect to any dispute arising out of or in connection with this Agreement.

### 15. Miscellaneous

15.1 Integration. This Agreement embodies the entire agreement and understanding among the parties relative to subject matter hereof and supersedes and replaces all prior agreements and understandings relating to such subject matter.

15.2 Applicable Law. All matters relating to the interpretation, construction, application, validity and enforcement of this Agreement shall be governed by the laws of the State of California without giving effect to any choice or conflict of law provision or rule, whether of the State of California or any other jurisdiction, that would cause the application of laws of any jurisdiction other than the State of California.

15.3 Tax Withholdings. Employer shall withhold from payments under this Agreement any amounts required or authorized to be withheld pursuant to law.

15.4 Other Tax Matters. This Agreement is intended to satisfy or be exempt from the requirements of Internal Revenue Code Sections 409A(a)(2), (3) and (4), including current and future guidance and regulations interpreting such provisions, including the exceptions for short-term deferrals, separation pay arrangements, reimbursements, and in-kind distributions, and shall be administered and interpreted accordingly. Each payment under this Agreement or any Employer benefit plan is intended to be treated as one of a series of separate payments for purposes of Code Section 409A and Treasury Regulation §1.409A-2(b)(2)(iii) (or any similar or successor provisions). If as of the Termination Date Employee is a "specified employee" under Code Section 409A(a)(2)(B)(i) and any applicable policy of Employer, then any payment under this Agreement that is treated as deferred compensation under Code Section 409A payable upon termination of Employee's employment or separation from service shall be delayed until the date which is six months after the date of Employee's "separation from service" as determined under Code Section 409A (without interest or earnings). To the extent that payments under this Agreement are payments under a "reimbursement plan" subject to Code Section 409A, the right to reimbursement may not be exchanged for cash or any other benefit, the amount of expenses eligible for reimbursement in one calendar year shall not affect the expenses eligible for reimbursement in any other calendar year, and the reimbursement of any eligible expense shall be made pursuant to Employer's normal policies and procedures for expense reimbursement, which shall be in any event no later than the last day of the calendar year following the calendar year in which the expense was incurred.

Employment Agreement Joe Mullis
page 8 of (10)



15.5 <u>Counterparts</u>.  This Agreement may be executed in several counterparts and as so executed shall constitute one agreement binding on the parties hereto.

15.6 <u>Binding Effect</u>.  Except as herein otherwise provided to the contrary, this Agreement shall be binding upon and inure to the benefit of the Employer and its successors, assigns and personal representatives, including without limitation any affiliates of Employer, without any requirement of the consent of Employee for assignment of its rights or obligations hereunder.

15.7 <u>Notices</u>.  All notices, requests and other communications hereunder shall be given in writing and deemed to have been duly given or served if personally delivered, or sent by reliable overnight courier, or sent by first class, certified mail, return receipt requested, postage prepaid, to the party at the address as provided below, or, to such other address as such party may hereafter designate by written notice to the other party:

    i. If to Employer, to the address of its then principal office.

    ii. If to Employee, to the address last shown in the records of Employer.

15.8 <u>Modification</u>.  This Agreement shall not be modified or amended except by a written instrument signed by the parties.  No term or condition of this Agreement shall be deemed to have been waived, except by a statement in writing signed by the party against whom enforcement of the waiver is sought.  Any written waiver shall not be deemed a continuing waiver unless specifically stated, shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.9 <u>Severability</u>.  The invalidity or partial invalidity of any portion of this Agreement shall not invalidate the remainder thereof, and said remainder shall remain in full force and effect. If the duration of, the scope of or any business activity covered by any provision of Sections 8, 9 or 10 is in excess of what is valid and enforceable under applicable law, such provision shall be construed to cover only that duration, scope or activity that is valid and enforceable.  Employee and Employer agree that Sections 8, 9 or 10  shall be given the construction which renders their provisions valid and enforceable to the maximum extent, not exceeding its express terms, possible under applicable law.

15.10 <u>Headings</u>.  The section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

15.11 <u>Survival</u>.  Employee acknowledges and agrees that Employee's non-competition, confidentiality, return of property, and invention obligations under Sections 8, 9 or 10 of this Agreement shall survive the termination of this Agreement, and the termination of Employee's employment with the Employer, regardless of the reason for termination.

15.12 <u>Opportunity to Obtain Advice of Counsel</u>.  Employee acknowledges that Employee has been advised by Employer to obtain legal advice prior to executing this Agreement, and that Employee had sufficient opportunity to do so prior to signing this Agreement.

THIS AGREEMENT was voluntarily and knowingly executed by the parties as of date first set forth above.

Neology Inc.

By: _____

Its:

EMPLOYEE:

_____
Joe Mullis

# EXHIBIT B



PRIVILEGED & CONFIDENTIAL

August 8, 2023

Mr. Joseph Mullis
1152 Breakaway Drive
Oceanside, CA 92057

Re:  Documents Belonging to Neology, Inc.

Dear Joe:

I am writing on behalf of Neology, Inc. The firm recently reviewed your former email account at Neology and learned that on numerous occasions you sent company emails and documents to your personal email account joenmullis@gmail.com. Under Neology's General Use and Ownership Policy any work-related documents or emails sent to or stored on a personal email account are "the exclusive property of the Company". The company is concerned that many of the documents that you sent to your personal email account are confidential Neology documents. The use of such documents by a competitor of Neology could cause severe damage. Given that you recently launched a new business, Qore4, which from its description competes with Neology, we are particularly concerned that your continued possession of these documents could cause harm to Neology.

To protect the trade secrets and confidential information of Neology, we request that you immediately search your email account to identify any documents relating to the business of Neology.

We ask that you send us electronic copies of all documents located and promptly delete all documents relating to Neology's business from your personal email accounts. Similarly, if you have saved any Neology documents on any other media, we ask that you send copies of all such documents back to Neology and destroy any such documents that may be in your possession (including deleting them from trash or any other locations where copies might be stored on electronic media).  Please also confirm whether you have used such documents in connection with any business activities outside Neology, Inc.

We look forward to your prompt response confirming that you will be returning Neology documents to us and deleting all remaining copies.

Sincerely,

Roberto Enríquez
Vice President, Human Resources
1917 Palomar Oaks Way, Suite 110
Carlsbad, CA 92008

# EXHIBIT C

**From:** Joe Mullis <joenmullis@gmail.com>
**Sent:** Monday, August 21, 2023 9:50 AM
**To:** Roberto Enriquez <renriquez@neology.net>
**Subject:** Re: Neology Documents

Roberto,

I've met the obligation as noted in your email and from your response it is clear the documents you identified were in fact subject to public domain and not trade secrets.

Joe

On Fri, Aug 18, 2023 at 4:26 PM Roberto Enriquez <renriquez@neology.net> wrote:

Dear Joe,

Your employment Agreement with Neology includes the broadest possible language to define "Confidential Information" that must be returned to the Company upon your departure:

*"financial information, personnel information, and information relating to such matters as existing or contemplated products, services, profit margins, fee schedules, pricing, design, processes, formulae, business plans, sales techniques, marketing techniques, training manuals and materials, policies or practices related to Company's business, personnel or other matters, computer databases, computer programs, software and other technology, customer lists and requirements, vendor lists, or supply information. Confidential Information includes such information of Company, its customers, vendors, and other third parties or entities with whom Company does business. Any information disclosed to Employee or to which Employee has access during the time of Employee's employment that Employee reasonably considers to be Confidential Information, or which the Company treats as Confidential Information, will be presumed Confidential Information."*

The documents listed in my prior email fall within these broad categories. If you no longer have these documents, please indicate what happened to them since we have evidence that they were sent to your personal email. If they were deleted, please indicate the date of deletion.  Please also indicate whether you ever gave copies of any of these documents to another party or know of any copies that may be in existence anywhere outside Neology.

1

Regards,



**Roberto Enriquez**

Vice President Human Resources

Mobile: + 1 (619) 433 2862

Email: renriquez@neology.net

1917 Palomar Oaks Way, Suite 110

Carlsbad, CA 92008

**www.neology.net**



---

**From:** Joe Mullis <joenmullis@gmail.com>
**Sent:** Tuesday, August 15, 2023 12:33 PM
**To:** Roberto Enriquez <renriquez@neology.net>
**Subject:** Re: Neology Documents

Roberto,

I've provided you an appropriate response in my prior email.   To be clear, I do not have any of the following documents in my possession:

- o  2022 Tolling Strategy Discussion (███████)
- o  Revenue Recognition versus Revenue Award
- o  ADDRESSABLE MARKET, GROWTH, & VALUE CHAIN ANALYSIS
- o  Competition in US (January, 2022)
- o  RFID Transponder Products
- o  Vendor Information
- o  Vendor Questions
- o  Confidentiality and Use of Information
- o  Appendix One (cut sheets)
- o  Appendix Two (Vehicle ID Cut Sheet)
- o  Appendix Three (Neology T&C document)
- o  Appendix Four (White Paper)
- o  Appendix Five (OmniAir Certifications)
- o  Appendix Six (RapidPass)
- o  Appendix Seven (ODB)

***Please note the following:***

- I would note that from the titles alone it appears many of the documents you have identified would be subject to public domain and not trade secret related (i.e. cut sheets, omni air certifications, RFID transponder products, etc.) however I do not have these files in my possession.
- Vendor questions and answers was likely a response to a procurement which is subject to public domain as well.
- I have no personal use for a strategy discussion that was based on a partnership with Neology and ██████ that no longer exist and for which was likely used in part to showcase our combined synergies and capabilities in RFP's, communications and presentations to customers that again subject the material to public domain and not trade secret.
- The competition and addressable market information was likely garnished from third party providers, so again much of the informaiton not trade secret.

In any event, I do not have these files in my possession.

Regards,

Joe

On Tue, Aug 15, 2023 at 11:15 AM Roberto Enriquez <renriquez@neology.net> wrote:

PRIVILEGED & CONFIDENTIAL

Dear Joe,

Thank you for acknowledging receipt of previous email, following up with this subject:

1. Please confirm that you have searched your email to ensure that all Neology related documents have been deleted except those that relate to the alleged disputes with Neology and related entities.
2. Please confirm whether any Neology documents you are retaining are solely in the possession of your attorneys and whether or not they have been removed from the email accounts or other media that are available for your use or the use of any individuals or entities other than your legal team.
3. Please confirm that the following documents, which are unrelated to any dispute, have been permanently deleted from all devices and accounts and please provide the date of deletion . We have seen evidence that these documents were sent to your personal email account.

   o 2022 Tolling Strategy Discussion ()

   o Revenue Recognition versus Revenue Award
   o ADDRESSABLE MARKET, GROWTH, & VALUE CHAIN ANALYSIS
   o Competition in US (January, 2022)
   o RFID Transponder Products
   o Vendor Information
   o Vendor Questions
   o Confidentiality and Use of Information
   o Appendix One (cut sheets)
   o Appendix Two (Vehicle ID Cut Sheet)
   o Appendix Three (Neology T&C document)
   o Appendix Four (White Paper)
   o Appendix Five (OmniAir Certifications)
   o Appendix Six (RapidPass)
   o Appendix Seven (ODB)

4. Please send us copies of all Neology documents that you have retained that allegedly relate to any dispute between you and Neology.
5. Please preserve all documents and metadata related to the transmission of any Neology documents to any party.

Thank you,



Roberto Enriquez

Vice President Human Resources

Mobile: + 1 (619) 433 2862

Email: renriquez@neology.net

1917 Palomar Oaks Way, Suite 110

Carlsbad, CA 92008

www.neology.net



**From:** Joe Mullis <joenmullis@gmail.com>
**Sent:** Friday, August 11, 2023 9:42 PM
**To:** Roberto Enriquez <renriquez@neology.net>
**Subject:** Re: Neology Documents

Dear Roberto,

I'm in receipt of your email and recognize your concern.  Any materials I've retained are exclusively to support my legal issues with Neology, Inc., members of Neology Board of Directors, OEP, and JPMorgan.  My legal team will handle the disposition of materials following the conclusion of these matters accordingly.

Regards,


Joe


On Tue, Aug 8, 2023 at 1:42 PM Roberto Enriquez <renriquez@neology.net> wrote:

PRIVILEGED & CONFIDENTIAL

Dear Joe,


Please find attached documents and emails request letter.


Regards,




**Roberto Enriquez**

Vice President Human Resources


Mobile: + 1 (619) 433 2862


Email: renriquez@neology.net


1917 Palomar Oaks Way, Suite 110

Carlsbad, CA 92008


**www.neology.net**




# EXHIBIT D

**From:** Consumer Protection Advocates <consumerprotectionadvocates7@gmail.com>
**Date:** March 11, 2025 at 11:03:47 AM PDT
**To:** Ask.Investigations@dot.ca.gov, CBiemeret@bart.gov, info@metro-oig.net, customers@octa.net, clerkoffice@octa.net, info@rctc.org, info@gosbcta.com, bridgecomments@goldengate.org
**Cc:** Bradley Feldmann <bfeldmann@neology.net>, Joerg Zirener <Joerg.Zirener@oneequity.com>, Andrew Dunn <andrew.dunn@oneequity.com>
**Subject: Urgent Concern Regarding Flip Bit Issue in California Toll Transponders & Call for Immediate Action**

Dear Internal Audit, Compliance, and Investigative Oversight Teams,

We are writing to bring to your attention a critical technical flaw affecting tolling operations and consumer billing across California's toll road systems. This issue demands immediate investigation and corrective action to ensure transparency, accountability, and consumer protection.

## The Flip Bit Issue & Its Impact on Consumers

Several California toll agencies utilize toll transponders supplied by Neology, whose technology is based on an outdated RFID integrated circuit (IC) developed in 2008 by Alien Technology—a Chinese-owned company with manufacturing ties to China. This legacy technology lacks built-in flip bit detection and correction, creating a serious vulnerability in toll transaction accuracy.

When a toll reader scans a transponder, a flipped bit can misrecord the transaction, assigning it to the wrong account—potentially resulting in unnoticed billing errors for consumers. If the bit flips again, the error may self-correct, making it difficult to trace and quantify the financial impact on drivers. This flaw jeopardizes consumer trust and creates potential financial losses that taxpayers unknowingly bear.

A report on this issue was recently circulated among the 6C Coalition, of which many California toll agencies are members. Many agencies have since transitioned to modern RFID ICs that eliminate this problem through built-in flip bit detection and correction—a

technological advancement that ensures reliable tolling operations and protects consumers from erroneous charges.

## Bringing Transparency & Resolution

To bring immediate resolution and transparency to this issue, we have engaged in discussions with other consumer protection organizations and will be formally escalating this matter to:

- State Oversight & Regulatory Bodies responsible for transportation integrity
- The Governor's Office & California Attorney General, given the potential impact on consumer rights and fair billing practices
- Key State Legislators, particularly those on transportation and consumer protection committees
- Media & Public Awareness Campaigns to ensure Californians are informed of this issue and their rights

## Why This Issue Must Be Addressed

Given that Neology remains the only vendor still supplying this outdated technology, there is no justifiable reason why California toll agencies should continue to rely on RFID ICs that do not meet modern industry standards—especially when viable, tested solutions are readily available. Neology has a history of innovation and should be fully capable of developing transponders with updated safeguards.

## Recommended Actions

- Mandate the transition to modern RFID transponders with built-in flip bit detection and correction to eliminate this issue.
- Engage with all transponder vendors—including Neology—to push for updated technology that aligns with current industry standards and consumer protection expectations.

## A Matter of Consumer Protection & Public Trust

California taxpayers and toll road users deserve transparency and accuracy in electronic toll transactions. This issue has persisted for far too long, and agencies must take proactive steps to ensure fair and accountable tolling operations.

We urge immediate action to ensure transparency, accountability, and the integrity of California's tolling systems, safeguarding taxpayers and toll users from financial harm caused by faulty technology.

Sincerely,
Consumer Protection Advocates