EMIL PETROSSIAN (State Bar No. 264222)
epetrossian@glaserweil.com
ALEXANDER R. MILLER (State Bar No. 294474)
amiller@glaserweil.com
GLASER WEIL FINK HOWARD
  JORDAN & SHAPIRO LLP
600 West Broadway, Suite 2850
San Diego, California 92101
Tel.: (619) 765-4380
Fax: (619) 483-0646

*Attorneys for Plaintiff*
NEOLOGY, INC.

*Additional Counsel Listed on Signature Page*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEOLOGY, INC., a Delaware corporation,<br><br>          Plaintiff,<br><br>v.<br><br>JOSEPH N. MULLIS, an individual; and QORE4 LLC, a Nevada limited liability company,<br><br>          Defendants. | Case No.: 3:25-cv-01744-JES-BJW<br><br>Hon. James E. Simmons, Jr.<br>Courtroom No. 4B<br><br>**PLAINTIFF NEOLOGY, INC.'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE UNDER CAL. CODE CIV. PROC. § 425 AND FED. R. CIV. P. 12(f), AND MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)**<br><br>Hearing Date:    January 28, 2026<br>Hearing Time:    9:00 a.m. |

# TABLE OF CONTENTS

Introduction ............................................................................................................. 1

Factual Background ................................................................................................. 1

Argument ................................................................................................................. 3

I.    Defendants' Anti-SLAPP Motion Fails. .......................................................... 5

    A.    The CPA Emails Are Not Protected Petitioning Activity. .................. 5

    B.    Public Records Activity is Not Core to the Claims. ........................... 7

    C.    The *Noerr-Pennington* Doctrine Does Not Apply. ............................ 10

    D.    Neology Has a Probability of Prevailing on Its Claims. .................... 10

        *1.    Neology Has a Probability of Prevailing on Its Trade Libel Claim.* ........................................................................... 11

        *2.    Neology Also Has a Probability of Prevailing on Its Interference and UCL Claims.* .......................................... 14

II.   Defendants' 12(b)(6) Motion to Dismiss Fails. ............................................ 16

    A.    Neology Has Stated a Claim for Breach of Contract. ........................ 16

    B.    Neology Has Stated a Claim for Intentional Interference. ................. 18

    C.    Neology Has Stated a Claim for Trade Secret Misappropriation. ...... 19

        *1.    Neology Has Pleaded Its Trade Secrets with Specificity.* ........ 19

        *2.    The Trade Secrets Are Not Generally Known.* ......................... 21

        *3.    Neology Adequately Has Pleaded Misappropriation.* .............. 22

        *4.    Neology Adequately Has Alleged Ownership of the Trade Secrets.* .............................................................................. 24

        *5.    Neology Need Not Plead Damages, But Has Done So.* ........... 24

    D.    Neology Has Stated a Claim Under the UCL. .................................... 24

Conclusion ............................................................................................................. 25

ii

Glaser Weil

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*1-800 Remodel, Inc. v. Bodor*,
    2018 U.S. Dist. LEXIS 225000 (C.D. Cal. Oct. 17, 2018) ..................23

*Aetna Casualty & Surety Co. v. Centennial Ins. Co.*,
    838 F.2d 346 (9th Cir. 1988) ..................14

*Alfasigma USA, Inc. v. First Databank, Inc.*,
    398 F. Supp. 3d 578 (N.D. Cal. 2019)..................4, 7, 11

*AlterG, Inc. v. Boost Treadmills LLC*,
    2019 U.S. Dist. LEXIS 151688 (N.D. Cal. Sept. 5, 2019)..................16

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
    7 Cal. 4th 503 (1994)..................19

*Applied Medical Distribution Corp. v. Jarrells*,
    100 Cal. App. 5th 556 (2024)..................24

*Baral v. Schnitt*,
    1 Cal. 5th 376 (2016)..................10

*Bautista v. Hunt & Henriques*,
    2012 U.S. Dist. LEXIS 5009 (N.D. Cal. Jan. 17, 2012) ..................7, 9, 11

*Bear Down Brand LLC v. Bora Servs.*,
    2023 U.S. Dist. LEXIS 142749 (C.D. Cal. May 25, 2023)..................15

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................4

*BMO Harris Bank NA v. Corley*,
    2022 U.S. Dist. LEXIS 180826 (D. Ariz. Oct. 3, 2022) ..................20

*CelLink Corp. v. Mamaflex, LLC*,
    2025 U.S. Dist. LEXIS 136884 (N.D. Cal. Jul. 17, 2025) ..................24

*City & Cnty of San Francisco v. Tutor-Sliba Corp.*,
    2005 U.S. Dist. LEXIS 46590 (N.D. Cal. Mar. 17, 2005) ..................17

iii

*ComputerXpress, Inc. v. Jackson*,
    93 Cal. App. 4th 993 (2001) ........................................................................ 9, 11

*Copart Inc. v. Sparta Consulting Inc.*,
    277 F. Supp. 3d 1127 (E.D. Cal. 2017) .......................................................... 18

*Custopharm, Inc. v. Exela Pharma Scis., LLC*,
    2022 U.S. Dist. LEXIS 21475 (S.S. Cal. Feb. 4, 2022) .................................. 18

*Erlich v. Etner*,
    224 Cal. App. 2d 69 (1964) .......................................................................... 14

*Fed. Ins. Co. v. Oak Industries, Inc.*,
    1986 U.S. Dist. LEXIS 29615 (S.D. Cal. Feb. 5, 1986) .............................. 4, 5

*Ferlauto v. Hamsher*,
    74 Cal. App. 4th 1394 (1999) ....................................................................... 11

*Franklin Fueling Sys. v. Veeder-Root Co.*,
    2009 U.S. Dist. LEXIS 72953 (E.D. Cal. Aug. 11, 2009) ......................... 12, 15

*Gregory v. McDonnell Douglas Corp.*,
    17 Cal. 3d 596 (1976) ................................................................................... 11

*Henry Schein, Inc. v. Cook*,
    191 F. Supp. 3d 1072 (N.D. Cal. Jun. 10, 2016) ........................................... 23

*Hicks v. Grimmway Enters., Inc.*,
    2023 U.S. Dist. LEXIS 97760 (S.D. Cal. Jun. 5, 2023) ............................ 3, 4, 6

*HM Elecs. Inc. v. R.F. Techs., Inc.*,
    2013 U.S. Dist. LEXIS 208233 (S.D. Cal. Mar. 15, 2013) ............................ 12

*Homeland Housewares, LLC. v. Euro-Pro Operating LLC*,
    2014 U.S. Dist. LEXIS 156675 (C.D. Cal. Nov, 5, 2014) .............................. 14

*Iloh v. Regents of Univ. of Cal.*,
    94 Cal. App. 5th 947 (2023) ........................................................................... 9

*Imax Corp. v. Cinema Technologies, Inc.*,
    152 F.3d 1161 (9th Cir. 1998) ....................................................................... 21

*Inteliclear, LLC v. ETC Global Holdings, Inc.*,
    978 F.3d 653 (9th Cir. 2020) .................................................................... 21, 24

Glaser
Weil

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOT. TO STRIKE & MOT. TO DISMISS**

*Jordan-Benel v. Universal City Studios, Inc.*,
    859 F.3d 1184 (9th Cir. 2017) ............................................................. 9

*Lexington Ins. Co. v. Energetic Lath & Plaster*,
    2015 U.S. Dist. LEXIS 123123 (E.D. Cal. Sept. 14, 2015) .............................. 16

*Mann v. Quality Old Time Service, Inc.*,
    120 Cal. App. 4th 90 (2004) ............................................................. 15

*Melaleuca, Inc. v. Clark*,
    66 Cal. App. 4th 1344 (1998) ........................................................... 13

*Navellier v. Sletten*,
    29 Cal. 4th 82 (2002) ................................................................... 9

*Neurelis Inc. v. Aquestive Therapeutics*,
    2022 Cal. Super. LEXIS 46216 (June 17, 2022) .......................................... 14

*NJOY, LLC v. Imiracle (HK) Ltd.*,
    760 F. Supp. 3d 1084 (S.D. Cal. 2024) .................................................. 15

*Overstock.com Inc. v. Gradient Analytics, Inc.*,
    151 Cal. App. 4th 688 (2007) ........................................................... 14

*Philips N. Am. LLC v. Advanced Imaging Services*,
    2021 U.S. Dist. LEXIS 211026 (E.D. Cal. Oct. 29, 2021) ................................ 20

*Prata v. Superior Court*,
    91 Cal. App. 4th 1128 (2001) ........................................................... 16

*Silvaco Data Sys. v. Intel Corp.*,
    184 Cal. App. 4th 210 (2010) ........................................................... 18

*Soil Retention Prods. v. Brentwood Indus.*,
    582 F. Supp. 3d 725 (S.D. Cal. 2022) ................................................... 16

*Sosa v. DirectTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ........................................................... 10

*Space Data Corp. v. X*,
    2017 U.S. Dist. LEXIS 109842 (N.D. Cal. Jul. 14, 2017) ............................ 21, 23

*StreamCast Networks, Inc. v. IBIS LLC*,
    2006 U.S. Dist. LEXIS 97607 (C.D. Cal. May 1, 2006) .................................... 17

v

*Strikepoint Trading LLC v. Sabolyk*,
    2008 U.S. Dist. LEXIS 130788 (C.D. Cal. Dec. 22, 2008)................................24

*Swiss Am. Trading Corp. v. Regal Assets, LLC*,
    2015 U.S. Dist. LEXIS 18848 (C.D. Cal. Feb. 17, 2015)............................11, 14

*Sycks v. Transamerica Life Ins. Co.*,
    643 F. Supp. 3d 959 (D. Alaska 2022)................................................17

*Taylor v. Populus Grp., LLC*,
    2020 U.S. Dist. LEXIS 193760 (S.D. Cal. Oct. 19, 2020)................................5

*TMX Funding, Inc. v. Impero Techs., Inc.*,
    2010 U.S. Dist. LEXIS 60260 (N.D. Cal. June 17, 2010) ....................20, 22, 25

*Upstream, Inc. v. BHFO, Inc.*,
    2021 U.S. Dist. LEXIS 97086 (S.D. Cal. May 21, 2021) ................................24

*Vasonova Inc. v. Grunwald*,
    2012 U.S. Dist. LEXIS 176276 (N.D. Cal. Dec. 11, 2012) ............................25

*Veronica Foods Co. v. Ecklin*,
    2017 U.S. Dist. LEXIS 101325 (N.D. Cal. Jun. 29, 2017) ........................22, 23

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ................................3

*Vintage Real Estate Group v. Murray*,
    2023 Cal. Super. LEXIS 7570 (Cal. Super. Ct. Jan. 20, 2023).........................23

*XCorp. v. Ctr. For Countering Digit. Hate, Inc.*,
    724 F. Supp. 3d 948 (N.D. Cal. 2024)................................10

## **STATUTES**

Bus. & Prof. Code §§ 17200 *et seq.* ................................5, 15

Cal. Code Civ. Proc. § 425.16 ................................1, 5

Cal. Code Civ. Proc. § 425.16(e)................................3, 4

Cal. Code Civ. Proc. § 425.17(c)................................5

Cal. Code Civ. Proc. § 3426.7 ................................18

vi

# <u>OTHER AUTHORITIES</u>

Fed. R. Civ. P. 12(b)(6) .................................................................. 1, 4, 16

Fed. R. Civ. P. 12(f) ......................................................................... 1, 4, 5

Fed. R. Evid. 201(b) ................................................................................ 7

1   Plaintiff Neology, Inc. ("Neology") respectfully opposes Defendants Joseph N.

2   Mullis's ("Mullis") and QORE4, LLC's ("QORE4," together with Mullis,

3   "Defendants") Special Motion to Strike Under Cal. Code Civ. Proc. § 425.16 and Fed.

4   R. Civ. P. 12(f) and Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) (the "Motion").

5                              **INTRODUCTION**

6   Neology's First Amended Complaint (Dkt. No. 31) ("FAC") seeks to remedy the

7   harm caused by Defendants' stealing Neology's trade secrets and disparaging Neology

8   to its customers (pretending to be a "consumer protection advocate") to unfairly

9   compete in the tolling industry. The FAC includes straightforward claims for breach of

10  contract, intentional interference with contract, misappropriation of trade secrets, trade

11  libel, and unfair competition. In their Motion, Defendants' assert these claims are

12  strategic lawsuits against public participation ("SLAPP") and otherwise fail to state a

13  claim for which relief may be granted.

14  Both motions are baseless. Defendants are competitors who present to be

15  engaged in "public participation" by *deceiving* public entities about their identity by

16  pretending to be a "consumer protection advocate." As we know now from the

17  expedited discovery ordered by this Court and opposed by Defendants, the "consumer

18  protection advocate" who falsely attacked Neology's products was Mullis, the CEO of

19  Neology competitor, QORE4. Defendants' actions were taken to obtain a competitive

20  edge, rendering them commercial speech. Defendants also drastically overstate the

21  relevance of arguably protected activity to the claims at issue. Moreover, Defendants'

22  positions in support of their motion to dismiss ignore and are entirely inconsistent with

23  the Rule 12(b)(6) standard, under which the truth of the FAC's allegations must be

24  assumed and the totality of the allegations considered as a whole. Defendants do

25  neither. For all these reasons, which are explained in greater detail below, the Court

26  should deny Defendants' Motion.

27                         **FACTUAL BACKGROUND**

28  Neology operates in the highly technical tolling industry and services public

agencies, focusing on the design, manufacturing, and integration of sophisticated electronic toll collection systems, automated vehicle identification and classification based on radio-frequency identification ("RFID"), enforcement technologies, and digital payment platforms. (FAC ¶¶ 1-2, 22-25.) Neology bids for and wins business through resource-intensive proposals that incorporate Neology's confidential and trade secret information, including pricing, technical approaches, and supply-chain strategies. (FAC ¶ 26.)

Mullis joined Neology in 2003 and ultimately served as its General Manager for the United States, while also sitting on Neology's Board of Directors. (FAC ¶¶ 27-30.) His roles gave him access to Neology's strategic, financial, technical, supply-chain, and pipeline information under an Employment Agreement that imposed strict confidentiality and return-of-information obligations surviving termination. (FAC ¶¶ 31-32.) In September 2022, Neology terminated Mullis as part of a company restructuring. (FAC ¶¶ 35, 89.)

After terminating him, Neology discovered that, beginning in or around May 2020 and continuing through his departure, Mullis had forwarded to his personal Gmail account a substantial volume of Neology's confidential and trade secret materials—creating a private library of Neology's strategic plans, pipeline, pricing and margin data, supplier terms, and proposal materials—that he then refused to identify or return despite repeated demands. (FAC ¶¶ 2-5, 40-58, 72-88.) This was information that Neology protected and Mullis was contractually obligated to keep confidential and to return to Neology upon his departure from the company. (*Id.* ¶¶ 36-39.)

Less than a year after departing Neology, Mullis launched QORE4, an RFID-focused competitor, using Neology's trade secrets and immediately began to compete with Neology in the highly technical and complex tolling industry. (FAC ¶¶ 3-7, 90, 93.) Unable to compete legitimately, Defendants devised and executed an anticompetitive scheme to disparage Neology and disrupt its customer relationships. (FAC ¶¶ 1, 7-11, 93-110.) As part of that scheme, beginning in or about March 2025,

Glaser
Weil

Mullis, while CEO and sole managing member of QORE4, posed as a non-existent "Consumer Protection Advocates" ("CPA") organization and sent multiple emails to Neology's public-agency customers making false and misleading statements about Neology's products, all while concealing his identity. (FAC ¶¶ 102-10.) Further, Defendants submitted proposals deceptively presenting Neology's work and track record as that of QORE4. (FAC ¶¶ 94-96.) These schemes reflect efforts by Defendants since the inception of QORE4 to gain unfair competitive advantages over Neology. (FAC ¶¶ 93-101.)

Defendants' misrepresentations caused injury to Neology, including reputational harm and the diversion of significant resources to correct the record and mitigate the resulting disruption. (FAC ¶¶ 108-111.) The misrepresentations were designed to, and did, cause disruption, including heightened audits, inquiries, and internal escalations at certain agencies, causing Neology to take expensive steps to retain its customers. (Haddix Decl. ¶ 6). In particular, Neology expended $90,000 of dollars on public relations consultants in addition to attorneys' fees, and devoted substantial internal resources responding to Defendants' conduct. (FAC ¶¶ 108-110; Haddix Decl. ¶¶ 6, 8.)

## **ARGUMENT**

In considering Defendants' Anti-SLAPP Motion to Strike, the Court must engage in a two-part inquiry. *Hicks v. Grimmway Enters., Inc.*, 2023 U.S. Dist. LEXIS 97760, at *5 (S.D. Cal. Jun. 5, 2023) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003)). First, Defendants must show that the challenged claims arise from "protected activity," as defined in Cal. Code Civ. Proc. § 425.16(e). Protected activity under Cal. Code Civ. Proc. § 425.16(e) includes (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum

3

1  in connection with an issue of public interest; or (4) any other conduct in furtherance

2  of the exercise of the constitutional right of petition or the constitutional right of free

3  speech in connection with a public issue or an issue of public interest. *Id.*

4       Under this first prong, courts consider whether the cause of action arises from

5  commercial speech rather than petitioning activity. *Id.* at *6. Establishing commercial

6  speech is a "low threshold." *Alfasigma USA, Inc. v. First Databank, Inc.*, 398 F. Supp.

7  3d 578, 587 (N.D. Cal. 2019). If the cause of action arises from commercial speech, the

8  anti-SLAPP analysis ends. *Hicks*, 2023 U.S. Dist. LEXIS 97760, at *7. If not, the Court

9  continues to the second step of the analysis.

10       Second, the plaintiff must then demonstrate a probability of prevailing on the

11  claims at issue, and the trial court considers the pleadings and/or evidentiary

12  submissions of both the plaintiff and defendants. *Alfasigma*, 398 F. Supp. 3d at 584. In

13  making this assessment, courts do not weigh the credibility or comparative probative

14  strength of competing evidence. Rather, courts may grant an anti-SLAPP motion only

15  if, as a matter of law and taking as true all of the evidence in light favorable to the

16  plaintiff, the plaintiff fails to demonstrate a minimum level of legal sufficiency and

17  trialability. *Id.* at 585-86.

18       On a Rule 12(b)(6) motion to dismiss, the Court must accept as true all well-pled

19  factual allegations. *See Fed. Ins. Co. v. Oak Industries, Inc.*, 1986 U.S. Dist. LEXIS

20  29615, at *4 (S.D. Cal. Feb. 5, 1986). Rule 8 sets forth a plausibility pleading standard,

21  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), and the FAC must be

22  liberally construed and should not dismissed unless it appears beyond a doubt that

23  Neology could not prove any set of facts to support the claim which would entitle it to

24  relief. *Fed. Ins. Co.*, 1986 U.S. Dist. LEXIS 29615 at *4-5.[1]

25  ───────────────

26  [1] Defendants have styled their motion as arising under Rule 12(f) as well. Under that
rule, the Court may strike from a pleading only such matters that are (1) an insufficient
27  defense; (2) redundant; (3) immaterial; (4) impertinent; or (5) scandalous. *Taylor v.
Populus Grp., LLC*, 2020 U.S. Dist. LEXIS 193760, at *4 (S.D. Cal. Oct. 19, 2020).
28  Rule 12(f) targets surplusage in pleadings, not wholesale claim dismissal; using it to

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOT. TO STRIKE & MOT. TO DISMISS**

## I.    Defendants' Anti-SLAPP Motion Fails.

### A.    The CPA Emails Are Not Protected Petitioning Activity.

Neology asserts three claims arising from Defendants' CPA emails: intentional interference with contract (Count V), trade libel (Count VI), and unfair competition claim under Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL") (Count VII). Defendants attack these claims in the aggregate, arguing that they "plainly qualify as protected petitioning activity under various subparts of Section 425.16," (Mot. at 4). Yet Defendants neither identify the purported relevant "subparts," nor explain how any would apply. None does.[2] The CPA emails were not petitioning activity; they were commercial speech expressly exempt from anti-SLAPP protections. Cal. Code Civ. Proc. § 425.17(c).

Courts assess four factors to determine whether the commercial speech exemption to the SLAPP law applies: (1) the cause of action is against a person primarily engaged in the business of selling or leasing goods or services; (2) the cause of action arises from a statement or conduct by that person consisting of representations of fact about that person's or a business competitor's business operations, goods, or services; (3) the statement or conduct was made either for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services or in the course of delivering the person's goods or services; and (4) the intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer. *Hicks*, 2023 U.S. Dist. LEXIS 97760, at *6.

While Defendants do not mention the commercial speech exemption at all, there

---

strike portions of a complaint that seek dismissal is improper. *Id.* Defendants do not attempt to meet the Rule 12(f) standard and instead seek dismissal so any Rule 12(f) argument fails.

[2] These were not statements made before a proceeding or made in connection with an issue under consideration by a legislative, executive or judicial body. Cal. Code Civ. Proc. § 425.16(e)(1), (2). The statements also are in private emails, not a public forum, and they do not concern public issues. Cal. Code Civ. Proc. § 425.16(e)(3), (4).

can be no serious dispute as to factors one, two, and four. Each cause of action is brought against Mullis—QORE4's founder, sole Managing Member, and Chief Executive Officer—and against QORE4 itself, a direct competitor of Neology. The statements at issue purport to make factual representations about the products of Neology, a QORE4 competitor, including assertions that Neology's technology is outdated, that Neology is the sole vendor supplying it, and that an alternative technology would be preferable. (FAC ¶¶ 104-106.) The recipients were Neology's customers, and thus QORE4's potential customers, including the Los Angeles County Metropolitan Authority, the Colorado Department of Transportation, the Oklahoma Turnpike Authority/Department of Transportation, the Bay Area Rapid Transit, the Utah Department of Transportation, the Riverside County Transportation Commission, the Golden State Bridge Highway & Transportation District, the San Bernardino County Transportation Authority, the Northwest Parkway, E-470 Public Highway Authority, the Orange County Transportation Authority, the San Francisco Bay Area Rapid Transit District, the North Texas Tollway Authority, the Kansas Turnpike Authority, the Georgia State Inspector General, and the Texas Department of Transportation. (FAC ¶ 102; Haddix Decl. ¶ 5.) Defendants seek to inflate the fact that these customers are public agencies and, therefore, that the statements concerned public issues. But that has no bearing on whether the commercial speech exemption applies. *See Hicks*, 2023 U.S. Dist. LEXIS 97760, at *12 ("Communications may, however, 'constitute commercial speech notwithstanding the fact that they contain discussions of important public issues.' Moreover, the distribution of the ESG Report to legislative officials does not negate the ESG Report's commercial nature.").

Defendants' Motion implicitly targets only factor three. They contend that Neology's allegation that the communications were intended to induce the agencies to terminate their contracts with Neology is unsupported because the emails did not expressly offer QORE4 products or explicitly request termination. (Mot. at 6.) Defendants fight with the pleadings and the facts. Neology need not identify a

talismanic phrase in which Defendants asked customers to cancel their Neology contracts or purchase Defendants' products to satisfy the third factor. Neology has pled that the purpose of the communications was to influence commercial decisions by Neology's customers in a manner that would benefit QORE4. (*See* FAC ¶ 108.) This allegation must be taken as true at this stage of the case. *See Alfasigma USA, Inc.*, 398 F. Supp. 3d at 585-56. To the extent Defendants' position is that Neology has not yet proved this assertion, that makes sense. Neology has not had the opportunity to engage in discovery; dismissal on this factual dispute alone would therefore be improper. *See Bautista v. Hunt & Henriques*, 2012 U.S. Dist. LEXIS 5009, at *23-24 (N.D. Cal. Jan. 17, 2012) ("While Defendant may prove to be correct, Plaintiff has not had the opportunity to engage in any discovery.").[3]

In any event, the factual context corroborates Neology's allegations. Defendants disseminated false accusations about Neology's technology to Neology's known customers, cloaking themselves in the guise of a consumer protection agency to lend credence to their disparaging statements. The evident purpose of that conduct was to disrupt Neology's customer relationships and thereby advance QORE4's commercial interests. Indeed, Defendants made materially similar statements when directly competing with Neology for business. (FAC ¶ 108.) Defendants' conduct fits comfortably within factor three's requirement that the statements be made to promote or secure commercial transactions.

    B.    Public Records Activity is Not Core to the Claims.

Defendants also argue that Neology's misappropriation, intentional interference, trade libel, and UCL claims (Counts III, IV, V, VI, and VII) target Defendants'

---

[3] The Court should not take judicial notice of another complaint to validate Defendants' concerns. (Dkt. No. 34-3.) Whether those concerns were legitimate is irrelevant to whether their speech was commercial (it was). In any event, this is a disputed merits issue, not a proper subject of judicial notice. *See* Fed. R. Evid. 201(b). If the Court takes notice anyway, it should also notice that the unverified *RJL* complaint concerns matters unrelated to the CPA emails and Neology was dismissed from that case.

invocation of public records laws. But, at best, Defendants misrepresent the context in which Neology raises public records activity. In the FAC, the public records activity serves three limited purposes: (1) demonstrating Neology's further, non-exhaustive efforts to protect disclosure of its trade secrets; (2) providing one non-exhaustive basis for how Defendants knew about Neology's existing contracts; and (3) shedding further light on Defendants' goals here: to mimic Neology's business to gain an unfair competitive advantage in the market. (FAC ¶¶ 39, 100, 150.)

While the public records activity is thus relevant, it is not "core" to the claims at issue which are founded upon other conduct unrelated to that activity. For example, Neology's misappropriation claims concern the information Mullis stole while at Neology and then passed on to QORE4. While Neology accurately states that Defendants are trying to get trade secrets through public records requests as well, that is not the conduct that gives rise to the misappropriation claim. (*See* FAC ¶¶ 131-133.) Moreover, while Neology alleges that it protects its trade secret information through various state procedures for public records requests, this allegation merely bolsters the other ones already demonstrating that Neology reasonably protects its trade secret information. (*See, e.g.,* FAC ¶¶ 36-38.) Defendants' assertion that these claims merely "re-cast lawful public records activity as unlawful" (Mot. at 15) misstates the pleadings and fails for the same reason.

With respect to the intentional interference claim, the targeted conduct has nothing to do with public records requests. Rather, Neology alleges that Defendants had knowledge of Neology's existing contracts through their knowledge of the industry, Neology's business, *and* public records requests. As for the trade libel claim, Neology does not even mention public records activity in support of it.

Finally, while the UCL claim mentions Defendants' misuse of public records requests, the gravamen of the claim is Defendants' comprehensive, anti-competitive scheme to harm Neology and take its market share. (FAC ¶ 165.) At its core, the claim concerns Mullis's attempt to recreate Neology's business for himself and QORE4,

8

1    using the trade secrets he stole, its track record he passed off as his own, its former

2    employees, and its customer relationships. (*Id.*)[4]

3        To that end, Neology is not, as Defendants suggest, "suing over Defendants' use

4    of public records laws and related proceedings" (Mot. at 6).[5] The mere fact that

5    Defendants' invocation of public records laws may be relevant to the factual

6    background does not transform Neology's claims into matters arising out of protected

7    speech. As the Ninth Circuit has explained, even where speech or petitioning activity

8    is tangentially implicated, it is not the basis of a claim unless it constitutes the specific

9    wrongful act challenged. *See Jordan-Benel v. Universal City Studios, Inc.*, 859 F.3d

10   1184, 1190-91 (9th Cir. 2017); *see also Bautista*, 2012 U.S. Dist. LEXIS 5009, at *13

11   ("[C]ollateral allusions to protected activity should not subject the cause of action to

12   the anti-SLAPP statute.") (cleaned up).

13       Defendants next make a related, convoluted argument that the FAC's references

14   to public records requests should be stricken, and that the claims must then be dismissed

15   because, without those allegations, they cannot survive. (Mot. at 9.)[6] This is just a

16

17   _____

18   [4] *Iloh v. Regents of Univ. of Cal.*, 94 Cal. App. 5th 947 (2023) is factually dissimilar.
     Unlike in *Iloh*, Neology is not suing to prevent disclosure of communications or
     prohibit newsgathering activities. Rather, it is suing to remedy the misappropriation of

19   its trade secrets, the use of a fictious agency to disparage and harm its relationships,
     and the overall anticompetitive scheme Defendants are engaged in.

20   [5] Defendants implicitly agree. They cite *Navellier v. Sletten*, 29 Cal. 4th 82 (2002), for

21   the argument that "the critical consideration is whether the cause of action is *based on*
     the defendant's protected free speech or petitioning activity." (Mot. at 8 (emphasis

22   added).) As one of Defendants' other cases further articulates "the act which forms the
     basis for the plaintiff's cause of action must *itself* have been an act in furtherance of the

23   right of petition or free speech." *ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th
     993, 1003 (2001) (cleaned up) (emphasis in original).

24   [6] Defendants cite *XCorp. v. Ctr. for Countering Digit. Hate, Inc.*, 724 F. Supp. 3d 948

25   (N.D. Cal. 2024), and *Baral*, 1 Cal. 5th 376, to make this point, but rely only on non-
     controversial legal standards. *XCorp.*, 724 F. Supp. 3d at 963 (whether the exercise of

26   protected activity is valid does not impact the assessment if a claim is based on
     protected activity); *Baral*, 1 Cal. 5th at 396 (successful anti-SLAPP motion eliminates

27   protected-activity allegations underlying a stricken claim that do not otherwise support
     a surviving claim). As noted above, *Baral* also says contextual allegations cannot be

28   stricken, which is exactly Neology's point. *See supra* p. 10.

9

repackaging of the same meritless argument. Public records allegations need not be stricken from a complaint if the plaintiff's causes of action are not premised on them. *Baral v. Schnitt*, 1 Cal. 5th 376, 394 (2016) ("Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute."). In any event, as explained above, the public records allegations are not so intertwined with Neology's claims that they do not otherwise survive; they do.

### C.    The *Noerr-Pennington* Doctrine Does Not Apply.

Defendants devote a single sentence to asserting that their conduct is immunized by the *Noerr-Pennington* doctrine (Mot. at 8), but that perfunctory assertion lacks substance and warrants only a brief response. This case does not burden petitioning activity. *Compare Sosa v. DirectTV, Inc.*, 437 F.3d 923, 932 (9th Cir. 2006) (cited by Defendants) (seeking liability for sending demand letters would "quite plainly burden [defendant's] ability to settle legal claims.") Moreover, Neology references the public records requests solely to show that they are being used for sham purpose. On those bases, *Noerr-Pennington* is inapplicable.

### D.    Neology Has a Probability of Prevailing on Its Claims.

Even if the Court finds that the claims implicate protected speech (they do not) and that the public records allegations are essential (they are not), dismissal is improper because Neology can demonstrate a probability of prevailing on its claims. Where, as here, Defendants attack facts before discovery has commenced, such an attack is premature and an outright dismissal is inappropriate. *Bautista*, 2012 U.S. Dist. LEXIS 5009, at *10. Regardless, this second prong requires "only a minimum level of legal sufficiency and trialability," where all evidence is taken as true and in plaintiff's favor. *Alfasigma*, 398 F. Supp. 3d 585 (citations omitted). Neology's trade libel (Count VI) and, in turn, intentional interference claim (Count V) and UCL claim (Count VII) easily meet this standard.

1    *1.    Neology Has a Probability of Prevailing on Its Trade Libel Claim.*

2    Defendants advance four arguments as to why Neology's trade libel claim

3    purportedly fails and then attempt to bootstrap those arguments to the remaining claims.

4    The first contention—that the FAC merely characterizes rather than quotes the

5    challenged statements—lacks merit. It is incorrect as a factual matter: the FAC directly

6    quotes the CPA letters. (FAC ¶¶ 104–106.) In any event, the FAC attaches—and

7    therefore incorporates—an exemplar of the complete letter. (FAC, Ex. D.) These

8    allegations satisfy the requirement to plead the substance of the statements at issue.

9    Defendants' second argument that the challenged statements are "classic

10    statements of opinion, prediction, and advocative puffery" (Mot. at 11) rests on

11    inapposite authority[7] and fails on the merits. Puffery encompasses generalized,

12    subjective assertions "upon which no reasonable buyer would rely." *Swiss Am. Trade*

13    *Corp. v. Regal Assets, LLC*, 2015 U.S. Dist. LEXIS 18848, at *5 (C.D. Cal. Feb. 17,

14    2015). Here, by contrast, Defendants deliberately cloaked their statements with the

15    gravitas of a purportedly verified third-party protection agency, plainly designed to

16    induce reliance. That context alone undermines any claim that the statements were

17    nonactionable opinions. *See id.*, at *5-6 ("fabricated opinions of purportedly

18    knowledgeable professionals in the field who, in reality, do not exist," were actionable).

19    Substantively, the statements are actionable because they assert verifiable facts

20    rather than vague, promotional opinions or predictions. *See Franklin Fueling Sys. v.*

21    *Veeder-Root Co.*, 2009 U.S. Dist. LEXIS 72953, at *18 (E.D. Cal. Aug. 11, 2009)

22    (statements capable of being proven true or false are subject to trade libel liability). The

23    law distinguishes between general, subjective claims about a product and actionable

24

25    ───────────────

26    [7] *ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993 (2001) concerned anonymous, hyperbolic message-board posts. *Gregory v. McDonnell Douglas Corp.*, 17 Cal. 3d 596 (1976) addressed heated labor-dispute rhetoric about union officers' motives. *Ferlauto*

27    *v. Hamsher*, 74 Cal. App. 4th 1394 (1999) involved partisan name-calling in a memoir

28    signaling "rhetorical hyperbole." Here, by contrast, Defendants made verifiable factual assertions intended to induce reliance—that are actionable if false.

misrepresentations concerning specific and absolute characteristics whose veracity can be tested. *See id.*, at *18. The challenged statements fall squarely in the latter category. Defendants represented that Neology's transponders suffer from a "critical technical flaw," purportedly because Neology uses "an outdated RFID integrated circuit (IC) developed in 2008" and "remains the only vendor still supplying this outdated technology," while "[m]any agencies have since transitioned to modern RFID ICs that eliminate this problem." These are concrete, testable assertions about product design, market adoption, and comparative performance, not rhetorical flourishes. (FAC ¶¶ 104-106; Haddix Decl. ¶ 4.) *See HM Elecs., Inc. v. R.F. Techs., Inc.*, 2013 U.S. Dist. LEXIS 208233, at 17 (S.D. Cal. Mar. 2013) ("it is clear that Plaintiff alleges Defendant did much more than express mere opinions.").

Defendants' position also undermines itself. Although framed as an opinion/puffery challenge, their briefing effectively argues that the statements are true and necessarily treats the statements as verifiable facts rather than nonactionable opinions. *See Franklin Fueling Sys.*, 2009 U.S. Dist. LEXIS 72953, at *18. For example, Defendants contend that the statement "Neology remains the only vendor still supplying this outdated technology" is not actionable because Neology's rebuttal identifies other manufacturers in the 6C coalition only as entities that *use* the same base technology, not suppliers of it. (FAC ¶ 105.) In context, however, use and supply are synonymous for purposes of this assertion. (*See* Haddix Decl. ¶ 4.) The statement is therefore false.

Defendants further suggest that ambiguities concerning geography and customer scope render the statement an unprovable opinion. But those hypotheticals are beside the point. Defendants asserted that Neology is the only entity supplying this technology, and that assertion is false regardless of the customer or region at issue. As another example, Defendants' assert that their statement that other modern RFID ICs would eliminate the issue of mischarges is nonactionable because it purportedly aligns with Neology's public blog post. (Mot. at 11.) This is wrong because it rests on a selective

Glaser
Weil

reading of the post that is stripped of context. The post's organizing premise is that bit flips are "so rare, that no U.S. tolling agency or toll industry certification consortium has mandated the requirement for bit flip correction in its RFID tag standards." (Haddix Decl. ¶ 7; *see also* FAC ¶ 106.)[8] By Defendants' own rule, "the words at issue must be specifically identified in their context." (Mot. at 11.) Read in full, the blog post does not say what Defendants claim; it undermines their position.

Third, Defendants argue that Neology's trade libel claim fails merely because the challenged statements were made to sophisticated industry participants rather than the general public. But if adopted, Defendants' position would effectively immunize disparagement delivered to the very consumers who matter most in commercial markets, even though that is a common setting for trade libel. The audience is relevant in that if statements are raised in a context in which "the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion." *Melaleuca, Inc. v. Clark*, 66 Cal. App. 4th 1344, 1354 (1998). But that is not what occurred here. Defendants' false statements were presented as though they were being made by a verified third-party agency from which the audience—public agencies—would expect factual assertions, not rhetorical opinion. Far from undermining Neology's claim, *Overstock.com Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688 (2007), cited by Defendants, supports Neology. There, the court allowed claims to proceed even though the publications were aimed at institutional investors, a sophisticated audience with specialized knowledge. *Id.* at 718. This Court should do the same.

Fourth, Neology adequately alleged pecuniary harm. Defendants are incorrect

---

[8] Defendants request judicial notice of this blog post, which is attached as Exhibit B to the Haddix Declaration and publicly available. Defendants also request judicial notice of thirteen (13) website links, but do not reference, rely on, or otherwise explain their connection to the Motion.

that Neology needed to plead specific lost sales.[9] Instead, it is sufficient that Neology has alleged that Defendants' statements necessitated both substantial expenditures on a public-relations firm to address the disruption with customers and a diversion of internal business resources to respond to Defendants' false statements. (FAC ¶ 110.) *See Neurelis Inc. v. Aquestive Therapeutics*, 2022 Cal. Super. LEXIS 46216, at *2 (June 17, 2022); *Swiss*, 2015 U.S. Dist. LEXIS 18848, at *6 (harm to reputation and goodwill sufficient). Although not required at this stage, Neology has further quantified these losses, which total over $90,000. (Haddix Decl. ¶ 8.) In *Neurelis*, it was sufficient that the plaintiff "suffered harm to its reputation and goodwill," and had to "pay multiple medical and communications consultants to respond to and correct [defendant's] campaign of disinformation[.]" *Id.* at *2. Neology pleads at least as much here: its reputation was harmed, it incurred consultant fees to correct the record and prevent procurement cancelations or delays from confused and concerned customers, and it was forced to divert time and resources from core operations to counter Defendants' false statements. (FAC ¶ 110; Haddix Decl. ¶ 8.)[10] Thus, Neology has demonstrated a probability of prevailing on its trade libel claims.

      *2.*    *Neology Also Has a Probability of Prevailing on Its Interference and UCL Claims.*

Because Neology will prevail on the trade libel claim, it will likewise prevail on

---

[9] There may also be lost sales. As Neology pleads, it cannot yet know the impact on its future business. Defendants seize on that uncertainty to suggest the absence of harm, but it simply recognizes that the statements may continue to injure Neology beyond the date of the FAC.

[10] Once again, Defendants' authority is distinguishable. *Erlich v. Etner*, 224 Cal. App. 2d 69 (1964) (at ***trial***, plaintiff made no showing of damages); *Homeland Housewares, LLC. v. Euro-Pro Operating LLC*, 2014 U.S. Dist. LEXIS 156675 (C.D. Cal. Nov, 5, 2014) (generally seeking $3 million in damages for several claims without alleging any was attributable to libelous statements); *Aetna Casualty & Surety Co. v. Centennial Ins. Co.*, 838 F.2d 346 (9th Cir. 1988) (merely stating special damages are an element of the claim); *Franklin Fueling Sys*, 2009 U.S. Dist. LEXIS 72953 (special damages alleged); *Mann v. Quality Old Time Service, Inc.*, 120 Cal. App. 4th 90 (2004) (plaintiff cannot rely on a "general decline in business," which Neology does not).

its derivative intentional interference (Count V) and UCL (Count VII) claims too.

Neology's UCL claim also survives on its own. The UCL recognizes three categories of unfair competition: the unlawful, the unfair, and the fraudulent. Cal. Bus. & Prof. Code § 17200. Because Neology has adequately pleaded predicate violations—including intentional interference with contract, trade libel, and trade secret misappropriation—it has also sufficiently alleged a UCL violation. *See, e.g.*, *Bear Down Brand LLC v. Bora Servs.*, 2023 U.S. Dist. LEXIS 142749, at *8 (C.D. Cal. May 25, 2023) ("A tortious interference with contract claim can serve as a predicate 'unlawful' business practice for UCL purposes.")

Even absent a predicate claim, however, the UCL claim may proceed under the unfair and fraudulent prongs. Under the unfair prong, a competitor must allege conduct that "significantly threatens or harms competition." *NJOY, LLC v. Imiracle (HK) Ltd.*, 760 F. Supp. 3d 1084, 1115 (S.D. Cal. 2024). Neology has done so: Defendants are diverting public-agency customers from Neology's products by disseminating false statements while impersonating a fictitious public interest agency. As in *NJOY*, Defendants' conduct distorts the competitive process by forcing Neology to compete with Defendants' duplicitous schemes. *Id.* Competition is also undermined when a competitor purports to act as an impartial watchdog and publicly comments on another competitor.

The same conduct plainly satisfies the fraudulent prong. Acting for QORE4, Mullis sent emails to Neology's public-agency customers containing false or materially misleading statements while posing as a consumer protection agency. Defendants' intentional concealment of Mullis's identity and the impersonation of a legitimate agency are, by definition, fraudulent. The UCL's burden is modest: Neology need only show that members of the public are likely to be deceived. *Prata v. Superior Court*, 91 Cal. App. 4th 1128, 1144 (2001). Neology meets that standard. Accordingly, the anti-SLAPP motion should be denied as to these counts.

## II.     Defendants' 12(b)(6) Motion to Dismiss Fails.

Neology's claims are not subject to dismissal under Rule 12(b)(6) either because all of the disputed claims are based on plausible, adequately pled factual allegations.[11]

### A.     Neology Has Stated a Claim for Breach of Contract.

Defendants advance three grounds for dismissing Neology's breach of contract claim against Mullis. None of them has merit.

First, they contend that Neology has not plausibly alleged damages. That is incorrect. The FAC alleges that Mullis's breach caused harm, including by using confidential information to launch a competing venture that free-rode on Neology's proprietary information, necessarily impairing its competitive position, diverting market share, and impeding its ability to win business. (*See* FAC ¶¶ 5, 94, 118.) Straight-forward allegations like these are sufficient to plead damages at this stage. *See, e.g., AlterG, Inc. v. Boost Treadmills LLC*, 2019 U.S. Dist. LEXIS 151688, at *29 (N.D. Cal. Sept. 5, 2019) (allegation that plaintiff suffered monetary damage because defendants used confidential information to compete was sufficient); *Lexington Ins. Co. v. Energetic Lath & Plaster*, 2015 U.S. Dist. LEXIS 123123, at *22 (E.D. Cal. Sept. 14, 2015) (allegation that plaintiff suffered damages as a result of breach was sufficient); *Soil Retention Prods. v. Brentwood Indus.*, 582 F. Supp. 3d 725, 737 (S.D. Cal. 2022) ("a plaintiff need not plead contract damages with unusual specificity. . . . Fairly rudimentary contract allegations satisfy Rule 8."); *Sycks v. Transamerica Life Ins. Co.*, 643 F. Supp. 3d 959, 973 (D. Alaska 2022) ("Plaintiffs do not plead in detail the damages they claim to have suffered from Defendant's breach, but they need not do so.")

Defendants' Motion attempts to use Rule 9(g) to convert the plausibility standard into one of hyper-specificity. But Rule 9(g) applies only to special damages. Fed. R. Civ. P. 9(g). Because the law can imply damages from a breach of contract, a plaintiff

---

[11] Counts V (intentional interference) and VI (trade libel) are sufficiently pled for the reasons stated above.

need not plead special damages to state a claim and Rule 9(g) is not implicated. *See StreamCast Networks, Inc. v. IBIS LLC*, 2006 U.S. Dist. LEXIS 97607, at *17 (C.D. Cal. May 1, 2006). For that reason, "[o]n a motion to dismiss, general factual allegations of injury may suffice, for a court will presume that the general allegations embrace those specific facts that are necessary to support the claim." *Id.* Thus, even if Neology has not alleged special damages arising from Mullis's breach, that would not warrant dismissal where, as here, general damages are alleged. Courts instead routinely defer any dispute over special damages until a later stage. *See id.*, at *19. Defendants' own authority confirms as much: in *City & County of San Francisco v. Tutor-Sliba Corp.*, 2005 U.S. Dist. LEXIS 46590 (N.D. Cal. Mar. 17, 2005), the court refused to dismiss a contract claim for lack of particularized special-damages allegations because it could not "determine whether the damages sought in each [breach of contract] claim would inevitably follow from the alleged wrongful conduct[.]" *Id.* at *49-52.

Second, Defendants assert that Mullis's breaches predating July 8, 2021 are time barred under the four-year limitations period. But Neology expressly pleads that it did not discover Mullis's misconduct until he left company. (FAC ¶¶ 4, 40.) This, of course, makes sense. The hallmark of a misappropriation scheme like Mullis's is concealment. He used his personal email and stored documents outside of Neology's systems. (FAC ¶¶ 40, 73.) Neology had no practical way to detect that conduct: use of personal email was unauthorized and served no business purpose, and Mullis had a company-issued device and email that he was expected to use for all company business. (*See id.* ¶ 72.) The statute of limitations therefore did not begin to run until Neology reasonably discovered the misconduct, *i.e.* after September 2022. *See Custopharm, Inc. v. Exela Pharma Scis., LLC*, 2022 U.S. Dist. LEXIS 21475, at *10-13 (S.D. Cal. Feb. 4, 2022) (discovery rule tolls breach of contract "where '[t]he injury or the act causing the injury, or both, have been difficult for the plaintiff to detect'; 'the defendant has been in a far superior position to comprehend the act and the injury'; and 'the defendant had reason

1    to believe the plaintiff remained ignorant he had been wronged.'").[12]

2    Third, Defendants' argument that the breach claim is preempted by the California

3    Uniform Trade Secret Act ("CUTSA") because it is based on the same nucleus of facts

4    as the misappropriation claims fails as a matter of law. CUTSA does not displace

5    "contractual remedies, whether or not based upon misappropriation of trade secret."

6    Cal. Code Civ. Proc. § 3426.7. Defendants' conclusory assertion that the contract claim

7    "is at its core a quasi-contract / implied-in-law restitution," (Mot. at 25), is unsupported

8    and incorrect, as evidenced by the fact that it is inconsistent with Defendants' own

9    characterization of the claim as being one for "breach of written contract." (Mot. at 17)

10   Because Neology asserted a claim for breach of written contract, CUTSA does not

11   preempt it.[13]

12       B.    Neology Has Stated a Claim for Intentional Interference.

13   Defendants contend that the intentional interference claim against QORE4

14   related to Mullis's employment agreement (Count II) fails because it is "circular,"

15   (Mot. at 18), analogizing this case to those holding that a party cannot interfere with its

16   own contract. That analogy is misplaced. This case involves three separate actors:

17   Neology and Mullis, who entered into the employment contract in 2011, and QORE4,

18   formed twelve years later, that interfered with the preexisting agreement. Put another

19   way, QORE4 is a distinct corporate entity. The fact that a corporation acts through its

20   officers, or may be deemed to possess their knowledge, does not immunize it from

21   liability when it induces one of those officers to breach his prior, independent

22   employment contract. Nor do the allegations that Mullis often acted on QORE4's behalf

23   collapse all of QORE4's conduct into Mullis's conduct. The complaint identifies other

24   QORE4 executives and collective corporate actions through which QORE4 could have,

25

---

26   [12] Defendants' argument also narrows the scope of the claim, which challenges not only the initial taking of information but the ongoing use and disclosure of it.

27   [13] Neither *Copart Inc. v. Sparta Consulting Inc.*, 277 F. Supp. 3d 1127 (E.D. Cal. 2017),

28   nor *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210 (2010) concerned preempting contract claims. They are therefore inapposite.

Glaser Weil

and did, operate. (FAC ¶¶ 91-92.) It is therefore incorrect to assert that every relevant act of QORE4 was merely Mullis acting for himself.

Defendants cite no authority supporting their novel theory. In fact, the authorities they cite cut the other way. As the California Supreme Court has explained, interference claims protect "the expectations of contracting parties against frustration *by outsiders* who have no legitimate social or economic interest in the contractual relationship." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514 (1994) (emphasis in original). QORE4 is just such an outsider. Mullis executed his employment contract with Neology before QORE4 even existed; at that time, QORE4 could not have had, and was not contemplated to have, any legitimate social or economic interest in the Neology–Mullis relationship. Because QORE4 did not exist when the contract was drafted, executed, or performed, it cannot be treated as the contracting party, and its later conduct fits squarely within the core of actionable interference.

C.    <u>Neology Has Stated a Claim for Trade Secret Misappropriation.</u>

Defendants ignore express allegations, and abandon pleading standards, to argue that Neology's trade secret misappropriation claims (Counts III and IV) fail.

*1.    Neology Has Pleaded Its Trade Secrets with Specificity.*

"[A]t the pleading stage, a plaintiff need not spell out the details of the trade secret. Instead, the basic test is (1) whether something beyond general knowledge [in the profession] is being claimed and (2) whether there is enough specificity to put the defendant on notice of what the theft is about." *BMO Harris Bank NA v. Corley*, 2022 U.S. Dist. LEXIS 180826, at *10 (D. Ariz. Oct. 3, 2022) (allegation that trade secrets include, without limitation, client names and lists was sufficient); *Philips N. Am. LLC v. Advanced Imaging Services*, 2021 U.S. Dist. LEXIS 211026, at *7 (E.D. Cal. Oct. 29, 2021) (standard for specificity is whether plaintiff provided enough for defendants to be on notice of the trade secrets at issue).

Neology easily meets this standard. The FAC identifies the specific emails in which each trade secret appears, describes the particular information that is

confidential, alleges that it is non-public, explains its value to Neology, and articulates why it would be valuable to a competitor. (*See* FAC ¶¶ 40-67.) As just one example, on September 23, 2022, Mullis forwarded to his personal account an email Neology had sent to its Board. (*Id.* ¶ 45.) The first attachment—marked Company Proprietary—contained Neology's strategy and sales pipeline, detailed financial goals, action items implementing those goals, a description of a confidential partnership, and discussion of changes to Neology's business model. (*Id.*) The second attachment, a June 2022 monthly financial report marked Confidential, included management discussion and analysis of Neology's financials, including margins and profitability. (*Id.*) The FAC alleges this information would benefit a competitor by enabling it to replicate Neology's strategy, target its pipeline, interfere with planned relationships, and undercut Neology in the market. (*Id.*) Neology has pages of similarly detailed allegations for each identified trade secret.

Defendants' suggestion that these allegations are too general ignores both the level of detail provided and applicable law. Courts routinely allow trade secret complaints to proceed on far less. *See, e.g., TMX Funding, Inc. v. Impero Techs., Inc.*, 2010 U.S. Dist. LEXIS 60260 at *3 (N.D. Cal. June 17, 2010) (finding trade secrets sufficiently pled based on allegations of "nine broad categories of trade secret information" including "customer lists," "customer profiles," "product information," and "business methods and marketing plans," among other similarly broad categories). Requiring more granularity at this stage risks public disclosure of the very secrets the law protects. *See id.* at *8.

Nor is there any merit to Defendants' critique that Neology's use of topic headers somehow renders the pleading impermissibly categorical. The FAC does not rely on abstract labels; it ties each trade secret to specific, dated emails and identifies the confidential content within. That Neology organized those allegations by theme—financials and strategy, technology and supply chain, strategic partnerships and customers, and opportunities, (*i.e.*, those needed to build a competing business)—does

1  not transform particularized allegations into broad, untethered categories.[14]

2     Finally, even if Defendants were correct that further specificity is theoretically

3  possible without revealing the substance of the secrets, the law recognizes that trade

4  secret identification typically evolves through discovery. *Inteliclear, LLC v. ETC*

5  *Global Holdings, Inc.*, 978 F.3d 653, 663 (9th Cir. 2020) ("Federal cases analyzing

6  whether a plaintiff's trade secrets are described with 'sufficient particularity' typically

7  arise in the battleground of discovery," which provides an "iterative process" to refine

8  identifications). Refinement through discovery "makes good sense," *id*., and dismissal

9  on particularity grounds is appropriate only after a prolonged discovery period in which

10  a plaintiff repeatedly fails to achieve the requested specificity, such as in *Imax Corp. v.*

11  *Cinema Technologies, Inc*., 152 F.3d 1161 (9th Cir. 1998), cited by Defendants—

12  circumstances not present here. *See Inteliclear*, 978 F.3d at 664.

13        2.    *The Trade Secrets Are Not Generally Known.*

14     The information at issue is neither generally known nor readily ascertainable.

15  The complaint consistently alleges that this information is confidential and therefore

16  has independent economic value. (FAC ¶¶ 40-67.) For example, Neology's financial

17  and business strategy information is economically valuable because it is confidential

18  and a competitor armed with it—such as Defendants—could replicate Neology's

19  approach, sharpen its competitive position, and divert Neology's sales pipeline for its

20  own benefit. (*Id.* ¶¶ 41-45). Likewise, nonpublic details regarding Neology's

21  technology and supply chain would enable a competitor to reverse engineer products,

22  mirror Neology's supply chain, and secure advantageous supplier relationships and

23  terms that would otherwise be unavailable. (*Id.* ¶¶ 46-50; *see also id.* ¶¶ 51-67 (detailing

24  economic value of information about Neology's partnerships, work for end customers,

25  and opportunities.)) These well-pled allegations must be accepted as true at this stage.

26  *See TMX*, 2010 U.S. Dist. LEXIS 60260, at *10 ("It is self-evident that some of the

[14] *Space Data*, 2017 U.S. Dist. LEXIS 109842, at *5 (N.D. Cal. Jul. 14, 2017), cited by Defendants, finds the trade secrets are sufficiently specific.

types of information alleged are not generally known to others in the trade.")

Defendants' purported examples of public knowledge are not tethered to any specific trade secrets pled in the FAC, and thus do not show that any particular trade secret is generally known. As such, they are immaterial. They are also readily reconciled with Neology's allegations. For instance, while Neology may publicly announce certain partnerships for strategic reasons, it deliberately withholds others. That one publicly disclosed partnership is not a trade secret does not mean that other undisclosed partnerships—or other nonpublic aspects of Neology's business—are not protectable.

Defendants misread *Veronica Foods Co. v. Ecklin*, 2017 U.S. Dist. LEXIS 101325 (N.D. Cal. Jun. 29, 2017). That decision does not hold that public disclosure of some customer information renders customer identities unprotectable. Rather, it recognizes that customer identification can qualify as a trade secret; the court simply found that the plaintiff in that case did not plead it as such, and the public disclosure of customer names undermined any inference that the plaintiff intended to claim trade secret protection for them. *Id.* at *46-47. In any event, Neology's trade secret claim does not hinge solely on partnership identities. It encompasses specific, nonpublic business details, including concrete financial data, pipeline information, and particulars concerning opportunities and negotiations, which Defendants' argument do not address. (*See* FAC ¶¶ 40-67.)

### 3. Neology Adequately Has Pled Misappropriation.

Defendants do not dispute that Mullis misappropriated Neology's trade secrets through improper acquisition. For good reason. The FAC details repeated instances over multiple years in which Mullis forwarded Neology's confidential materials to his personal email for use at QORE4, despite company policies prohibiting such conduct. (FAC ¶¶ 40-67, 72.) Courts routinely recognize such conduct constitutes misappropriation. *See, e.g., Vintage Real Estate Group v. Murray*, 2023 Cal. Super. LEXIS 7570, at *10 (Cal. Super. Ct. Jan. 20, 2023); *1-800 Remodel, Inc. v. Bodor*, 2018

1  U.S. Dist. LEXIS 225000, at *14 (C.D. Cal. Oct. 17, 2018); *Henry Schein, Inc. v. Cook*,

2  191 F. Supp. 3d 1072, at *8-9 (N.D. Cal. Jun. 10, 2016).

3      Defendants instead challenge only the allegations against QORE4. But the FAC

4  plausibly pleads, on information and belief, that QORE4 improperly acquired

5  Neology's trade secrets from Mullis and Defendants are using them to compete. (FAC

6  ¶¶ 5, 73, 93, 133, 144.) This is not a conclusory "they stole it, so they must be

7  competing" theory, as Defendants suggest. (Mot. at 22.)[15] Rather, the facts as pled

8  support a reasonable inference of QORE4's acquisition and Defendants use: Mullis

9  assembled a cache of Neology's trade secret materials off-system for his anticipated

10  competitive venture, launched that venture within a year of departing, and began

11  competing immediately. (FAC ¶¶ 5, 73). QORE4 entered a technically demanding

12  market unusually fast, notwithstanding that, as a start-up, it lacked an existing product

13  line, established supplier relationships, or deep technical know-how that the industry

14  typically requires. (*Id.* ¶ 93) Mullis's refusal to return Neology's confidential

15  information further supports the inference of ongoing use at QORE4. (*Id.* ¶ 94.) *See*

16  *Upstream, Inc. v. BHFO, Inc.*, 2021 U.S. Dist. LEXIS 97086, at *19 (S.D. Cal. May

17  21, 2021). And another former Neology employee who joined QORE4 engaged in

18  similar misconduct, reinforcing that this was not an isolated episode but part of a

19  broader scheme. (*Id.* ¶¶ 68-71.) At the pleading stage, allegations pleaded on

20  information and belief like these that are supported by specific facts which make the

21  inference plausible are taken as true just as any other allegation. *See CellLink Corp. v.*

22

23  [15] Defendants' cases are readily distinguishable. *Veronica Foods Co.*, 2017 U.S. Dist.

24  LEXIS 101325 dealt with "naked assertions" of use without any facts that tended to
   exclude an innocent explanation for the conduct. By contrast, the complaint here alleges

25  detailed conduct—Mullis's intentional off-system cache, rapid competitive entry in a
   highly technical field, refusal to return materials, and parallel misconduct by another

26  QORE4 employee—that admits of no innocent explanation. *Space Data Corp. v. X*,
   2017 U.S. Dist. LEXIS 109842 (N.D. Cal. Jul. 14, 2017) addresses use within the scope

27  of a non-disclosure agreement and turns on contract language authorizing the
   challenged use; it is inapposite.

28

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOT. TO STRIKE & MOT. TO DISMISS**

1  *Mamaflex, LLC*, 2025 U.S. Dist. LEXIS 136884, at *28 (N.D. Cal. Jul. 17, 2025)

2  (information and belief allegations sufficient to support misappropriation claim).

3         *4.     Neology Adequately Has Alleged Ownership of the Trade Secrets.*

4         Neology's information does not lose trade secret status merely because it arose

5  from, or relates to, a collaborative relationship. For example, a non-disclosure

6  agreement may keep it protected. *See Inteliclear, LLC*, 978 F.3d at 661 (confidential

7  disclosures do not destroy trade secret status). Or perhaps the trade secret relates to the

8  partnership but was never disclosed to the partner. In any event, trade secrets may be

9  jointly owned. *Strikepoint Trading LLC v. Sabolyk*, 2008 U.S. Dist. LEXIS 130788, at

10  *18 (C.D. Cal. Dec. 22, 2008) ("trade secrets can be jointly owned"). Defendants'

11  argument to the contrary ignores these principles and instead poses questions that need

12  not be answered by the pleadings. Neology has adequately alleged that the trade secrets

13  at issue are its own, and those allegations must be accepted as true at this stage.

14  Moreover, not all of Neology's asserted trade secrets concern joint ownership or

15  collaborative proposals. (FAC ¶¶ 40-67.)

16         *5.     Neology Need Not Plead Damages, But Has Done So.*

17         Damages are not an element of trade secret misappropriation. *See Applied*

18  *Medical Distrib. Corp. v. Jarrells,* 100 Cal. App. 5th 556, 570 (2024) ("[W]e conclude

19  causation and damages are not elements of a claim for misappropriation of trade secrets

20  under the California UTSA.") In any event, Neology's allegation that "[a]s a result of

21  Defendants' conduct, Neology has been harmed" and "is entitled to actual damages as

22  well as permanent injunctive relief," is sufficient at this stage of the case. *See Vasonova*

23  *Inc. v. Grunwald*, 2012 U.S. Dist. LEXIS 176276, at *11 (N.D. Cal. Dec. 11, 2012) ("A

24  plaintiff's allegation that he has, as a 'direct and proximate result' of defendant's

25  violation, 'sustained special and general damages' suffices").

26        D.   <u>Neology Has Stated a Claim Under the UCL.</u>

27         Because the predicate claims do not fail, the UCL claim does not fail either.

28  Moreover, as explained above, the UCL claim is based on an unfair and fraudulent

24

scheme and the allegations at issue support that scheme, even if they do not independently make out a predicate claim themselves (they do).

Further, the UCL claim is not preempted by CUTSA for similar reasons. The UCL claim is not exclusively premised on misappropriation of trade secrets but rather addresses and seeks relief for an entire anticompetitive scheme. In such circumstances, preemption does not apply. *See TMX*, 2010 U.S. Dist. LEXIS 60260, at *12-13 (UCL claim survives where it the conduct underlying it is not limited to misappropriation of trade secrets). And even if the misappropriation allegations are preempted, the claim can still survive based on all the other conduct alleged.

## **CONCLUSION**

For all of the foregoing reasons, Defendants' Motion should be denied in its entirety. If the Court grants any portion of Defendants' Motion, Neology respectfully requests leave to amend its FAC to address any issues identified by the Court.

Respectfully submitted,

DATED:  January 14, 2026

GLASER WEIL FINK HOWARD JORDAN & SHAPIRO LLP

By: */s/ Alexander R. Miller*
       Emil Petrossian
       Alexander R. Miller

Robert Haney, Jr. (Admitted Pro Hac Vice)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY 10019
Tel.: (212) 812-0399
rhaney@foleyhoag.com

Leah Rizkallah (Admitted Pro Hac Vice)
Rachel Kerner (Admitted Pro Hac Vice)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Tel.: (617) 832-1000
lrizkallah@foleyhoag.com

Attorneys for Plaintiff
NEOLOGY, INC.

25