EMIL PETROSSIAN (State Bar No. 264222)
epetrossian@glaserweil.com
ALEXANDER R. MILLER (State Bar No. 294474)
amiller@glaserweil.com
GLASER WEIL FINK HOWARD
  JORDAN & SHAPIRO LLP
600 West Broadway, Suite 2850
San Diego, California 92101
Tel.: (619) 765-4380
Fax: (619) 483-0646

*Attorneys for Plaintiff*
NEOLOGY, INC.

*Additional Counsel Listed on Signature Page*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEOLOGY, INC., a Delaware corporation,<br><br>  Plaintiff,<br><br>v.<br><br>JOSEPH N. MULLIS, an individual; and QORE4 LLC, a Nevada limited liability company,<br><br>  Defendants. | Case No.: 3:25-cv-01744-JES-BJW<br><br>Hon. James E. Simmons, Jr.<br>Courtroom No. 4B<br><br>**DECLARATION OF STEVE HADDIX IN SUPPORT OF PLAINTIFF NEOLOGY, INC.'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE UNDER CAL. CODE CIV. PROC. § 425 AND FED. R. CIV. P. 12(f), AND MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)** |

I, Steve Haddix, declare:

1. I am the Senior Vice President of Strategic Capture of Neology, Inc. ("Neology"). I submit this declaration in support of Neology's Opposition to Defendant's Special Motion to Strike and Motion to Dismiss (Dkt. 34) ("Motion"). I make this declaration based on my personal knowledge and my review of Neology's business records kept in the ordinary course. If called as a witness, I could and would competently testify to the matters set forth herein.

2. As noted in Neology's First Amended Complaint (Dkt. 31) ("FAC") Neology is a global technology company that designs, manufactures, and integrates electronic toll collection systems and related solutions based on radio-frequency identification (RFID) used broadly by public transportation agencies. (FAC, ¶ 22). Our proposals and production rely on significant proprietary know-how, supplier relationships, technical specifications, pricing and margin data, pipeline information, and strategic partnership structures. (FAC, ¶¶ 22-25). We invest heavily in protecting this information and in maintaining our reputation for technical integrity and reliability with public agencies. (FAC, ¶ 26; 36-39).

3. **The "CPA" Emails.** In or about March 2025, multiple public agency customers of Neology received emails from a sender styling itself as "Consumer Protection Advocates" using the email address consumerprotectionadvocates7@gmail.com. (FAC, ¶¶ 102-103). The CPA email did not identify a real agency, provided no letterhead or contact information, and concealed the sender's identity. *Id.* Neology later learned in discovery that Defendant Joseph Mullis authored the CPA emails, while serving as founder and CEO of QORE4, LLC, a direct competitor seeking to influence public agency procurement decisions. (FAC, ¶ 108). The subject line for one such email sent on March 15, 2025 was "Urgent Technical Flaw in Colorado Tolling Systems – Immediate Action Required." The email purported to address "Internal Audit, Compliance, and Investigative Oversight Teams" at public agencies and disparaged Neology's RFID technology and product line while

advocating that agencies mandate a transition to other "modern" technology. A true and correct copy of one such email is attached as **Exhibit A**. The email, which copied my colleagues at Neology and Neology's parent company, along with several other examples of similarly worded emails from CPA, were quickly forwarded to me.

4. The CPA emails made five core assertions, each of which is false or materially misleading and harmful to Neology:

    a. It stated that there is a "critical technical flaw affecting tolling operations and consumer billing" associated with Neology's transponders. The so-called "flip bit" reference grossly overstates risk, misstates system-level design and mitigation practices, and wrongly attributes a supposed flaw to Neology's products. Neology's products are tested and certified by the OmniAir Consortium, Inc. (Omniair), the recognized RFID certifying authority for the Tolling industry, and are deployed in wide use across the Tolling industry.

    b. It asserted Neology uses "an outdated RFID integrated circuit (IC) developed in 2008." Neology's RFID products incorporate current-generation capabilities that meet all 6C Coalition (the leading trade coalition) and Omniair certification standards, including patented, unique features and system-level mitigations that are neither "outdated" nor functionally obsolete. In my opinion, the characterization "outdated" is a pejorative and inaccurate description of technology that remains widely used across the 6C Coalition manufacturers. (*See* FAC, ¶ 105).

    c. It asserted "Neology remains the only vendor still supplying this outdated technology." Except for a single manufacturer in the 6C Coalition that released certified tags integrated with bit-flip detection in mid-2024, as far as I am aware, every other 6C tolling

       tag manufacturer's Omni-Air certified products rely on the same base technology family as Neology and do not provide bit-flip protection. Neology alleged this in the FAC, stating that only one manufacturer in the 6C Coalition "is using different technology[.]" By this, Neology means that a single manufacturer has released an Omni-Air certified product *using* different bit flip protection technology to *supply* its customers. (FAC, ¶ 105).

    d.    CPA also claimed that "[m]any agencies have since transitioned to modern RFID ICs that eliminate this problem." This is false. As far as I know, no agency has mandated bit-flip protection in its tag procurements or listed that feature as a desired trait. Further, no IC "eliminates" the theoretical possibility of bit-level error under all conditions. (*See* FAC, ¶ 106). The bit flip risk was determined by agency members of the 6C Coalition to be marginal, and the technology referenced in the emails as an alternative to Neology's technology would only reduce these risks, not eliminate them, while possibly introducing greater risks if time was not taken to ensure a proper antenna design. (*See id.*). In fact, Neology's rigorous testing showed that next-generation chips—like those CPA advocated—have unique operating characteristics that can cause errors unless the design accounts for them.

    e.    Finally, CPA urged agencies to "[m]andate the transition to modern RFID transponders with built-in flip bit detection and correction to eliminate this issue." This recommendation is predicated on false premises about Neology's products and the industry's technical realities and in my opinion was plainly designed to interfere with procurement and technology decisions at the specific public

- 4 -

agencies where Neology is an incumbent supplier, rather than all agencies in general.

5. The customers in receipt of the disparaging CPA emails (which were near identical) were Neology's public agency customers, including the Los Angeles County Metropolitan Transportation Authority, the Colorado Department of Transportation, the Oklahoma Turnpike Authority/Department of Transportation, the Utah Department of Transportation, the Riverside County Transportation Commission, the Golden Gate Bridge Highway & Transportation District, the San Bernardino County Transportation Authority, the Northwest Parkway, E-470 Public Highway Authority, the Orange County Transportation Authority, the San Francisco Bay Area Rapid Transit District, the North Texas Tollway Authority, the Kansas Turnpike Authority, the Georgia State Inspector General, and the Texas Department of Transportation. (FAC, ¶ 102). It was thus obvious to me that the emails were sent to interfere with Neology's customer relationships, reduce Neology's sales, and to steer agencies toward technology positioning that would advantage QORE4 in current or future procurements.

6. From my perspective, the CPA emails were designed to intimidate public agency staff and cause fear and disruption, including heightened audits, inquiries, and internal escalations at certain agencies. They were successful. and did, Neology's was forced to undergo a significant manpower effort to create white papers and an education campaign to share across our customer base to assist them with their response to the CPA letters and the related calls from members of the press who received similar claims, and to avoid negative procurement impacts following the CPA communications, with the CPA narrative being cited in agency-side discussions as triggering the concern.

7. **Neology's Blogpost.** In their Motion, Defendants cite to an educational blogpost by Neology dated April 28, 2025 to supports their contention that "Neology itself states essentially the same thing publicly" as the false statements in the CPA emails. (Motion at 11). This is a complete misinterpretation of the blogpost titled

"Tackling RFID Chipset Bit Flip Data Integrity Challenges in Transportation Systems." The blogpost provides general educational information about industry practices for data integrity and system-level mitigations. It does not state or imply that Neology's products are defective, "outdated," or uniquely responsible for systemic misbilling, nor does it claim that alternative ICs "eliminate" bit-level error. In fact, in their cherry-picking of the blogpost's contents, Defendants fail to mention that Neology wrote, "The good news is the potential for bit flips in RFID toll tags has been studied by chip manufacturers, tolling agencies, and toll industry consortia for over ten years. It's been found to be so rare, that no U.S. tolling agency or toll industry certification consortium has mandated the requirement for bit flip correction in its RFID tag standards." The blogpost therefore cannot reasonably be read as adopting or confirming the CPA emails' statements and does not undermine our showing of falsity. A true and correct copy of the blogpost is attached as **Exhibit B**.

8. **Damages and Mitigation.** The CPA emails prompted confusion and concern across the fifteen agency customers targeted with the threats in the letter. Just as one concrete example, the emails threatened to engage the media regarding the dubious allegations they advanced, alarming Neology's public-facing customers that they could be drawn into a media controversy. In at least two instances, it seems CPA did contact the media, which then reached out to Neology's customers with assertions that those customers were using flawed and problematic technology as alleged by CPA. Those two customers contacted Neology, and based on their outreach, my understanding was that they expected Neology to take steps to correct the record. Recognizing their concerns—and anticipating that other customers likely shared them even if they had not voiced them—Neology was compelled to divert senior technical and account personnel to rebut the inaccuracies in the CPA emails and to mitigate the reputational harm caused by the false suggestion that Neology deployed "outdated" and defective technology at odds with industry practice. Neology invested substantial time and resources in targeted outreach to reassure agencies, correct misstatements, and

avert the unwarranted procurement cancellations or delays that the letter sought to trigger. Neology also retained external communications and public-relations support to help oversee this effort and manage the fallout, expending approximately $90,000, in addition to attorneys' fees to evaluate and address the false claims with customers. (FAC, ¶ 110).

      I declare under the penalty of perjury that the foregoing is true and correct and this Declaration was executed on January 13, 2026 in Brookeville, Maryland.

DATED: January 13, 2026                                            Steve Haddix