UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEOLOGY, INC., Plaintiff, v. JOSEPH N. MULLIS; QORE4 LLC; and DOES 1 to 20, Defendants. | Case No.: 3:25-cv-01744-JES-BJW **ORDER: (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO STRIKE AND (2) DENYING DEFENDANTS' MOTION TO DISMISS** |

Before the Court is a motion to strike and motion to dismiss by Defendants Joseph N. Mullis ("Mullis") and QORE4 LLC ("QORE4") (collectively, "Defendants"). ECF No. 34. Plaintiff Neology, Inc. ("Plaintiff" or "Neology") alleges that Mullis, a former employee, wrongfully obtained and used its trade secrets and confidential information to benefit his new company QORE4, and made improper statements to Neology's customers to interfere with its business. ECF No. 31 ("FAC") ¶ 1. Defendants argue that the claims arise in part from protected speech that should be stricken under California's anti-SLAPP law, and that the claims are otherwise deficient. ECF No. 34-1 ("Mot.") at 9. For the reasons set forth below, the Court **GRANTS** in part and **DENIES** in part the motion to strike and motion to dismiss.

## I. BACKGROUND

Neology is a technology company that specializes in radio-frequency identification ("RFID") technology used in automobile toll systems around the world. FAC ¶ 22. In August of 2003, Neology hired Mullis as an Operations Manager. *Id.* ¶ 27. He was promoted to Director of Operations and then General Manger for the United States, a title he held until he left the company on September 30, 2022. *Id.*

As General Manger, Mullis was responsible for high-level business management and strategy functions, giving him access to confidential business information. *Id.* ¶¶ 28, 31. He entered into an Employment Agreement (the "Employment Agreement") with Neology when he was appointed General Manager, which contained the following provisions regarding confidentiality:

> <u>Section 9.2: Restrictions on Use or Disclosure of Confidential Information.</u> Employee shall keep the Confidential Information in absolute confidence both during the Employment Period and after the Termination Date, regardless of the reason for such termination. Employee agrees that Employee will not, at any time, disclose to others, use for Employee's benefit, or the benefit of any other entity or person other than Company, or otherwise take or copy any such Confidential Information, whether or not developed by Employee except as required in Employee's duties to Employer.
>
> <u>Section 9.4: Return of Confidential Information and Property.</u> When the Employment Period terminates, regardless of the reasons for such termination, Employee will promptly turn over to Employer in good condition all Company property in Employee's possession, or control, including but not limited to all originals, copies of, or electronically stored documents or other materials containing Confidential Information, regardless of who prepared them. In the case of electronically stored information retained by Employee outside of Company's electronic systems, Employee will promptly make a hard copy of such information in paper, audio recording, disc format, or other format requested by Employer, provide that copy to Employer, and then destroy all electronically stored information. Further, Employee agrees to provide Employer with written confirmation that all Confidential Information in the Employee's possession, or to which the Employee has access, has been turned over to Employer.

> Section 9.5: Confidential Information and Trade Secrets of Others. Employee agrees that he will not disclose or otherwise use the confidential information or trade secrets of any third party which Employee learns of prior to or otherwise outside the scope of his employment with Employer.

*Id.* ¶ 32. Section 9.1 of the Employment Agreement defined Confidential Information as follows:

> any information which Employee learns of or develops during the Employment Period that derives independent economic value from being not generally known or readily ascertainable by other persons who could obtain economic value from its disclosure or use, and includes, but is not limited to, trade secrets, Inventions as defined in Section 10 below, financial information, personnel information, and information relating to such matters as existing or contemplated products, services, profit margins, fee schedules, pricing, design, processes, formulae, business plans, sales techniques, marketing techniques, training manuals and materials, policies or practices related to Company's business, personnel or other matters, computer databases, computer programs, software and other technology, customer lists and requirements, vendor lists, or supply information. Confidential Information includes such information of Company, its customers, vendors, and other third parties or entities with whom Company does business.

*Id.* ¶ 33. Section 15.11 stated that all obligations under Section 9 of the Employment Agreement would survive termination of the Agreement and termination of Mullis' employment of Neology, regardless of the reason for termination. *Id.* ¶ 34. Mullis was terminated from Neology in September 2022. *Id.* ¶ 35.

Neology requires all new hires to sign confidentiality agreements, and requires executives to sign employment agreements with confidentiality provisions. *Id.* ¶ 36. Neology's Employee Handbook also states that all information stored on, or received or transmitted using, its computer systems are its sole and exclusive property. *Id.* ¶ 37. Neology mandates use of passwords and other computer security measures on its devices, and does not allow employees to use personal devices on its network without prior approval. *Id.* Neology also requires its business partners to enter into non-disclosure

agreements, and monitors public records requests which may involve confidential information. *Id.* ¶¶ 38-39.

Neology alleges that after Mullis left the company, it discovered that he had been sending documents containing confidential and trade secret information from his Neology email to his personal email account. *Id.* ¶ 40. Neology alleges that Mullis began sending emails in March 2020 and continued until his departure in September 2022. *Id.* Neology alleges that the emails included confidential and trade secret information regarding Neology's financials and business strategies, information related to its patented technology and supply chain, information detailing its partnerships and work for end customers, and information related to its opportunities for customer or partner relationships. *Id.* ¶¶ 41-67. Neology alleges that Mullis' activity of sending documents from his business email to his personal email was unauthorized and served no business need. *Id.* ¶ 72.

On August 8, 2023, Neology sent Mullis a letter demanding that he identify and return any confidential information he sent from his business email to his personal email, destroy any such documents in his possession, and confirm whether he had used such documents in connection with business activity outside Neology. *Id.* ¶ 77. Over the course of several correspondences, Mullis responded that he only retained materials regarding a legal dispute regarding equity, that he did not have some specific documents, and that other documents were subject to public domain and not trade secret related. *Id.* ¶¶ 80-82. Neology continued to seek further assurances regarding the documents and their deletion. *Id.* ¶¶ 83-84. Mullis ultimately responded that he had met the obligations set forth in Neology's email, and that the documents Neology had identified were not confidential. *Id.* ¶ 85.

On July 18, 2023, Mullis officially launched his new company QORE4. *Id.* ¶ 90. In a press release, QORE4 described itself as a product and service provider focused on RFID technology. *Id.* Former Neology Vice President of Sales and Strategy Manual Moreno, who Neology alleges also sent confidential and trade secret information from his business email to his personal email, joined QORE4 shortly after its launch. *Id.* ¶¶ 68, 91.

Neology alleges that QORE4 has used Neology's confidential information and trade secrets in entering into the market. *Id.* ¶ 93. Neology alleges that Mullis has submitted proposals on behalf of QORE4 which deceptively present Neology's work as QORE4's. *Id.* ¶ 95. Neology alleges that it became aware of these representations in July 2024 when Mullis, on behalf of QORE4, submitted a proposal to a state agency claiming, among other things, that QORE4 had a proven track record with that agency but referring to Neology's work. *Id.* ¶¶ 95-96.

Neology also alleges that beginning in September 2024, Mullis, on behalf of QORE4, made numerous public records requests to agencies including at least nine of Neology's customers with the objective of obtaining confidential and trade secret information. *Id.* ¶ 97. In April 2025, when an agency informed it that Mullis and QORE4 had requested documents and contested redactions for confidentiality. *Id.* ¶ 98. Neology alleges that QORE4 intends to use the public records process to obtain information that it will use alongside other wrongfully obtained information to undercut Neology in the market. *Id.* ¶ 100.

Neology also alleges that Mullis sent emails from a fictitious entity calling itself "Consumer Protection Advocates" ("CPA") to Neology's customers beginning in March of 2025. *Id.* ¶ 102. Neology names the following customers as recipients of the emails: the Los Angeles Department of Transportation, the Colorado Department of Transportation, the Oklahoma Turnpike Authority, the Bay Area Rapid Transit, the Utah Department of Transportation, the Riverside County Transportation Commission, the Northwest Parkway, E-470 Public Highway Authority, the Orange County Transportation Authority, the North Texas Tollway Authority, and the Kansas Turnpike Authority. *Id.* The CPA emails, which Neology attached a sample of to the complaint, purport to highlight "critical technical flaws affecting tolling and consumer billing across [the customer's] toll road systems," and claim that Neology's technology uses "an outdated RFID integrated circuit" and that "Neology remains the only vendor still supplying this outdated technology." FAC at 60-61, Exh. D ("Sample email"). Neology alleges that the statements in the emails injured its reputation,

and required it to spend significant resources on public relations efforts. *Id.* ¶ 110. Neology states that, through discovery in this action, it has learned that Mullis sent these emails while acting as CEO and sole managing member of QORE4. *Id.* ¶ 108. Neology alleges that Mullis knew of its contracts with the parties he emailed from his work at Neology and/or from public records requests. *Id.* ¶ 109.

Neology brings the following claims: (1) breach of contract, against Mullis; (2) intentional interference with contractual relations regarding the contract between Neology and Mullis, against QORE4; (3) misappropriation of trade secrets under California law, against Mullis and QORE4; (4) misappropriation of trade secrets under federal law, against Mullis and QORE4; (5) intentional interference with contractual relations regarding contracts between Neology and its customers, against Mullis and QORE4; (6) trade libel against Mullis and QORE4; and (7) unfair competition against Mullis and QORE4. *Id.* ¶¶ 111-168.

## II. LEGAL STANDARD

### A. Cal. Civ. Proc. § 425

California's Anti-SLAPP statute states: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Civ. Proc. Code § 425.16(b)(1).

Federal courts use a two-step procedure in California Anti-SLAPP claims. *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261–63 (9th Cir. 2013) (en banc). First, the moving defendant must show that the action arises from protected activity. *Id.* at 261. Second, the burden shifts to the plaintiff to show a probability of prevailing on the claims at issue in order to survive dismissal. *Id.* "Under this standard, the claim should be dismissed if the plaintiff presents an insufficient legal basis for it, or if, on the basis of the facts shown by

the plaintiff, 'no reasonable jury could find for the plaintiff.'" *Id.* (quoting *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir.2001)).

**B. Federal Rule of Civil Procedure 12(b)(6)**

A motion to dismiss under Federal Rule of Civil Procedure ("FRCP") 12(b)(6) for failure to state a claim tests the legal sufficiency of a plaintiff's claim. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). When considering the motion, the court must accept as true all well-pleaded factual allegations in the complaint. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The court need not accept as true legal conclusions cast as factual allegations. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient).

A complaint must "state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. To survive a motion to dismiss, a complaint must include non-conclusory factual content. *Id.* at 555; *Iqbal*, 556 U.S. at 679. The facts and the reasonable inferences drawn from those facts must show a plausible—not just a possible—claim for relief. *Twombly*, 550 U.S. at 556; *Iqbal*, 556 U.S. at 679; *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009). The focus is on the complaint, as opposed to any new facts alleged in, for example, the opposition to a defendant's motion to dismiss. *See Schneider v. California Dep't of Corrections*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998), *reversed and remanded on other grounds as stated in* 345 F.3d 716 (9th Cir. 2003). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The "mere possibility of misconduct" or "unadorned, the defendant-unlawfully-harmed me accusation[s]" fall short of meeting this plausibility standard. *Id.*; *see also Moss*, 572 F.3d at 969.

## III. DISCUSSION

**A. Anti-SLAPP Motion**

Defendants move to strike Counts III through VII under California's anti-SLAPP statute on the basis that the CPA emails and record requests are protected speech-based

activities. Mot. at 9. Plaintiff contests the motion. ECF No. 35 ("Opp'n.") at 8. At the first step of this motion, Defendant bears the burden of showing that the emails and records requests (1) are protected activity under the statute, and (2) give rise to a claim for relief. *See Park v. Bd. of Trs. of California State Univ.*, 2 Cal. 5th 1057, 1062 (2017). At the second step, the burden shifts to Plaintiff to show that it has a probability of prevailing on its claims. *See id.* at 1061.

The anti-SLAPP issues are well briefed by the parties, and the Court agrees with each in part but neither in whole. In the analysis that follows, the Court finds that the CPA emails and record requests constitute protected speech under the statute, and that the commercial speech exception argued by Plaintiff does not apply. Next, the Court finds that Count V (intentional interference with contractual relations as to customers), Count VI (trade libel), parts of Count VII (unfair competition under § 17200) arise from protected activity, while Counts III (trade secret misappropriation under California law) does not, and Count IV (trade secret misappropriation under federal law) is not subject to a motion to strike. The Court also finds that only two challenged individual allegations in the body of the complaint are subject to a motion to strike because they are alleged to justify a remedy, while other challenged individual allegations are not because they are merely alleged to provide context. At the second step, the Court finds that Plaintiff has not shown a probability of prevailing on the claims for relief arising from protected conduct. Counts V and VI, as well as several identified individual allegations, are thus stricken from the complaint as detailed below.

**1. Writing and Conduct in Furtherance of Speech on a Public Issue**

The first issue is whether the records requests and CPA emails fall within the purview of the anti-SLAPP statute. The anti-SLAPP statute applies to "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest" or "any other conduct in furtherance of the exercise of ... the constitutional right of free speech in connection with a public issue or an issue of public interest." Cal. Civ. Proc. Code §§ 425.16(e)(3)–(e)(4). "California courts have broadly

construed public interest to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1025 (N.D. Cal. 2017) (cleaned up).

Here, the Court agrees with Defendants that both the CPA emails and public records requests facially fall within the statute's purview. *See* Mot. at 12-16. The emails and the records requests concerned Neology's business with its transportation agency customers. FAC ¶¶ 97, 102. Neology produces technology that transportation entities use for "tolling, automated vehicle identification and classification, data processing, and digital payment systems" on public roads. *Id.* ¶¶ 22-26. Defendants sent the CPA emails and record requests to customers that manage major public roadways and means of public transit. *Id.* ¶¶ 97, 102. Public road tolling systems are a public issue, and record requests and communications to public emails are communications in public fora. *See* Cal. Civ. Proc. Code §§ 425.16(e)(3)–(e)(4). The fact that the emails were sent in the name of a fake organization and by email does not impact the analysis of their protection. *See McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 341-342 (holding that anonymous speech and use of pseudonyms are protected "[w]hatever the motivation may be"); *Packingham v. North Carolina*, 582 U.S. 98, 104, 137 (2017) (explaining that the internet is "the most important place[] (in a spatial sense) for the exchange of views."); *see also Bassi v. Bassi*, 101 Cal. App. 5th 1080, 1098 (2024) (finding that emails even between private parties regarding a public matter constituted protected speech). Thus, both the CPA emails and the record requests fall within the statute's definition of protected speech unless an exception applies.

**2. The Commercial Speech Exception**

Neology argues that the CPA emails are nonetheless actionable because they fit within the commercial speech exception to the anti-SLAPP statute. Opp'n at 10-11. The Court disagrees.

The commercial speech exception provides that the anti-SLAPP statute does not apply to certain business-related speech. Cal. Civ. Proc. Code § 425.17(c). The purpose of

the commercial speech exception is to "exempt[] from the reach of the anti-SLAPP statute cases involving comparative advertising by businesses." *Mendoza v. ADP Screening & Selection Servs., Inc.*, 182 Cal. App. 4th 1644, 1652 (Ct. App. 2010). The exception is "narrow" and only applies to "speech or conduct by a person engaged in the business of selling or leasing goods or services when [...] that challenged conduct pertains to the business of the speaker or his or her competitor." *Dean v. Friends of Pine Meadow* 21 Cal. App. 5th 91, 105 (2018). California courts construe the requirements of the statute strictly, and have explained that an economic motivation alone is insufficient to remedy a deficient showing of its application. *See, e.g, Mendoza*, 182 Cal. App. 4th at 1651 (strictly interpreting the "competitor" requirement of the statute); *Muddy Waters, LLC, v. Superior Court*, 62 Cal. App. 5th 905, 919 (2021) (holding that a defendant did not meet the competitor requirement despite being supported and funded by the plaintiff's direct competitors). "The burden of proof as to the applicability of section 425.17's commercial speech exemption falls on the party seeking the benefit of it." *Neurelis, Inc. v. Aquestive Therapeutics, Inc.,* 71 Cal. App. 5th 769, 786 (Ct. App. 2021).

The issue in this case is whether the anonymous CPA emails fall under the commercial speech exception without ever mentioning or promoting QORE4 or its technology, or promoting a sale. *See* Opp'n at 10-11; ECF No. 36 ("Reply") at 10-14. Plaintiff argues that Mullis should not be allowed to escape liability through careful wording when he was plainly motivated to send the emails by his business interests. Opp'n at 13-14. However, as Defendants point out, economic motivation alone is insufficient to show commercial speech. *See* Reply at 12; *Muddy Waters,* 62 Cal. App. 5th at 919; *see also Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 67 (1983) (holding held that a party's "economic motivation" for speech "would clearly be insufficient by itself to turn the materials into commercial speech."). Nor is it clear that a speaker is "engaged in the business of selling or leasing goods or services" when he speaks anonymously on a public issue, even if he is personally interested as a competitor. *See Friends of Pine Meadow,* 21 Cal. App. 5th 91 at 105. Additionally, the Court is unpersuaded that anonymous negative

speech in public fora on public issues is "comparative advertising" as contemplated by the California legislature. *Mendoza*, 182 Cal. App. 4th at 1652.

Plaintiff's argument that the exception applies relies on two federal district court cases: *Alfasigma* and *Hicks*. Opp'n at 12-14 (citing *Hicks v. Grimmway Enters., Inc.*, No. 22-CV-2038 JLS (DDL), 2023 WL 3829689 (S.D. Cal. June 5, 2023) and *Alfasigma USA, Inc. v. First Databank, Inc.*, 398 F. Supp. 3d 578, 586 (N.D. Cal. 2019). *Hicks* is not helpful in deciding the determinative issue here, because the court in that case relied on a variety of statements promoting the defendants' own business to make its decision. *See* 2023 WL 3829689, at *3. This case is also distinct from *Alfasigma* (and its progenitor *Exceltis*) in three key respects. *See generally* FAC; *cf. Alfasigma*, 298 F. Supp. 3d at 586; *Exeltis USA Inc. v. First Databank, Inc.*, No. 17-cv-04810-HSG, 2017 WL 6539909, at *13 (N.D. Cal. Dec. 21, 2017) (expressing "concerns about expanding the commercial speech doctrine," but applying it to preferential database treatment). First, emails regarding public contracts sent directly to a government agency are more akin to core petitioning activity than listings on a commercial database, giving the Court greater pause in allowing them to give rise to liability. *See id.* Second, product databases are comparative in nature, fitting *Exeltis* and *Alfasigma* more squarely into California caselaw on comparative advertising than the present case. *See id.* And third, unlike the plaintiffs in *Exeltis* and *Alfasigma*, Neology has not alleged non-conclusory facts showing that customers have relied on the speech at issue to make commercial decisions. *See id.* (highlighting the importance of customer reliance to the fact-intensive analysis). The fact that Neology spent money on public relations work to counteract the CPA emails does not fill this gap: by first amendment principles, a company's participation in the marketplace of ideas is distinct from commercial losses. *See* FAC ¶ 110; *see also Whitney v. California*, 274 U.S. 357, 377 (1927) (J. Brandeis, concurring), *overruled on other grounds by Brandenburg v. Ohio*, 395 U.S. 444 (1969) ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence.").

Whether false statements about a business competitor without self-promotion constitute commercial speech is a matter of explicitly unsettled law, which the Court does not decide today. *See Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 962 (2002). Nonetheless, the Court declines Plaintiff's invitation to further expand the commercial speech exception to the anti-SLAPP statute to speech concerning public contracts where no commercial transaction was proposed. *See Exeltis*, 2017 WL 6539909 at *13 (expressing "concerns about expanding the commercial speech doctrine"); *Bolger*, 463 U.S. at 66 (defining commercial speech as "speech which does no more than propose a commercial transaction.") (cleaned up). Plaintiff has not met its burden to show that the exception applies. The Court thus proceeds to the next step to determine which, if any, claims and allegations arise from the CPA emails and record requests as protected speech.

**3. "Arising from"**

The parties disagree over which, if any, claims arise from the protected speech at issue. Mot. at 17; Opp'n at 14-17. Defendants move to strike Plaintiff's trade secret misappropriation (Count III), intentional interference as to customers (Count V), trade libel (Count VI), and UCL (Count VII) claims as arising from the protected speech discussed above. Mot. at 12-14. In the alternative, Defendants move to strike individual allegations which mention the protected activity. *Id.* at 17.

Protected conduct gives rise to a claim for relief when "that activity underlies or forms the basis for the claim." *Park,* 2 Cal. 5th at 1062. Therefore, "a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." *Id.* at 1060 (emphasis in original). "[A] defendant in an ordinary private dispute cannot take advantage of the anti-SLAPP statute simply because the complaint contains some references to speech or petitioning activity by the defendant." *Sansoe v. Ford Motor Co.*, 668 Fed. Appx. 718, 719 (9th Cir. 2016) (internal quotation and citation omitted).

Count III, misappropriation of trade secrets, is plainly not subject to this anti-SLAPP motion because it does not mention or otherwise arise from either the CPA emails or the

public records requests. *See* FAC ¶¶ 126-136 (alleging that Mullis misappropriated trade secrets by sending them to himself by personal email and using them for QORE4's benefit). Count IV, which arises under 18 U.S.C. §§ 1831-39, is not subject to a California anti-SLAPP challenge because it is a federal law claim. *See Hilton v. Hallmark Cards*, 599 F.3d 894, 901 (9th Cir. 2010) ("[A] federal court can only entertain anti-SLAPP special motions to strike in connection with state law claims."). The Court thus **DENIES** the motion to strike Counts III and IV of the FAC.

Counts V and VI both arise from the CPA emails. Count V, intentional interference with contractual relations, alleges that Mullis provided false and misleading information about Neology and its products to disparage Neology on behalf of QORE4, with the intent of disrupting Neology's contracts. FAC ¶¶ 151-152. Similarly, Count VI alleges that Mullis made false disparaging statements about Neology to Neology's customers on QORE4's behalf. *Id.* ¶¶ 156-168. While these claims do not explicitly name the CPA emails, the Court finds no other non-conclusory allegations the claims could be referencing in the complaint. *See generally*, FAC. The Court thus finds that Count V and Count VI arise from protected speech. *See X Corp. v. Center for Countering Digital Hate, Inc.,*724 F. Supp. 3d 948, 965 (explaining that courts should look to the thrust of a claim rather than the manner of pleading in assessing whether the claim arises from protected speech).

Count VII, Plaintiff's UCL claim, contains some allegations which relate to protected speech and some which do not. Plaintiff alleges that Defendants have committed unlawful, unfair, and fraudulent business acts, and give the following list: "(1) misusing Neology's confidential and trade secret information; (2) tortiously interfering with Neology's contractual and prospective business relationships while pretending to be a consumer protection agency; (3) disparaging and making false statements about Neology to various state agencies while pretending to be a neutral consumer protection agency; (4) leveraging Neology's track record as their own in various proposals to Neology's customers and potential customers in misleading fashion; (5) misusing the purpose of public records requests to try to obtain even more of Neology's trade secrets and

confidential information; and (6) restructuring QORE4's proposals to try to undercut Neology in the market." FAC ¶ 165 (numeration added for clarity of discussion). Sub-allegations 2, 3, and 5 (as numbered by the Court) reference the CPA emails and records requests, while sub-allegations 1, 4, and 6 do not. Because the claim arises from a mix of protected and non-protected activity, the Court **DENIES** the motion to strike Count VII as a whole. Instead, Defendant's alternative request to strike individual mentions of protected conduct within Count VII is analyzed below.

**4. Individual Allegations**

Defendants move to strike all mention of the public record requests from the complaint, namely FAC paragraphs 97, 98, 99, 100, 101, 150, and 165. Mot. at 14.

While the public record requests were protected conduct as defined by the anti-SLAPP statute, it does not follow that all mention of the requests in the FAC must be stricken. *See* Cal. Civ. Proc. Code §§ 425.16(e)(3)–(e)(4). An anti-SLAPP motion to strike may target specific allegations "[i]f the targeted claim amounts to a cause of action in the sense that it is alleged to justify a remedy." *Newport Harbor Offs. & Marina, LLC v. Morris Cerullo World Evangelism*, 23 Cal. App. 5th 28, 43 (2018) (internal quotation omitted). In analyzing motions to strike specific allegations, the key inquiry is whether some relief arises from the allegations or whether they "are merely incidental or collateral to the cause of action." *See Gamble v. Kaiser Found. Health Plan, Inc.*, 348 F. Supp. 3d 1003, 1024 (N.D. Cal. 2018) (internal quotations omitted).

The Court first addresses the mentions of the requests in the facts section of the complaint, paragraphs 97-101, and the mention of the requests in Plaintiff's Intentional Interference with Contractual Relations claim, paragraph 150. FAC ¶¶ 97-101, 150. Paragraphs 97, 98, and 99 lay out Mullis' public record requests and how Neology responded. As Neology correctly points out, these allegations contextualize the relationships between the parties, Neology's efforts to protect its trade secrets, and Defendants' interest in Neology's business relations. *See* Opp'n at 15. They do not appear to form the basis of any claim for relief. Similarly, Paragraph 150, although embedded in

Count V, states the records requests formed one basis for Defendants' knowledge of Neology's business. In the context of the claim as a whole, this mention also does not give rise to liability on the basis of speech as contemplated by the anti-SLAPP statute. The Court thus **DENIES** the motion to strike paragraphs 97-99 and 150 because they merely state background factual allegations and do not give rise to any claim. *See Jordan-Benel v. Universal City Studios, Inc.,* 859 F.3d 1184, 1190-91 (explaining that conduct which does not constitute the specific act of wrongdoing complained of by a plaintiff is not subject to an anti-SLAPP motion).

In contrast, paragraphs 100 and 101 allege, respectively, that Defendants used the public records requests to unfairly compete and that Neology was forced to expend significant resources to prevent the disclosure of confidential information. FAC ¶¶ 100, 101. These allegations go beyond mere incidental or collateral allegations, and in context are clearly alleged to justify a remedy because they state elements of Plaintiff's California UCL claim and potential damages. *See Gamble*, 348 F. Supp. 3d at 1024; Bus. & Prof. Code §§ 17200, et seq. Similarly, Paragraph 165, embedded within Plaintiff's UCL claim, alleges that "Defendants have committed business acts and practices that are unlawful […] by, *inter alia*, […] tortiously interfering with Neology's contractual and prospective business relationships while pretending to be a consumer protection agency; disparaging and making false statements about Neology to various state agencies while pretending to be a neutral consumer protection agency; [… and] misusing the purpose of public records requests to try to obtain even more of Neology's trade secrets and confidential information." FAC ¶ 165. While the mentions of other bases for the UCL claim in paragraph 165 are not subject to a motion to strike, as discussed above, the above quoted mention clearly seeks to assign liability to protected conduct. *See Gamble*, 348 F. Supp. 3d at 1024. The motion to strike paragraphs 100 and 101, and the mention of the public records requests in paragraph 165, therefore continues to the second stage, where the Court will evaluate Plaintiff's likelihood of success on the claims arising from protected speech.

//

**5. The Second Step: Probability of Prevailing**

At the second step, Neology bears the burden of showing that the challenged claims and allegations are legally sufficient and factually substantiated. *See Baral v. Schnitt*, 1 Cal. 5th 376, 396 (2016) (explaining that the key inquiry at the second stage is whether "the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment."). At this stage, "the plaintiff cannot simply rely on the allegations in the complaint but must provide the court with sufficient *evidence* to permit the court to determine whether there is a probability that the plaintiff will prevail on the claim." *ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1010 (2001) (internal quotations and citations omitted, emphasis in original).

**a. Count VI: Trade Libel**

Defendants argue that Plaintiff has not shown a probability of prevailing on its trade libel claim because it has not identified an actionable statement and has not alleged special damages. Mot. at 18-22. While the Court finds that Plaintiff has identified one actionable statement, the Court agrees with Defendants that Plaintiff has not adequately shown special damages caused by that statement as required by a trade libel claim.

"Trade libel is the publication of matter disparaging the quality of another's property, which the publisher should recognize is likely to cause pecuniary loss to the owner." *ComputerXpress,* 93 Cal. App. 4th at 1010. "The elements of trade libel are (1) a false publication, (2) which induces others not to deal with the party, and (3) special damages." *Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, 612 F. Supp. 3d 1131, 1138 (S.D. Cal. 2020) (citing *Aetna Cas. & Surety Co. v. Centennial Ins. Co.*, 838 F.2d 346, 351 (9th Cir. 1988)). To make a prima facie showing of trade libel, a plaintiff must prove that the defendant made a false statement of fact, not a statement of mere opinion, considering the context of the communication. *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 701 (2007).

Here, Neology points to four statements that it argues are testable false statements of fact: (1) that Neology's transponders suffer from a "critical technical flaw," (2) that

Neology uses "an outdated RFID integrated circuit (IC) developed in 2008," (3) that Neology "remains the only vendor still supplying this outdated technology," (4) while "[m]any agencies have since transitioned to modern RFID ICs that eliminate this problem." Opp'n at 19 (quoting ECF No. 35-2 at 2-3; Sample Email). Neology argues that these statements were especially injurious because they were presented as if made by a third party agency. Opp'n at 20. Defendant disagrees, arguing that the statements show opinion, prediction, and evocative puffery not based in verifiable fact, and that the context helps them because the public agencies were familiar with the issues in question. Mot. at 19-21.

The Court agrees with Defendants that most of these statements are not verifiable factual assertions. The notion that a technology is flawed or outdated, or that a particular flaw is critical, is generally a matter of opinion. The question of whether the number of agencies that have transitioned to a different technology constitutes "many" is also a matter of opinion, where no evidence before the Court indicates that the number of agencies at issue is one or fewer.

However, one statement from the email stands out as asserting a verifiable fact: the email's assertion that "Neology remains the only vendor still supplying this outdated technology." *See id.* at 20. Neology argues that this statement is verifiably false because several other businesses use the same base technology, as supported by a declaration by a senior Neology employee. *See* ECF No. 35-1 ("Haddix Decl.") ¶ 4; FAC ¶ 105. Defendants do not compellingly refute this assertion, making only semantic arguments regarding the difference between the words use and supply. *See* Mot. at 20-21 (arguing, in part, that the assertion is "packed with interpretive variables"). The Court finds that Plaintiff has shown a probability of prevailing on the false disparaging statement element of a trade libel claim on the basis of this statement and the evidence provided.

Next, Defendants argue that Plaintiff has not adequately alleged damages and causation. Mot. at 32. "A cause of action for trade libel requires pleading and showing special damages." *Piping Rock Partners, Inc. v. David Lerner Associates, Inc.,* 946 F. Supp. 2d 957, 981 (N.D. Cal. 2013). To prove the pecuniary damages element of a trade

libel claim, "[t]he plaintiff must prove in all cases that the publication has played a material and substantial part in inducing others not to deal with him, and that as a result he has suffered special damages." *Erlich v. Etner*, 224 Cal. App. 2d 69, 73 (1964) (internal quotation and citation omitted). "[U]nlike a claim for defamation, trade libel requires as an essential element that the plaintiff suffered direct financial harm because someone else acted in reliance on the defendant's statement." *Muddy Waters, LLC*, 62 Cal. App. 5th at 925.

Plaintiff argues that it has met its burden on a theory of reputational damage. Opp'n at 21. Neology cites two cases to support this theory: *Neurulis* and *Swiss America Trading*. *Id.* (citing *Swiss America Trading Corp. v. Regal Assets, LLC*, No. CV 14-04960 DDP (ASx), 2015 WL 631569, at *3 (C.D. Cal. Feb. 13, 2015) and *Neurelis,* 71 Cal. App. 5th at 777. *Neurelis* is not helpful on the dispositive issue here, because it appears that the parties did not argue, and the Court did not *sua sponte* discuss, whether a theory of reputational harm could suffice to show special damages for trade libel. *See Neurelis*, 71 Cal. App. 5th at 777. While the *Swiss America Trading* case does stand for the proposition that reputational harms can support a trade libel claim, it stands alone in a sea of cases holding otherwise. *See Quidel Corp.*, 612 F. Supp. 3d at 1138 (declining to follow Swiss America Trading because "the breadth of the cases require much more," and collecting cases).

Indeed, "California district courts have consistently dismissed trade libel claims when special damages are not pled specifically." *SB Diversified Prods., Inc. v. Murchison*, No. 12cv2328 JAH (MDD), 2014 WL 3894353, at *9 (S.D. Cal. July 28, 2014). The losses Plaintiff describes are analogous to the losses described in *Homeland Housewares, LLC v. Euro-Pro Operating LLC* as "general statements of economic loss," because they are not tied to one specific contract. No. CV 14-03954 DDP (MANx), 2014 WL 6892141, at *4 (C.D. Cal. Nov. 5, 2014). There, in an oft-quoted passage, the court explained that to state a claim for trade libel on a theory of general loss the plaintiff "should have alleged facts showing an established business, the amount of sales for a substantial period preceding the

publication, the amount of sales subsequent to the publication, and facts showing that such loss in sales were the natural and probable result of such publication." *Id.* (cleaned up, internal quotation omitted). Plaintiff simply does not allege such facts here.

Plaintiff also faces a causation issue arising from the paucity of actionable statements in the emails. Under the Court's above analysis, Plaintiff would have to show that the statement "Neology remains the only vendor still supplying this outdated technology" played a material and substantial part in the events that led to its losses. *See Erlich*, 224 Cal. App. 2d at 73. Neology's argument that it "cannot yet know the impact of Defendants' false and misleading statements on its future business," but that it was nonetheless necessary for it to expend some $90,000 to avoid potential losses, falls short. FAC ¶ 110. The Haddix declaration further confuses causation by stating that CPA's media contacts, not any statement in the emails, led customers to reach out to Neology to correct the record at great expense. Haddix Decl. ¶ 8. Because Plaintiff has not shown evidence that actionable statements in the CPA emails induced actions leading to its losses, Plaintiff has not shown a probability of prevailing on a trade libel claim based on that statement. *See ComputerXpress,* 93 Cal. App. 4th at 1010 (explaining that "the plaintiff cannot simply rely on the allegations in the complaint but must provide the court with sufficient *evidence*" to decide in their favor at the second step of an anti-SLAPP motion).

In conclusion, on review of the record available at this stage of litigation, the Court finds that Neology has not met its burden to show a probability of prevailing on its trade libel claim. The motion to strike Neology's trade libel claim is thus **GRANTED.**

**b. Count V: Intentional Interference with Contract as to customers**

Defendants argue that Plaintiff's intentional interference with contract claim regarding Neology's customers fails if the trade libel claim fails. Mot. at 22-23. Plaintiff appears to concede this point. Opp'n at 21-22. The Court thus **GRANTS** Defendants' motion to strike Plaintiff's Intentional Interference with Contract claim.

//

//

**c. Paragraphs 100, 101, and 165 sub-allegations 2, 3, and 5**

Regarding the allegations related to the record request in paragraph 165, within Plaintiff's § 17200 federal unfair competition claim, Defendants argue that the record requests should be stricken because they are core protected petitioning activity which cannot give rise to liability. Mot. at 16. Indeed, the right of any party, including a competitor, to request public records is codified by law. *See* Mot. at 15 (listing public record laws relevant to agencies in question); *Iloh v. Regents of Univ. of California*, 94 Cal. App. 5th 947, 959 (2023) (finding public records requests to be protected activity and remanding a lower court's denial of an anti-SLAPP motion). Plaintiff has not shown evidence that it could succeed on a claim that seeks relief based upon the public record requests, simply arguing that the allegations serve as background and context. *See* Opp'n at 15-16. Plaintiff has therefore not met its burden to show a probability of prevailing on a § 17200 claim arising from the record request allegations in paragraph 165. The Court thus **GRANTS** Defendants' motion to strike paragraph 165 in part, as follows:

> 165. Defendants have committed business acts and practices that are unlawful, unfair, and fraudulent in violation of California Unfair Competition Law ("UCL," Bus. & Prof. Code §§ 17200 et seq.) by engaging in a comprehensive anti-competitive scheme to harm Neology by, *inter alia*, misusing Neology's confidential and trade secret information; tortiously interfering with Neology's contractual and prospective business relationships ~~while pretending to be a consumer protection agency~~; ~~disparaging and making false statements about Neology to various state agencies while pretending to be a neutral consumer protection agency~~; leveraging Neology's track record as their own in various proposals to Neology's customers and potential customers in misleading fashion; ~~misusing the purpose of public records requests to try to obtain even more of Neology's trade secrets and confidential information~~; and restructuring QORE4's proposals to try to undercut Neology in the market.

*See* FAC ¶ 165; *Baral*, 1 Cal. 5th at 396; *see also Newport Harbor*, 23 Cal. App. 5th at 43 (explaining that individual allegations within a claim are subject to a motion to strike when they are alleged to justify a remedy).

Having struck the above portions of Count VII, the Court evaluates paragraphs 100 and 101 to determine whether they (1) support the stricken claim and (2) do not support any other claim upon which Plaintiff has shown a probability of prevailing. *See Baral*, 1 Cal. 5th at 396 ("Allegations of protected activity supporting the stricken claim are eliminated from the complaint, unless they also support a distinct claim on which the plaintiff has shown a probability of prevailing."). Paragraph 101 alleges that "Neology has been forced to expend significant resources to prevent Mullis and QORE4 from obtaining the confidential and trade secret information contained in Neology's proposals." FAC ¶ 101. In context, following a page of discussion of the record requests, this allegation refers to the record requests and is pled to support the above stricken portion of Paragraph 165. It does not support any other surviving claim, because the surviving claims do not require damages arising from the record requests but merely incorporate the records requests as context, as explained above. The Court thus **GRANTS** the motion to strike paragraph 101.

Paragraph 100 contains allegations supporting paragraph 165 and no other claims for the same reasons discussed above, but also discusses Neology's attempts to unfairly compete in other ways. FAC ¶ 100. The discussion of other forms of competition in the paragraph could support several of Plaintiff's other claims, such as unfair competition and breach of contract. The Court thus **GRANTS** Defendants' motion to strike paragraph 100 in part, as follows:

> 100. On information and belief, QORE4 is attempting to use ~~the public records request process to obtain information on Neology's bids and then use that information alongside~~ the trade secrets and confidential information Mullis stole from Neology to unfairly compete with Neology in the bidding process and in an attempt to undercut Neology in the market.

Based on the context of the FAC, the remaining claims, and the briefing of the parties, the Court finds that eliminating those portions will prevent the harm anticipated by the anti-SLAPP statute, and render the remaining mentions of the record requests background

information as intended by the Plaintiff per their briefing. *See Baral*, 1 Cal. 5th at 396; Opp'n at 14-17.

**d. Count VII: Unfair Competition under Section 17200**

Defendant argues that Plaintiff cannot show a probability of prevailing on Count VII, and later argues that Count VII is subject to CUTSA preemption. Mot. at 22-23, 32-33. Following the above analysis of paragraph 165, which is part of Count VII, the Court finds it appropriate to discuss CUTSA preemption as a determinative factor in Plaintiff's likelihood of success on this claim.

"Under California law, CUTSA provides the exclusive civil remedy for conduct falling within its terms and supersedes other civil remedies based upon misappropriation of a trade secret. It therefore supersedes claims—including Section 17200 claims—based on the same nucleus of facts as trade secret misappropriation." *Waymo LLC v. Uber Tech., Inc.*, 256 F. Supp. 3d 1059, 1062 (N.D. Cal. 2017) (citations omitted).

Because the Court has stricken the allegations related to protected speech from paragraph 165, Count VII now relies solely on allegations related to the emails Mullis sent himself and what he and QORE4 did with the information contained therein. FAC ¶¶ 164-68. Plaintiff's California trade secrets claim also relies on the emails and misappropriation of the information contained therein. *See id.* ¶¶ 126-136. The claims thus arise from the same nucleus of facts, subjecting Count VII, as a Section 17200 claim, to preemption under CUTSA. *See Waymo LLC*, 256 F. Supp. 3d at 1062. Because it is preempted, Plaintiff cannot show a probability of prevailing on this claim. The Court therefore **GRANTS** the motion to strike Count VII.

**B. Dismissal under 12(b)(6)**

Defendants also argue that all counts of the complaint are subject to dismissal under Rule 12(b)(6). Mot. at 24-33. Plaintiff disagrees. Opp'n at 23-32. The Court examines each remaining claim in turn below, and finds that the remaining claims are adequately pled.

//

//

**1. Count I: Breach of Contract**

Defendants argue that Plaintiff's breach of contract claim fails because Plaintiff has not plausibly alleged damages caused by a breach, and because the claim is time-barred under California law. Mot. at 25-26. Plaintiff argues that it has sufficiently pled damages at this stage, and that the statute of limitations was tolled by the late discovery rule. Opp'n at 23-25. The Court agrees with Plaintiff.[1]

Under California law, "the elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). The damages requirement can be met at the pleading stage with allegations that a defendant's breach caused non-speculative lost sales or profits. *AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1148 (N.D. Cal. 2019). The statute of limitations for breach of contract is four years, but may be tolled by the delayed discovery rule under California law. Cal. Civ. Proc. Code, § 337; *Gryczman v. 4550 Pico Partners, Ltd.*, 107 Cal. App. 4th 1, 4 (2003).

Here, Plaintiff alleges that Mullis breached the confidentiality provisions of their contract with him, in part by emailing confidential information to his personal email while still employed and using it at QORE4 to unfairly compete with and harm Neology's business, causing general and special damages to be determined at trial. FAC ¶¶ 5, 94, 118. While these allegations lack dollar amounts or names of specific lost opportunities, such specificity is not required for general damages in breach of contract claims at the pleading stage. *See Sycks v. Transamerica Life Ins. Co.,* 643 F. Supp. 3d 959, 973 (D. Alaska 2022) ("Plaintiffs do not plead in detail the damages they claim to have suffered from Defendant's breach, but they need not do so.") The Court finds that Plaintiff has stated a claim for breach of contract under federal pleading standards, and joins its sister courts in deferring

---

[1] Defendants also argue that Count I is preempted by CUTSA. Mot. at 32-33. However, the statute itself states that it does not preempt contract remedies. Cal. Civ. Code § 3426.7(b)(1).

the question of determining whether special damages are appropriate to the summary judgment or trial stage of litigation. *See StreamCast Networks, Inc. v. IBIS LLC*, No. CV 05-04239 MMM (Ex), 2006 WL 5720345, at *5 (C.D. Cal. May 2, 2006) (denying the motion to dismiss the plaintiff's breach of contract claim but noting that special damages may be denied at a later stage of litigation if not proven more specifically); *City & Cnty. of San Francisco v. Tutor-Saliba Corp.,* No. C 02-5286 CW, 2005 WL 645389, at *18 (N.D. Cal. Mar. 17, 2005) (denying a motion to dismiss special damages because "[a]t this stage in the proceeding, the Court cannot determine whether the damages sought in each claim would inevitably follow" but holding that special damages may be later denied).

Regarding the statute of limitations, the delayed discovery rule applies here. To benefit from the late discovery rule under California law, "[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Fox v. Ethicon Endo–Surgery, Inc.,* 35 Cal. 4th 797, 808 (2005). Plaintiff pleads the time and manner of discovery by alleging that it discovered the misconduct after Mullis was fired in September 2022. FAC ¶ 40. It also pleads that the use of personal email was unauthorized, and that Mullis was a high-ranking executive, which show justification for not making the discovery earlier. *Id.* ¶¶ 3, 72. The late discovery rule therefore applies. *See Fox*, 25 Cal. 4th at 808. Because Mullis was fired in September of 2022, and this action was filed in July of 2025, the breach of contract claim is not subject to dismissal based on the statute of limitations.

In conclusion, Defendants' motion to dismiss Plaintiff's breach of contract claim is **DENIED**.

### IV. Count II: Intentional interference as to Mullis' contract

Under California law, a claim of intentional interference with contractual relations claim requires "(1) a valid contract between plaintiff and another party, (2) defendant's knowledge of the contract, (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship, (4) actual breach or disruption of the contractual

relationship, and (5) resulting damage." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514 n. 5 (1994).

Count II is pled against QORE4 and alleges that QORE4 induced Mullis to breach his confidentiality agreement with Neology, which harmed Neology's business. FAC ¶¶ 119-125. Defendants argue that this claim cannot stand because Mullis cannot interfere with contracts to which he is a party. Mot. at 26-27. However, Plaintiff is correct that QORE4 is a separate entity from Mullis and the target of this claim. Opp'n at 25. While Defendants argue that QORE4 is interchangeable with Mullis in the complaint, the complaint also alleges at least two other QORE4 employees acting on the part of the company. FAC ¶¶ 91-92. The complaint also alleges QORE4's ongoing conduct of trade secret theft, relying on information Mullis sent to himself. *Id.* ¶¶ 3, 72. That theft would interfere with Mullis' ongoing obligations under his confidentiality agreement while he was not the sole individual behind QORE4. *See* FAC ¶ 32. Thus, the Court finds that Plaintiff has plausibly alleged its intentional interference claim. The motion to dismiss Count II is **DENIED**.

## V. Counts III and IV: Trade Secret Theft

Defendants argue that Plaintiff's trade secret theft claims fail for not adequately pleading the trade secrets at issue, their confidentiality, or the misappropriation. Mot. at 27. To determine whether a plaintiff has pled trade secrets, "the basic test is (1) whether something beyond general knowledge [in the profession] is being claimed and (2) whether there is enough specificity to put the defendant on notice of what the theft is about." *Arthur J. Gallagher & Co. v. Tarantino*, 498 F. Supp. 3d 1155, 1171 (N.D. Cal. 2020).

The complaint lists multiple emails Mullis sent to himself, and the contents of those emails, including strategy and sales pipelines, financial goals, business plans, and profitability. FAC ¶¶ 42-45. It sets out the measures Neology took to protect that information, including confidentiality agreements with employees and technological protections. *Id.* ¶¶ 36-39. It even alleges that some of the attachments Mullis forwarded to himself were labeled "Company Proprietary" and "Confidential." *Id.* ¶ 45. These

allegations are sufficiently particular to show confidential and not generally known information, and to give notice to Defendants of the conduct alleged. *See Arthur J. Gallagher*, 498 F. Supp. 3d at 1171.

Defendants cite *Imax Corp. v. Cinema Technologies, Inc.* to argue that a high level of specificity is needed to show trade secrets. *See* 152 F.3d 1161, 1164 (9th Cir. 1998). That case is not helpful in the present matter, because it was determined at the summary judgment stage and analyzed whether the plaintiff has shown sufficient evidence of its trade secret. *Id.* at 1166-67 (explaining that "the issue turns on whether Imax identified the precise numerical dimensions and tolerances of its projector as trade secrets with sufficient particularity."). Here, the Court is called to evaluate a motion to dismiss, which tests only the allegations in the complaint and not the proof of each element put forth by the parties. *See Twombly*, 550 U.S. at 556. Defendant's argument that some of the information discussed, such as Neology's business partnerships, is publicly available is also irrelevant at the motion to dismiss stage, where the Court must take allegations in the complaint as true in determining whether a cause of action is sufficiently pled. *See* Mot. at 29. The Court thus **DENIES** the motion to dismiss Counts III and IV of the complaint.

## VI. CONCLUSION

For the reasons explained above, the Court **GRANTS** Defendants' motion to strike Counts V, VI, and VII of the complaint, as well as paragraph 100 and parts of paragraph 101, under California's anti-SLAPP law. The Court **DENIES** the anti-SLAPP motion to strike as to all other claims, and **DENIES** the motion to dismiss.

**IT IS SO ORDERED**.

Dated: August 19, 2026

Honorable James E. Simmons Jr.
United States District Judge